UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
OLD POINT INTERNATIONAL CORPORATION,

                        *Plaintiff*,

      -- against --

BRUCE HILL and CHARLES HALE,

                       *Defendants*.
------------------------------------------------------------------X

Index No: 07-CV-08178 (GEL)

**DECLARATION OF
AVI VIGDER**

    **AVI VIGDER** hereby declares under penalty of perjury:

    1.    I am, among other things, a Director and Chairman of the Board of Sage Capital Growth, Inc., which serves as a sub-advisor to Enright Holding Corp., the financial advisor to the Plaintiff in this action.

    2.    I submit this Declaration in support of Plaintiff Old Point International Corporation's ("Old Point") opposition to Defendants' motion to dismiss the Complaint. The purposes of this Declaration are:

    a.    To explain the relationship of the parties, as well as other individuals and companies relevant to this action; and

    b.    To provide part of the factual basis for Plaintiff's claim that the Stock Purchase Agreements ("SPAs") between Plaintiff and Defendants do not bar Plaintiff's claims in this case.

**A.    OLD POINT'S BUSINESS STRUCTURE**

    3.    Old Point is a BVI company that is owned by a Trust of which certain members of the Steinmetz family are beneficiaries. Among other businesses and investments, the Steinmetz

family owns one of the world's largest diamond businesses. *See* http://www.steinmetz-group.com/.

4. Many of the Trust investment vehicles, one of which is Old Point, are managed by Enright Holding Corp. ("Enright"), a BVI company. I am the President and CEO of Enright, and Shlomo Meichor is its secretary and director.

5. Enright manages Trust investments throughout the world and, in this process, makes use of a number of sub-advisors with local or industry expertise. The sub-advisors are either fully owned subsidiaries of Enright, or companies which have an exclusive relationship with Enright pursuant to which they manage Trust investments. These sub-advisors assist in identifying investment opportunities, and then in managing, monitoring, reporting and disposing of such investments on behalf of Enright.

6. The investments in the United States are managed by Sage Capital Growth, Inc. ("Sage Capital"), a New York Corporation run by, among others, Eldad Gal and Danny Golan. Sage Capital makes and manages investments directly, and also indirectly, via its own sub-advisors. At an earlier point in time, the United States investments were managed through a predecessor company, Cavallo Capital ("Cavallo").

7. Within this structure, I am the key decision maker with respect to Enright's investment advice to the Trust. Enright is generally compensated for supervising all of these investments through (i) an equity participation in its sub-advisors, (ii) an equity participation in investments made by those sub-advisors, or (iii) the payment of fees back to Enright.

B.     <u>**THE HISTORY AND NATURE OF THE PARTIES' RELATIONSHIP**</u>

    (1)     <u>**The General Structure of Defendants' Relationship with Plaintiff**</u>

    8.     In or about December of 2001, Defendants approached Old Point through Cavallo in an effort to secure an arrangement pursuant to which Defendants would seek out investment opportunities for Old Point and then, if Old Point availed itself of an opportunity, manage Old Point's investment. Defendants then made a December 2001 presentation to Cavallo, as Old Point's representative, at Cavallo's Madison Avenue offices in New York County. Over the next two months, there were additional presentations, conversations, and negotiations between Defendants and Old Point's representatives.

    9.     In or about February of 2002, Old Point and Defendants reached an agreement pursuant to which, as proposed by Defendants, Defendants would recommend investment opportunities for Old Point and then manage those investments which Old Point made as a result of Defendants' recommendations. As part of this deal, Sage Capital Global, Ltd. ("Sage Global") provided office space free of charge to Divestiture Capital Growth ("DivestCap") at Sage Global's offices in New York City.

    10.     Initially, the parties' arrangement was put into effect through the creation of DivestCap as a sub-advisor to Cavallo (and, later, to Sage Capital). The parties agreed orally that (i) I would own 35% of DivestCap, (ii) Defendants would jointly own 65% of DivestCap, and (iii) DivestCap would receive compensation on all companies it managed equal to 20% of the net profits of Old Point in such investments. Thus, Defendants' 65% ownership interest in DivestCap gave them a net compensation of 13% (65% of 20%) of Old Point's profits on all DivestCap deals.

11. My description of this oral agreement with Defendants is confirmed by significant documentary proof:

12. Annexed hereto as Exhibit A is a March 18, 2004 e-mail that I received from Mr. Hale. It states, *inter alia*:

   a. Avi [Enright] gets 35% of the Management Co [DivestCap] carried interest....

   b. Carried interest is increased to 25%....

   c. CCH [Hale] and BGH [Hill] effective portion is 65% of 25% for subsequent returns....

13. Hence, as of March 2004, Mr. Hale confirmed the original deal discussed above by agreeing that (i) Enright owned 35% of DivestCap, (ii) Defendants owned the other 65% of the company, and (iii) the compensation was increased from the original 20% to 25%.

14. In addition, DivestCap's own website confirms that it is not an independent company, but rather is a sub-advisor to Sage Capital:

> **DivestCap is the private equity arm of Sage Capital Growth, a diversified global investment fund**. Over the past decade, Sage and related funds have invested in over 300 transactions with an aggregate value in excess of US $8.0 billion spanning, among other areas, real estate, venture capital, public equities, and convertible debt. As a testament to Sage's relationship orientation, approximately one-third of the transactions to date have consisted of multiple investments in the same companies. DivestCap and Sage have offices in cities including New York, Boston, Washington DC, San Francisco, Paris, and Herzilia (Israel).

(Exhibit B hereto) (Emphasis supplied).

15. Thus, there can be no credible dispute about the fact that Defendants, as principals of DivestCap, were indirect investment advisors to Old Point, and, as such, were plainly Old Point's fiduciaries. Indeed, in April of 2002, prior to the purchase of the assets of Fortel, Inc., Defendants,

through DivestCap, had completed a transaction for and then managed another investment – Summit Design, Inc. – for Old Point. As reflected on the DivestCap website, this company was sold in 2006. Significantly, the proceeds from that sale were divided according to the formula discussed above.

### (2)    The Transaction at Issue in This Case

#### (a)    The True Nature of the Parties' Relationship

16.    In 2003, Defendants identified an investment opportunity for Old Point: a Bankruptcy Court purchase, pursuant to 11 U.S.C. § 363, of the assets of a company, Fortel, Inc. ("Fortel"). Fortel designed and sold software systems throughout the world. Old Point contributed 100% of the $300,000 purchase price, with no financial contribution from Defendants.

17.    Given that Fortel sold its products both domestically and internationally, Defendants informed Old Point that, after consulting with their tax counsel, there was a much more tax-effective and entirely legal structure (recommended by Defendants' counsel) by which Defendants could manage Old Point's investment in the Fortel assets:

- a. Two companies would be created: (i) Glenridge Commercial, Inc. ("GCI"), a BVI corporation beneficially owned by Old Point, and (ii) SightLine Systems Corporation ("SSC"), a Delaware Subchapter S corporation wholly owned by Defendants;

- b. GCI, as Old Point's investment vehicle, would continue to own all of the Fortel assets;

- c. GCI would sell its products and intellectual property to SSC as the exclusive North American distributor of the Fortel products; and

- d. Defendants would manage the sale of GCI's products throughout the rest of the world, with the income from those sales going directly to GCI.

5

18. Consistent with the nature of Old Point's relationship with Defendants, I, on behalf of Old Point, deferred to them as fiduciaries with respect to the best way to structure the investment. Indeed, rather than use Old Point's lawyers at Bryan Cave, Defendants separately retained the law firm of Gray Cary (now DLA Piper) to advise on tax issues.

19. Nonetheless, it was always agreed (and explicitly confirmed in numerous telephone conversations that I had with Messrs. Hill and Hale in May and June of 2003) that, as between Old Point and Defendants, the creation of the two companies – one of them nominally owned by Defendants – did not change the parties' underlying agreement that Old Point was the 100% beneficial owner of the Fortel assets, and that Defendants were only managers who would be compensated as such. In other words, the parties agreed that, notwithstanding the corporate form, GCI and SSC were to be treated as one overall enterprise ("Sightline Enterprise"), beneficially owned by Old Point and managed by Defendants.

20. Consistent with the parties' custom of dealing on the basis of oral agreements, the structure suggested by Defendants was never memorialized in a signed contract. Indeed, there was no need to do so because, regardless of the formal structure of the investment, the parties operated as though GCI and SSC were one entity merely managed by Defendants. This fact is demonstrated by overwhelming documentary evidence:

21. On June 2, 2003, Mr. Hill wrote to Mr. Meichor, asking about the creation of a United Kingdom bank account for SSC, which Mr. Hill described as follows: "This is the latest deal **we** did – this is the one where **we** may want to receive payment outside the US from **our** foreign distributors." (Exhibit A to the Declaration of Shlomo Meichor) (Emphasis supplied). Hence, as of the beginning of June 2003 (*i.e.*, after the operative date of the SPAs), the parties were treating

the purchase of the Fortel assets as "our" investment, and were discussing how "we" can receive income from foreign distributors outside of the United States. Yet, if, as Defendants contend, Old Point is not the beneficial owner of SSC, there would have been no reason for Mr. Hill to be asking Mr. Meichor, who had no formal relationship with Messrs. Hill and Hale, to set up a bank account for a company in which Old Point had no ownership interest. Nor would there have been any reason why Mr. Hill would have been discussing how to handle income from "our foreign distributors" in light of the fact that the Distributorship Agreement between GCI and SSC (Exhibit C hereto) limits SSC's territory just to North America.

22.    On June 5, 2003, Mr. Hale sent an e-mail to Danny Golan of Sage Global (then associated with Cavallo) stating:

Danny,

I will do my best to hold off all payments until we find a better alternative. We might have one soon: I finally have 2 decent banks in contention for opening an account in the UK for the Oldpoint BVI

In the meantime, 2 important things:

1.    **Please see the attached as Gray Cary's proposed first steps to make the US sub a distributor for OIC, which we believe to be the tax optimal approach.** Note that:

    (a)    this structure matches the one Raz had suggested
**(US Sub becomes separate distributor for the BVI)**

    (b)    since DivestCap (BGH & CCH) will actually own the US distributor, **we'll need to do an agreement with Cavallo that has an adjustment provision to ensure that the total economic split is 20% - 80% DivestCap - Cavallo**

2.    **not reflected in this proposal, we believe it could be important to have a separate BVI buy the assets from Oldpoint for accounting simplicity, for exit simplicity, and for maximal protection of Oldpoint.**

7

**I'd like your blessing on #1**, and your thoughts on #2. Thanks much.

(Exhibit A to the Declaration of Danny Golan) (Emphasis supplied).

23.     This communication overwhelmingly supports Plaintiff's allegations in this action in that (i) it makes clear that Defendants conceived of and recommended the structure of the Sightline Enterprise based upon advice from Gray Cary, the attorneys they retained, and (ii) it is completely inconsistent with the two companies being separate, independent companies.

24.     On June 4, 2003, Mr. Hale sent an e-mail to Mr. Hill, with a copy to Mr. Golan (Exhibit B to Golan Declaration) which stated that "we" can use a general Old Point account until "we (i) get and account of our own **for Oldpoint** or (ii) do the tax structure reorg...." (Emphasis supplied). Hence, it is clear that Defendants were seeking to work out the manner in which the Fortel assets would be structured "for Oldpoint."

25.     On June 11, 2003, Mr. Hale sent an e-mail to Messrs. Meichor and Golan (Exhibit B to Meichor Declaration), stating:

> I have been foolish with my whole approach to a UK bank account. As you know, I have been trying to set one up under Oldpoint or our new BV for all of our international revenue. Last night, however, I realized that, with our new structure, I actually can't set up such an account because it would surely foul the separation of the entities. Ugh.

There is no way to reconcile Defendant Hale's reference to "our new BV [GCI]" or "our international revenue" unless Old Point and Defendants were treating the exploitation of the Fortel assets as one joint enterprise.

26.     On June 26, 2003, Mr. Hale sent an e-mail to Mr. Meichor (Exhibit C to Meichor Declaration) discussing a GCI distributorship agreement for GCI's Australian distributor which Mr. Hale had signed. This e-mail confirms and is consistent with Mr. Hale's status as a fiduciary of Old

8

Point. On what other basis would he have been signing contracts on behalf of GCI without advance approval from anyone associated with GCI?

27. On October 28, 2003, Mr. Hill sent an e-mail to Mr. Golan (Exhibit C to Golan Declaration) again discussing whether SSC should become a Subchapter S corporation because of the tax implications for a future sale of the company. If SSC were truly a separate company independently owned by Defendants, why would Mr. Hill have been consulting with Mr. Golan on the issue of whether he and Mr. Hill should make a Subchapter S election?

28. On March 18, 2004, Mr. Hale sent me the e-mail discussed above. (Exhibit A hereto). In addition to detailing the overall relationship with Defendants (*i.e.*, that DivestCap was owned 35% by Enright and 65% by Defendants, and that it would receive a 25% carry on deals going forward), it also states: "**Sightline has another 5% carried interest increase to 30%....**" (Emphasis supplied). This statement is of crucial importance because the underlying math unequivocally establishes that the parties' agreement with respect to the Sightline Enterprise – a "carry of 19.5%" – was exactly as alleged in the Complaint. In other words: on the Sightline Enterprise investment, Defendants were to receive 65% of a 30% carry. **Assuming a $100 sale, then, Defendants would receive 65% of $30, which equals $19.50.**

### (b) The Execution of the SPAs and the Failure to Deliver the Notes

29. I have reviewed the accompanying Declaration of Shlomo Meichor concerning the execution of the SPAs and Defendants' failure to deliver the promissory notes referenced as the consideration for the transfer of SSC's shares. For the sake of brevity, I adopt and incorporate by reference herein Mr. Meichor's Declaration with respect to those issues.

### (c)   Events Following Execution of the SPAs

30.   The parties' conduct following execution of the SPAs further confirms that they all understood that Old Point was the beneficial owner of the entire Sightline Enterprise.

31.   On December 30, 2004, Mr. Hale sent an e-mail to Mr. Meichor (Exhibit G to Meichor Declaration) explaining that, after certain wires from SSC to GCI, GCI will have received $3.39 million out of $4 million in combined net profits for 2004. Mr. Hale goes on to explain that this amount, which actually represents 84.75% of the total, "is over the 80% but we owe Avi some money." If the parties truly intended the SPAs to govern their relationship, there would have been no reason for SSC to remit the vast majority of its profits to GCI.

32.   This point is even more clearly demonstrated by an e-mail, entitled "Reconciliation Question", that Mr. Hale sent to me on February 17, 2006. (Exhibit D hereto). In this e-mail, Mr. Hale estimated that the combined net profit of GCI and SSC for 2005 would be $4,000,000, with $1.95 million of that figure accounted for by GCI's net profits for the year. Hence, according to this e-mail, Mr. Hale was estimating SSC's 2005 net profit at $2.05 million. If in fact the parties had been operating under the terms of the SPAs, all of this net profit would have belonged to SSC because (i) the SPAs do not grant Old Point any continuing interest in SSC's income, and (ii) SSC's Distributorship Agreement with GCI (Exhibit C hereto) granted SSC the right to **purchase** GCI's products at a 40% discount. Hence, any net profit figure for SSC would have come after deducting the costs of purchasing the product from GCI.

33.   Yet, Mr. Hale's e-mail reflects that the parties were not operating under such an agreement. Thus, the e-mail stated that SSC would be forwarding $1.3 million of its $2.05 million in net profits to GCI. This transfer only makes sense if the parties' agreement was as Plaintiff alleges: that GCI was to receive 80.5% of the combined net profit of GCI and SSC. Significantly,

Mr. Hale's calculation results in a total amount of $3.25 million to be paid to GCI, or **81.2% of the combined net profit.**

36. Finally, on February 20, 2006, Mr. Hale sent an e-mail to me (Exhibit E hereto) which provides further unequivocal proof that the parties had agreed that the SPAs did not govern their relationship. In this e-mail, Mr. Hale states: "I was also glad to hear that our collective 30% SSC carry won't be cut down if Sage leads in engineering an unusually high sale price." Thus, this e-mail confirms that the terms set forth in Mr. Hale's March 18, 2004 e-mail to me (Exhibit A hereto) were still operative in 2006: Defendants were to receive 65% of their "collective" 30% carry (*i.e.*, 19.5% of the total net proceeds to Defendants) with respect a sale of SSC.

**WHEREFORE**, your Declarant prays for an Order denying Defendants' motion to dismiss the Complaint.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 9 day of October, 2007, in Tel Aviv, Israel.

_____
AVI VIGDER

11