EXHIBIT A

**divestcap**

| | |
|---|---|
| **From:** | charles@divestcap.com |
| **Sent:** | Thursday, March 18, 2004 4:25 PM |
| **To:** | Vigder, Avi |
| **Cc:** | 'Bruce Hill' |
| **Subject:** | Tuesday Follow Up |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| | |
| **Categories:** | Red Category |

Avi,

We are emailing to continue our conversation from Tuesday, and to formalize our new understanding.

Overall, what we discussed is okay. We like you and feel at home with you. We feel that our relationship with you works really well overall, and provides significant value to you and to us.

Still, as much as we like you, on a negative note, we have to take you to task for this misunderstanding. We persistently worked at clarifying economics. Our main principle was always that Bruce and Charlie needed to be able to come away with 20% of the profits of an exceptional deal. As far as we knew, you agreed. The docs (including the Summit term sheet, attached) clearly back us up.

You may say that we should have thought about what was in it for you versus all the value you added. We did not (and do not) know your deal with Raz. You can't expect us to -- Tuesday was the first time we heard about those arrangements. From our perspective, we were (and are) making someone a ton of money with almost no principal risk, and we thought it was you. Twenty percent of the profits, net, never seemed unreasonable for these ultra-special situation investments (and they're not, especially with 50% super-return carried interest hurdles in funds today). We are not disputing that you have brought a lot value to this -- on the other hand, your side of this transaction is taking 80% of the profits. From our point of view, getting 20% of the profits for our work, particularly with so little capital at risk was fair, reasonable, and documented. Remember: unlike a PIPE deal, this was two years of our time. We took nothing out in that time. We managed this investment day-to-day everyday for the first year, and have been heavily involved since then. Personally, even with Summit, I won't do as well as I would have at Deutsche Bank despite making a tremendous amount of money for someone, and that's tough to swallow. It also suggests our model may be flawed.

So, on to what you proposed.

You proposed:

a. Avi gets 35% of the Management Co carried interest (LMC)
b. Carried interest is increased 5% to 25% once the IRR exceeds 25% in the investment
c. LMC portion is calculated on the total return from the transaction of $11.65 million
d. CCH and BGH effective portion is 65% of 25% for subsequent returns (16.25%)
e. Sightline has another 5% carried interest increase to 30% once the IRR exceeds 100%.

Fine. To execute on this structure, we believe you need to:

1. Wire more money into SDI Holdings LP to make the management company's carried interest align with the above formula.
   a. Assuming gross profits were $[11.65]mm and net profits $[11.4]mm, the carry calc at the above formula comes to $[2,808,958].
   b. SDI Holdings LP currently has $1,782,209.87. Therefore, you need to wire in an additional $1,026,748.13. Danny asked us to make the initial distribution out of SDI Holdings as debt, so this transaction should be no problem

2. SDI Holdings distributes the carried interest of $[2,808,958] in relationship to the 65%-35% split of profits.

# EXHIBIT B

# Divest Cap



**Divestiture Growth Capital ("DivestCap") specializes in acquiring, managing, and growing information technology companies. DivestCap's partners have participated in over 150 transactions and have 30 years of investment and operational experience in the computer hardware and software industries.**

**Company Profile**

Value Proposition

Pressroom

Selected Investments

Contact Us

Home

Mission Statement

Target Sectors

Ideal Target Profile

Management Principles

**Sage Capital**

## SAGE CAPITAL
### G R O W T H

DivestCap is the private equity arm of Sage Capital Growth, a diversified global investment fund. Over the past decade, Sage and related funds have invested in over 300 transactions with an aggregate value in excess of US $8.0 billion spanning, among other areas, real estate, venture capital, public equities, and convertible debt. As a testament to Sage's relationship orientation, approximately one-third of the transactions to date have consisted of multiple investments in the same companies. DivestCap and Sage have offices in cities including New York, Boston, Washington DC, San Francisco, Paris, and Herzilia (Israel).





**Sightline Systems, Inc. (formerly Fortel, Inc.)**
**www.sightlinesystems.com**

SightLine Systems' software and services allow IT System Managers to detect, diagnose, and prevent performance problems in the most complex and diverse environments. The SightLine software suite has been sold, supported and enhanced for more than fifteen years. SightLine software products are currently used by hundreds of customers in finance and banking, manufacturing, defense management, retail services and government. SightLine Systems counts among its customers many of the world's largest and most well known organizations and enterprises.

DivestCap acquired SightLine Systems under Section 363 of the US Bankruptcy Code in 2003. The assets that comprise SightLine Systems had been publicly traded prior to DivestCap's acquisition.

Corporate Profile

Value Proposition

Pressroom

Selected Investments

Contact Us

Home

Tadpole Technology, plc.

Cardtools Systems, Corp.

**Sightline Systems, Inc.
(formerly Fortel, Inc)**

Summit Design, Inc.

# Divest Cap



SELECTED INVESTMENTS



**Summit Design, Inc.**
**www.sd.com**



On April 23, 2002, DivestCap acquired Innoveda Incorporated's System Level Design ("SLD") business unit. Prior to its merger with Innoveda, SLD had been a standalone public company traded under the name Summit Design Inc. (Nasdaq: SMMT). DivestCap renamed the business Summit Design Inc. ("Summit") and operated it as a private company with offices in Tokyo, Paris, Boston, Los Gatos (California), and Herzilia (Israel).

DivestCap's acquisition of Summit was a growth-focused turnaround. DivestCap managed the company its first year, working with existing management to build an R&D center and its products into a standalone company. Under DivestCap's leadership, Summit's introduced its ESL (Electronic System Level) design solutions and grew to become a dominant player in ESL. In October of 2006, Mentor Graphics Corporation (Nasdaq: MENT) acquired Summit.

Corporate Profile
Value Proposition
Pressroom
Selected Investments
Contact Us
Home

Tadpole Technology, plc.

Cardtools Systems, Corp.

Sightline Systems, Inc.
(formerly Fortel, Inc)

Summit Design, Inc.

# Divest Cap





**Tadpole Technology, plc.**
**www.tadpoletechnology.com**

In January 2006, the Board of Directors of Tadpole Technology plc (LSE: TAD.L) decided in principle to sell an 80% interest in its Streaming Division, subject to several mutually agreeable conditions, to DivestCap Management Corporation in a three stage transaction for a cash consideration of $12.0 million. Further updates on the progress of the transactions will be provided as appropriate.

Corporate Profile

Value Proposition

Pressroom

Selected Investments

Contact Us

Home

**Tadpole Technology, plc.**

**Cardtools Systems, Corp.**

**Sightline Systems, Inc.
(formerly Fortel, Inc)**

**Summit Design, Inc.**

# EXHIBIT C

### North American Distributor Agreement

This Agreement is made between Glenridge Commercial Inc., a British Virgin Islands corporation ("GCI") and SightLine Systems Corporation ("Distributor") and dated May ___, 2003.

GCI is engaged in the development, production and licensing of computer software products, as more fully described on Exhibit A hereto (the "Products").

Distributor wishes to obtain and GCI wishes to grant to Distributor, subject to and upon the terms and conditions of this Agreement, the exclusive right to market, distribute and provide user support and maintenance services (collectively the "Sale Rights") for GCI's software products in the United States, Mexico and Canada (the "Territory").

Distributor desires to acquire the Products from GCI and has the necessary resources and expertise to provide all required user support and maintenance services within the Territory and to promote, distribute and license the Products within the Territory.

Therefore, in consideration of the foregoing and of the mutual promises, obligations, rights and agreements contained herein, the parties agree as follows:

1.  *Grant of Rights.*

1.1    Appointment of Distributor.

Subject to the terms and conditions of this Agreement, GCI hereby appoints Distributor as its exclusive distributor within the Territory with the right to market, distribute (directly or indirectly through multiple tiers of distribution) and provide user support and maintenance for the Products to Distributor's end users, resellers and other distributors within the Territory. Distributor may not solicit licenses for or distribute the Products outside the Territory and may not appoint any reseller or sub-distributor with rights to solicit licenses or distribute the Products outside the Territory.

1.2    Change of Products.

GCI shall give Distributor at least 90 days notice that GCI is discontinuing support for any Product. Any Product for which GCI discontinues support shall no longer be considered a Product hereunder after the expiration of such 90-day notice period; provided, however, that Distributor may continue to distribute copies of such Product that it has in its inventory following the expiration of such notice period. GCI reserves the right to make modifications to Products or Product specifications in its sole discretion, and by doing so shall not incur any liability or responsibility to modify or change any product previously shipped, nor shall it be obligated to supply future Products in accordance with earlier specifications.

1.3    Competitive Products.

Neither Distributor nor any sub-distributor or reseller within the Territory shall market, distribute or license any product that competes with the Products as listed on Exhibit B, as such exhibit is amended by GCI from time to time. If a sub-distributor or reseller breaches this prohibition, Distributor shall not be deemed in breach of this section, and GCI shall not have the right to terminate this Agreement or to exercise any other right or remedy against Distributor, if Distributor causes such sub-distributor or reseller to cease distributing and/or licensing such competing product within thirty (30) days of notice from Distributor to cease such competing product distribution and/or licensing.

### 1.4    Title to Intellectual Property Rights in Products.

All right, title and interest in and to the intellectual property rights embodied in the Products and any and all improvements, enhancements, updates or upgrades thereto, including without limitation any intellectual property or other proprietary rights, concepts or technology inherent in the software and/or related documentation, are, and at all times shall remain the sole and exclusive property of GCI. No right to use, print, copy or display the Products, in whole or in part, is granted hereby, except to the extent expressly provided herein. Nothing contained in this Agreement shall directly or indirectly be construed to assign or grant to Distributor or any third party any right, title or interests in or to the trademarks, copyrights, patents or trade secrets of GCI or any ownership right in or to the Products.

### 2.    *Prices and Payments.*

### 2.1    Prices.

Prices for Products will be as set forth on the Discount Schedule included on Exhibit A.  The Discount Schedule represents a discount from GCI's end user price, but the amount paid by Distributor to GCI for Products shall in no event be less than the discount on Exhibit A multiplied by the higher of (a) the actual price charged by Distributor to its end users or (b) the applicable discount from GCI's end user list price less the maximum volume discount offered by GCI, regardless of the actual price at which Products are marketed or sold by Distributor.  All charges and costs for freight, packing, shipping, handling, value added taxes and custom fees or duties shall be in addition to the listed prices and shall be the responsibility of Distributor.  Prices paid by Distributor to GCI for maintenance renewals in a month shall be based on the higher of the cost of the previous 12-month period's maintenance renewal rate or the actual amount charged for such renewal unless previously agreed in writing between GCI and Distributor.

### 2.2    Price Changes

GCI may change the list price for any Product upon thirty (30) days prior written notice of such change to Distributor.  The new price shall be effective for all Product orders GCI receives after the date of the price increase.

### 2.3    Payment Terms

2

GCI shall issue an invoice to the Distributor upon GCI's delivery of initial license keys to the Distributor's end user, and shall be payable upon the first to occur of sixty (60) days thereafter or the date that the Distributor receives payment from the end user with respect for such invoice. If the invoice payment is not made on the date due, GCI shall reserve the right to terminate the initial license key.

All payments under this Agreement shall be made in US dollars by wire transfer of immediately available funds as follows:

> HSBC Republic Bank (SUISSE) S.A.
> Account Number: 138 3191
> Account Name: Glenridge Commercial Inc.
> Rue Alfred Vincent 2
> GVA
> Swift Code :BLICCHGG

To the extent that any amount due or paid hereunder shall be required to be converted into US dollars for any purpose, such exchange shall be calculated based on the average of the exchange rates for such currency into US dollars as published in the Wall Street Journal on the first and last business days of the month in which such payment is due or was made, as the case may be.

### 2.4   Taxes and Similar Fees.

In addition to any other amounts due under this Agreement, Distributor agrees to pay, indemnify and hold GCI harmless from any Tax imposed by any governmental authority with respect to either or both of any payment to be made by Distributor to GCI under this Agreement or any item to be delivered by GCI to Distributor or on behalf of Distributor under this Agreement. For purposes of this Agreement, "Tax" means any tax, fee or cost not based on GCI's net income, including any sales, use, excise, import or export, value added, withholding or similar tax, or any duty or fee and any penalties or interest associated with any of the foregoing.

### 3.   *Duties of Distributor*

### 3.1   Performance

Any breach of a duty hereunder shall be considered a material breach of this Agreement.

### 3.2   Sales Effort; Promotion

Distributor shall use commercially reasonable efforts to promote the licensing and distribution of Products within the Territory and agrees that its marketing and advertising efforts will be of high quality, in good taste and will GCI's professional image and reputation. Distributor also agrees to use commercially reasonable efforts to supervise Product resellers and sub-distributors within the Territory, and to ensure their compliance with the terms hereof. Neither Distributor nor any reseller or sub-distributor within the Territory shall (a) engage in any activity which would in

any way diminish or detract from the licensing potential of the Products in the Territory or elsewhere or (b) distribute Products other than by means of a license key authorized and issued by GCI.

### 3.3   Products

Distributor shall not copy, modify, enhance or reproduce the Products, in whole or in part, and shall market Products only in the form in which the Products were originally provided by GCI to Distributor; provided, however, that the Distributor may copy and reproduce the Products in object code form only from any master disk or copy provided by GCI. No Product trademark or copyright notice shall be removed, modified or otherwise altered in any way.

### 3.4   License Agreements

Distributor shall, and shall cause its resellers and sub-distributors, to end into licenses with end users of Products with minimum terms and conditions as specified in Exhibit C.

### 3.5   Authorized Statements

Neither Distributor nor any reseller or sub-distributor within the Territory shall make any statement about the Products inconsistent with GCI's descriptions, advertising or promotional materials regarding the Products.

### 3.6   Ethics

Neither Distributor nor any reseller or sub-distributor within the Territory shall engage in any deceptive, misleading, or unethical practice and will conduct business in a manner which reflects favorably at all times upon the Products and on the name, goodwill and reputation of GCI. Without limiting the generality of the foregoing, Distributor and any reseller or sub-distributor within the Territory shall comply at all times with all laws, rules, regulations, decrees and orders applicable to such party's activities.

### 3.7   Assistance with Enforcement

If GCI or Distributor believes that an end user customer, reseller or sub-distributor is in breach of any agreement for any Product or is damaging or diminishing the rights or reputation of GCI, such party shall give notice of such event to the other party, and they shall cooperate reasonably in investigating and remedying such situation, including by means of legal or equitable action if necessary.

### 3.8   Claims

Distributor shall indemnify and defend GCI from any and all third party claims of loss or liability arising out of or connected with Distributor's, or its resellers' or sub-distributors', activities, including, but not limited to, breaches of warranties made by any of their respective personnel),

4

improper support, installation, maintenance or other acts by such personnel, or their improper performance or failure to perform their duties hereunder.

As a condition to being indemnified under this section, GCI shall: (i) promptly notify Distributor of such action, suit or proceeding; (ii) allow Distributor sole control of the defense and settlement of such suit, action or proceeding; and (iii) provide Distributor with reasonable assistance, at GSI's expense, in connection with Distributor's defense and settlement of such action, suit or proceeding. Distributor agrees that it will not settle any claim in a manner which would involve an admission of guilt or wrong-doing or would impose any obligation or liability on GCI without GCI's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

### 3.9   Limitation of Distributor Liability

GCI agrees that regardless of the form of any claim, GCI'S SOLE REMEDY AND DISTRIBUTOR'S SOLE OBLIGATION SHALL BE GOVERNED BY THIS AGREEMENT, AND IN NO EVENT SHALL DISTRIBUTOR'S LIABILITY TO GCI HEREUNDER FOR BREACH OF ANY OBLIGATION HEREUNDER OR FOR ANY THIRD PARTY LIABILITY THAT GCI INCURS IN CONNECTION WITH THIS AGREEMENT EXCEED $50,000. ANYTHING TO THE CONTRARY HEREIN NOTWITHSTANDING, DISTRIBUTOR SHALL NOT BE LIABLE TO GCI OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, OR SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER SUCH CLAIM ARISES IN TORT OR CONTRACT AND EVEN IF ADVISED OF THE POSSIBILITY OF THE SAME.

### 3.10   Expenses

Distributor shall assume all costs and expenses of every kind and description relating to its duties under this Agreement. Distributor shall be solely responsible for payment of all salaries or wages to employees and all taxes or other assessments due or payable on behalf of employees or as a result of employment, as may be required by the laws of the country where such employee is located. Distributor shall be liable for all costs and expenses associated with compliance with local or national government requirements in the Territory. No payment due to GCI hereunder shall be in any way diminished or reduced on account of any expense or cost incurred by Distributor or any of its resellers or sub-distributors.

### 3.11   Reports

Distributor agrees to keep GCI informed of any significant information regarding the distribution, marketing or licensing of the Products in the Territory. Distributor shall provide, within 10 business days of the beginning of each calendar quarter, separated into two categories of new customers and existing customers, (a) a written report of its forecast of sales of Products and related licenses and maintenance services for Products within the Territory during such quarter, (b) a list of marketing and promotional activities to be conducted by Distributor during such quarter, (c) a list of sales of Products and related licenses granted and maintenance or support agreements entered into during the preceding quarter, including at least the purchaser's

name and address, contact person (including telephone number and e-mail address), licenses or services purchased,  and (d) list of feature requests, enhancements or bug fixes requested by customers within the Territory during the preceding quarter.

### 3.12   Ability to Contract

Distributor represents and warrants that it can lawfully enter into this Agreement and perform its obligations hereunder, that it has complied with and will continue to comply with during the term hereof with all laws and governmental regulations necessary to carry out its obligations in accordance with the terms hereof.  Distributor warrants that it will take all steps as may be necessary to satisfy all legal or other requirements of any jurisdiction within the Territory with respect to declaring, filing, recording or otherwise rendering this Agreement, and all requirements to perform under it, including without limitation the ability to make payments in US dollars without deduction or withholding, valid and enforceable.

### 3.13  Compliance with Export Laws; Restricted Rights

Distributor agrees that with respect to the execution of this Agreement and the licensing of Products it shall at all times comply with all export laws and regulations of the United States and the countries within the Territory, as such laws and regulations may exist from time to time. Without limiting the application of the preceding sentence, Distributor agrees not to re-export, and to cause any reseller or sub-distributor not to re-export, directly or indirectly, any Product acquired under this Agreement to any country for which the US Government requires an export license or other governmental approval without first obtaining such license or approval.  GCI will provide Distributor with such information as GCI has or controls that Distributor needs to comply with such laws, regulations and government requirements and approvals.

For any Product and related documentation delivered to an agency or instrumentality of the United States Government, Distributor shall identify the Product and related documentation as "commercial computer software" and "commercial computer software documentation" and, as specified in FAR 12.212 or DFARS 227.7202, and their successors, as applicable, shall restrict the United States Government's rights to use, reproduce or disclose such Product and accompanying documentation in accordance with the terms of the accompanying end user license agreement.

### 3.14  Customer Support

As part of distributing the Products, Distributor agrees to the following:

(a)    **Personnel**

Distributor agrees at all times to employ at least two persons who are trained in customer support procedures for the Products.

(b)    **Maintenance and Support Services**

Distributor will provide prompt and courteous customer support and maintenance services for the Products to customers within the Territory in accordance with GCI's customer support and maintenance procedures as they exist from time to time. This shall include installation support, screening customer problems and disseminating enhancements and updates as they are distributed by GCI.

### 3.15  Duties of GCI

GCI will use reasonable endeavors to keep Products up-to-date on all new levels of supported operating systems and keep Products competitive in the marketplace. GCI recognizes that Distributor's revenue forecasts were made for informational purposes only and with the assumption that Products will continue to be updated and be competitive in the market from time to time during the term of this Agreement. Distributor agrees to give GCI prompt written notice of any failure of Products to remain competitive in the market or any new level of operating system support that is not then provided. Distributor acknowledges that the current version of Products is currently competitive in the market.

## 4.  *Orders and Delivery*

### 4.1  Acceptance of Orders

Subject to Product availability, GCI shall undertake reasonable efforts to fill all orders from Distributor for Products ("Orders") within thirty (30) days of receipt the Order, unless the Order indicates a later shipment date, in which case GCI shall make reasonable efforts to ship on the date requested.

### 4.2  Orders

All Orders and documentation shall clearly indicate the country of ultimate destination, and shall contain detailed shipping instructions including source of shipment, delivery contact, manner of shipment and such other information as GCI may reasonably require. All Orders shall be fulfilled only through the issuance of a license key for the relevant Product by GCI.

5. *Confidential Information*

5.1 Definition of Confidential Information.

"Confidential Information" means all non-public information disclosed by either party ("Disclosing Party") to the other party ("Receiving Party") pursuant to this Agreement: (a) in written form, but only where the writing is marked "Confidential", "Proprietary" or with a similar designation, or (b) in oral form, but only where the Disclosing Party indicates that such information is confidential at the time of disclosure and sends a written summary to the Receiving Party within thirty (30) days of disclosure and marks such summary as "Confidential", "Proprietary" or with a similar designation; or (c) where, due to its character or nature, a reasonable person in a like position and under like circumstances would treat the information as confidential. Confidential Information also includes all summaries or abstracts of Confidential Information.

5.2 Confidentiality Obligation.

Each party acknowledges that in the course of the performance of this Agreement, it may obtain the Confidential Information of the other party. The Receiving Party shall, at all times both during the term of this Agreement and thereafter, keep in confidence and trust all of the Disclosing Party's Confidential Information received by it. The Receiving Party shall not use the Confidential Information of the Disclosing Party other than as expressly permitted under the terms of this Agreement. The Receiving Party shall take reasonable steps to prevent unauthorized disclosure or use of the Disclosing Party's Confidential Information and to prevent it from falling into the public domain or into the possession of unauthorized persons, but in no event will the Receiving Party use less care than it would in connection with its own Confidential Information of like kind. The Receiving Party shall not disclose Confidential Information of the Disclosing Party to any person or entity other than its officers, employees and consultants who need access to such Confidential Information in order to effect the intent of this Agreement and who have entered into confidentiality agreements that protect the Confidential Information of the Disclosing Party sufficient to enable the Receiving Party to comply with this section.

5.3 Exceptions.

The obligations set forth in Section 5.2 shall not apply to the extent that Confidential Information includes information which is: (a) now or hereafter, through no unauthorized act or failure to act on the Receiving Party's part, in the public domain; (b) known to the Receiving Party without an obligation of confidentiality at the time the Receiving Party receives the same from the Disclosing Party, as evidenced by its written records; (c) hereafter furnished to the Receiving Party by a third party as a matter of right and without restriction on disclosure; (d) furnished to others by the Disclosing Party without restriction on disclosure; or (e) independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information. Nothing in this Agreement shall prevent the Receiving Party from disclosing Confidential Information to the extent it is legally compelled to do so by any governmental investigative or judicial agency pursuant to proceedings over which such agency has jurisdiction; provided, however, that prior to any such disclosure, the Receiving Party shall (i) assert the confidential nature of the Confidential Information to the agency; (ii) immediately notify the Disclosing Party in writing of

8

the agency's order or request to disclose; and (iii) cooperate fully with the Disclosing Party in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of the compelled disclosure and protecting its confidentiality.

6. *Trademarks and Tradenames*

6.1 **Acknowledgment of Rights**

Distributor acknowledges that GCI is the owner of all right, title and interest in and to the name GCI and all other GCI trademarks, service marks, trade names and logos, including without limitation any Product name (the "Trademarks") and Distributor agrees not to, and to require any reseller or sub-distributor not to, adopt or use any of the Trademarks in any manner whatsoever except as expressly provided in this Agreement.

6.2 **Use of Trademarks**

GCI grants to Distributor and its resellers and sub-distributors a non-exclusive license to use the Trademarks in the Territory in connection with the exercise of the Sale Rights hereunder. Distributor agrees to use, and to cause any reseller and sub-distributor to use, the Trademarks only to identify the Products or to identify the customer support and maintenance services described above. Any such use of the Trademarks shall at all times be in accordance with the styles and together with such Trademark notices as GCI shall require. GCI reserves the right to review Distributor's use of any Trademark at any time and from time to time. Distributor shall not, and shall require any reseller or sub-distributor not to, combine the Trademarks with any other name or mark in a manner that creates a unitary mark. Upon termination of this Agreement, Distributor and its resellers and sub-distributors shall immediately cease the use of the Trademarks, except to the extent provided in Sections 1.2 and 11.3.

6.3 **Registration of the Trademarks**

Distributor shall not, and shall require any reseller or sub-distributor not to, apply for registration of the Trademarks, or any mark confusingly similar thereto, and shall not register or use any company or business name containing any of the Trademarks. GCI may elect to apply for registration of one or more of the Trademarks in the Territory, in which event Distributor shall assist and cooperate with GCI to affect such registration. All uses of the Trademarks shall inure exclusively to the benefit of GCI.

6.4 **Infringement**

Distributor shall promptly inform GCI of any and all infringements or attempted infringements of the Trademarks that come to Distributor's attention, and shall provide reasonable assistance and cooperation in taking such action to prevent such infringement as GCI may elect at GCI's expense.

7. *Disclaimer of Warranties*

EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO WARRANTY OR CONDITION, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OR CONDITIONS RELATED TO FITNESS FOR PURPOSE OR MERCHANTIBILITY, OR WARRANTIES OF TITLE, ARE GRANTED TO DISTRIBUTOR, ITS RESELLERS, SUB-DISTRIBUTORS OR END USERS, AND ALL SUCH WARRANTIES AND CONDITIONS ARE EXPRESSLY AND SPECIFICALLY DISCLAIMED AND EXCLUDED.

## 8.   *Limitation on Liability*

### 8.1 Consequential Damages Waiver.

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, EXEMPLARY, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, WHETHER ARISING OUT OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, RESULTING FROM OR RELATED TO THIS AGREEMENT (WHETHER OR NOT SUCH PARTY KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF ANY SUCH DAMAGES).

### 8.2   Limitation of GCI's Liability.

Distributor agrees that regardless of the form of any claim, DISTRIBUTOR'S SOLE REMEDY AND GCI'S SOLE OBLIGATION SHALL BE GOVERNED BY THIS AGREEMENT, AND IN NO EVENT SHALL GCI'S LIABILITY TO DISTRIBUTOR HEREUNDER FOR BREACH OF ANY OBLIGATION HEREUNDER OR FOR ANY THIRD PARTY LIABILITY THAT DISTRIBUTOR INCURS IN CONNECTION WITH THIS AGREEMENT EXCEED $50,000. ANYTHING TO THE CONTRARY HEREIN NOTWITHSTANDING, GCI SHALL NOT BE LIABLE TO DISTRIBUTOR OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, OR SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER SUCH CLAIM ARISES IN TORT OR CONTRACT AND EVEN IF ADVISED OF THE POSSIBILITY OF THE SAME. GCI shall not be responsible for any damage or expense resulting from or relating to the alteration or unauthorized use of Products, or from the unintended and unforeseen results obtained by Distributor or third parties resulting from such use, or for any marketing or licensing of Products outside the Territory. Neither termination of this Agreement pursuant to its various termination provisions nor expiration without renewal of this Agreement shall result in any liability or obligation of GCI for any damage, loss or expense, and Distributor expressly waives any such claim.

## 9.   *Protection of Intellectual Property*

### 9.1   Copyrights.

The software and written documentation contained in Products are protected under the copyright laws of the United States and under similar laws affecting proprietary and intellectual property rights of other countries. Distributor acknowledges that GCI owns these copyrights and other rights and has, without limitation, the following exclusive rights to the Products: to reproduce the software and documentation in any and all forms; to adapt, transform, or rearrange the software

10

and documentation; to prepare derivative works of the Products; to control the distribution of the software and documentation. Distributor agrees to preserve all copyright notices in the software and documentation, and do all things reasonably necessary to preserve GCI's copyright and other protections in the Territory at GCI's expense.

9.2    Software

Distributor agrees that it will not, and will require its resellers and sub-distributors not to, decompile, reverse engineer, reverse compile or perform any similar type of operation on any of the object code in the Products.

10. *Force Majeure*

Neither party will be liable for any failure or delay in performance under this Agreement which might be due, in whole or in part, directly or indirectly, to any contingency, delay, failure, or cause of, any nature beyond the reasonable control of such party, including, without in any way limiting the generality of the foregoing, fire, explosion, earthquake, storm, flood or other weather, unavailability of necessary utilities or raw materials, strike, lockout, unavailability of components, activities of a combination of workmen or other labor difficulties, war, insurrection, riot, act of God, act of terrorism or the public enemy, law, act, order, export control regulation, proclamation, decree, regulation, ordinance, or instructions of government or other public authorities, or judgment or decree of a court of competent jurisdiction (not arising out of breach by such party of this Agreement). If any such event happens, the party whose performance is so affected will give prompt written notice to the other party, stating the period of time it is expected to continue.

11. *Term and Termination*

11.1   Term

The initial term of this Agreement shall expire on April 30, 2006. This Agreement shall be automatically extended for successive one (1) year terms, unless either party gives notice of termination by December 31 of the preceding year.

11.2   Termination for Cause

GCI may terminate this Agreement upon the happening of any of the following events if Distributor fails to cure the problem within thirty (30) days of notice:

11

(a)    Distributor breaches any representation, warranty or material term of this Agreement, including without limitation the obligation to make the payments due hereunder; or

(b)    Distributor fails to comply any legal prerequisites, formalities and/or governmental regulations of either the United States or any jurisdiction within the Territory.

## 11.3  Effect of Termination

Distributor agrees that upon expiration or termination of this Agreement, GCI is discharged from any further obligation hereunder and that Distributor's and any of its resellers' or sub-distributors' rights to distribute, license and market Products shall cease as of the date of such expiration or termination; provided, however, that they may continue to distribute copies of the Products that they have in their inventory any they may fulfill binding contracts for the sale of Products, and if they do not have sufficient inventory to fulfill such contracts, GCI shall sell them the necessary Products. Termination shall not reduce Distributor's liability to make any payment required hereunder in respect of any period ending on or prior to the date of termination. Termination or expiration of this Agreement shall not affect any end user licenses with respect to the Products.

The following provisions will survive termination or expiration of this Agreement: Section 1.4, Section 2, Section 3.8, Section 3.9, Section 3.10, Section 5, Section 6, Section 7, Section 8, this Section 11.3, Section 17, Section 19 and Section 21.

## 11.4  No Continuing Interest

Distributor agrees and acknowledges that neither Distributor nor any of its resellers or sub-distributors now have, nor shall any of them have after expiration or termination, any continuing interest or right to the goodwill, assets or proceeds of GCI, and that GCI's sole responsibilities and liabilities are as expressly set forth in this Agreement. GCI's right to terminate is absolute, and Distributor acknowledges it has considered the term of this Agreement and the termination provisions in making expenditures of money and time in preparing for the performance of this Agreement and has further considered the possible loss or damage on account of the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases, property improvements or commitments in connection with the goodwill or business of Distributor resulting from the ending of this Agreement. GCI shall have no liability to Distributor, and Distributor expressly waives any liability of GCI, as a result of termination or expiration of this Agreement in accordance with its terms, including without limitation claims relating to loss of profit, goodwill, creation of clientele, advertising costs, costs of supplies and equipment, termination of employees, employees' salaries, unrecovered expenditures, investments, inventory purchases, leases, property improvements or any other item.

## 12.  *No Agency, Representation or Joint Venture*

12

It is expressly understood that Distributor and GCI are business entities independent of one another. Distributor acknowledges that it is obtaining Products for its own account for the purpose of redistribution to its customers and that it has no authority to represent GCI in the Territory or elsewhere as agent, or to bind GCI by any contract, representation, understanding, act or deed concerning GCI or Products.

13. _Assignment_

The rights granted to Distributor are personal, nontransferable and nonassignable in whole or in part unless prior written consent is received from GCI, which consent may be withheld for any reason in GCI's discretion. GCI may assign this Agreement to any other party that has the capacity to perform GCI's obligation hereunder; and, upon notice to Distributor of such assignment, GCI shall have no further obligation hereunder.

14. _Headings_

The heading contained in this Agreement are for convenience only and shall not be construed to limit or expand any terms otherwise provided.

15. _Notices_

Any notice made in relation to this Agreement shall be sent to the addresses set forth below or to such other address as the intended recipient has previously designated by written notice. Any notice shall be in the English language and be sent by prepaid courier, with a copy by facsimile or electronic mail. Any such notice shall be effective when received by facsimile or electronic mail, if confirmed.

If to GCI:

8 PICTET DE ROCHEMONT 1207 GENEVA
Switzerland

If to Distributor:

SightLine Systems Corporation
12150 Monument Drive, Suite 300
Fairfax, VA 22033
(703) 385-7711 (fax)

16. _Legal Review_

The parties acknowledge that they have had the opportunity for legal review of all terms of this Agreement. The parties agree that in interpreting any issue which may arise, any rule of construction related to who prepared the Agreement shall be inapplicable, each party having contributed or having had the opportunity to contribute to clarify any issue.

13

17. *Partial Illegality*

It is agreed that if any provision, or part of any provision, of this Agreement is held to be invalid or unenforceable under any applicable statute or rule of law, then the parties shall use their best efforts to replace the invalid or unenforceable provision by a provision that, to the extent permitted by applicable law, achieves the purposes intended under the original provision and to allow the parties to have the intended benefit of their bargain. If it cannot be so reformed it shall be omitted. The balance of this Agreement shall remaining valid and unchanged and in full force and effect.

18. *Waiver of Compliance*

Any failure by either party to enforce at any time any term or condition under this Agreement shall not be considered a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

19. *Applicable Law and Venue*

This Agreement shall be deemed to be a contract made and performed in New York, shall be construed under and governed by the laws of the State of New York and shall bind the parties, their successors and permitted assigns. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from application to this Agreement. The stipulate that the proper forum, venue and court for any legal action arising from or in connection with this Agreement shall be the state courts of the State of New York and the parties consent to the personal jurisdiction of such courts. Each party agrees that it will not commence any action against the other party except in such courts.

20. *Amendments*

Any amendment to or change in this Agreement shall be in writing and shall be executed by a duly authorized officer of each of the parties, except as expressly provided herein.

21. *Entire Agreement*

This Agreement constitutes the entire agreement and understanding between the parties on the subject matter above and merges all prior discussions and negotiations between the parties. Neither party shall be bound by any condition, definition, representation or warranty with respect to the subject matter of this Agreement other than as expressly set forth above.

IN WITNESS WHEREOF, the parties through their respective duly appointed representatives have executed this Agreement as of the date first above written.

Glenridge Commercial Inc.                    SightLine Systems Corporation

By _____                 By _____
Name:                                        Name:

14

Title:                              Title:

EXHIBIT A

## Products

GCI's Sightline products including without limitation the following:

Expert Advisor/Vision
Summary Advisor/Vision
Interface Agents — all applications, all versions
Power Agents – all operating systems, all versions
ForSight
Torch
Software Developers' Kit

## Discount

Distributor shall purchase Products and related licenses from GCI at a discount from GCI's list price of 60% for all new Product orders. Distributor shall purchase maintenance contracts from GCI at a discount of 60% for all new maintenance orders, and 50% for all renewal maintenance orders. The parties shall meet on a quarterly basis and negotiate in good faith any adjustment to these discount provisions necessary to fulfill the intent of the parties that each should earn reasonable profit from the distribution relationship.

16

EXHIBIT B

COMPETITIVE PRODUCTS

17

EXHIBIT C

## END-USER LICENSE MINIMUM TERMS AND CONDITIONS

All end user licenses for Products shall include provisions that provide:

(1)     only a limited, nontransferable, and non-exclusive right to use the Products is granted to such end user;

(2)     GCI or its suppliers retain all right, title and interest, including all intellectual property rights, in and to the Products, and all copies thereof, and no title to the Products, or any intellectual property rights in the Products, is transferred to such end user;

(3)     the end user shall not copy the Products, except for a reasonable number of copies for backup or archival purposes only and only as necessary to use the Products, and that all such copies (including documentation) shall contain all copyright and other proprietary notices or legends of GCI and its suppliers;

(4)     the end user shall not reverse engineer, disassemble, decompile, or otherwise attempt to derive source code for the Products;

(5)     the end user shall comply with all export and re-export restrictions and regulations of the Department of Commerce or other United States agency or authority, and not to transfer, or authorize the transfer, of the Products to a prohibited country or national or resident of a prohibited country or otherwise in violation of any such restrictions or regulations;

(6)     GCI MAKES NO WARRANTY IN CONNECTION WITH THE PRODUCTS AND DISCLAIMS AND EXCLUDES ALL WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSES AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS; and

(7)     GCI SHALL NOT BE LIABLE TO THE END USER FOR ANY GENERAL, SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, PATENT INFRINGEMENT OR OTHER DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THE LICENSING OF THE PRODUCTS.

# EXHIBIT D

**From:** Charles Hale [mailto:charles@divestcap.com]
**Sent:** Friday, February 17, 2006 6:05 PM
**To:** Golan, Daniel; Sagi, Mor; Vigder, Avi
**Cc:** Gilad; Bruce Hill
**Subject:** RE: Reconciliation Question

Actually, he usually doesn't answer me anyway which is one reason why I'm doing GCI's numbers for you only now.

Anyway, this is PRELIMINARY what I have for GCI:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| PAWS | $ 599,232 | $ 1,441,554 | $ 1,603,937 |
| Genesis | $ 74,953 | $ | $ 41,212 |
| Wildetech | $ 94,223 | $ 90,310 | $ 75,922 |
| ASCII | $ 34,335 | $ 23,510 | $ 81,488 |
| SSC | $ 1,541,971 | $ 1,339,009 | TBD |
| Pathway | $ 76,484 | $ 129,398 | $ 129,040 |
| Fee/Interest | $ 196 | $ 7,922 | $ 18,219 |
| SUM | $ 2,421,395 | $ 3,031,690 | $ 1,949,823 |

You can see that the organic growth has been pretty good. The SUM is misleading because the accrued SSC to GCI payment is pending. By this Sunday, I should have completed the lapsing and other cash->GAAP reconciliations required to arrive at the number SSC owes GCI. GCI will need to approve it.

If I had to guess, GCI + SSC will be $4m – right on target – with a $1.3m payment to GCI. We estimated $5m cash for the Japanese for 2006. Is that too much? I think not. 2006 has had a strong start in Europe. DISA, Unisys, and UBS could result in significant deals. Unisys alone has $3-5m potential.

I don't think the non-operating expenses will be material (mostly legal, some travel). The clear message I had last time was to GROW operations out of SSC. We never did that, which we all discussed as a failure. Obviously, I'm now putting this failed effort on hold (except for one resource we can discuss). This is fair warning though that you need to tell me if you want different treatment of our ops. Thanks.

Charlie


Charles C. Hale
Mobile: 617 818 2222
NY Office: 212 651 9023
charles@divestcap.com

---

**From:** Gilad [mailto:Gilad@hartbay.com]
**Sent:** Friday, February 17, 2006 3:07 PM
**To:** Charles Hale
**Subject:** RE: Reconciliation Question

I doubt if Shlomo will answer until Saturday night (Israel Time). He usually doesn't answer during "Shabbat".

# EXHIBIT E

## divestcap

| From: | Charles Hale [charles@divestcap.com] |
|---|---|
| Sent: | Monday, February 20, 2006 9:09 PM |
| To: | Vigder, Avi |
| Cc: | Bruce Hill |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Flagged |

Avi - thanks for the call today. I really appreciated the background and explanations. I was also glad to hear our collective 30% SSC carry won't be cut down if Sage leads in engineering an unusually high sale price.

Question: is it Sage's position that yearly portfolio company management fees to DivestCap are also not apropriate? My view is that they are standard for buyout firms, from KKR on down to the tiny SBA funds. They would also help ameliorate the reasonable concerns of your investors.

Charlie