UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
OLD POINT INTERNATIONAL CORPORATION,

                 *Plaintiff,*

     -- against --

BRUCE HILL and CHARLES HALE,

                 *Defendants.*
-----------------------------------------------------------------X

ECF CASE

Index No: 07-CV-08178 (GEL)

 

JUDD BURSTEIN, P.C.
Judd Burstein (JB-9585)
1790 Broadway, Suite 1501
New York, New York 10019
(212) 974-2400

*Attorneys for Plaintiff*

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT I

THE SPAS DO NOT BAR THIS ACTION BECAUSE
DEFENDANTS HAVE FAILED TO ALLEGE, MUST
LESS SUBMIT PROOF, THAT THEY EVER TENDERED
THE CONSIDERATION REQUIRED BY THOSE AGREEMENTS . . . . . . . . . . . . . . . . . . . . 2

POINT II

BECAUSE PLAINTIFF'S RELIANCE UPON THE
SPAS IS IN THE NATURE OF AN AFFIRMATIVE DEFENSE,
DEFENDANTS MAY NOT SECURE DISMISSAL OF THE
COMPLAINT AT THE PLEADING STAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT III

EVEN IF THE SPAS HAD COME INTO EFFECT,
THEIR INTEGRATION CLAUSES DO NOT BAR
THIS ACTION IN LIGHT OF PLAINTIFF'S CLAIM
THAT IT WAS FRAUDULENTLY INDUCED INTO
EXECUTING THE SPAS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT IV

THE SPAS ARE IN ANY EVENT IRRELEVANT
BECAUSE OF THE PARTIES' CONDUCT SUBSEQUENT
TO THE EFFECTIVE DATE OF THE SPAS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

The Nature of the Parties' Overall Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The SightLine Investment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Parties' Course of Conduct After the Effective Date of the SPA . . . . . . . . . . . . . . . . . 16

POINT V

AT A MINIMUM, PLAINTIFF SHOULD BE
PERMITTED TO FILE AN AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

CASES

*Abry Partners V, L.P. v. F&W Acquisition LLC,*
    891 A.2d 1032 (De.Ch. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*American Financial International group-Asia, L.L.C. v. Bennett,*
    2007 WL 1732427 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,4

*Broadwall America, Inc. v. Bram*
    Will-El LLC, 32 A.D.2d 748, 821 N.Y.S.2d 190 (1st Dep't 2006) . . . . . . . . . . . . . . . . . 3

*Continental Ins. Co. v. Rutledge & Co.,*
    *Inc.* 750 A.2d 1219 (Del. Chan. Ct. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*D.L.K. v. T.M.K.*
    2004 WL 3245797 (Del.Fam.Ct. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Davis v. CCF Capital Corp.,*
    277 A.D.2d 342, 717 N.Y.S.2d 207 (2d Dep't 2000) . . . . . . . . . . . . . . . . . . . . . . . 12,24

*DeMarie v. Neff,*
    2005 WL 89403 (Del.Ch. Jan. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Donahue v. Uno Restaurants, LLC,*
    2006 WL 1373094 (N.D.N.Y. May 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*Engle v. Oney,*
    1989 WL 44045, *2 (Del. Chan. Ct. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*GMAC Mortgage Corp. Of Pa, v. Weisman,*
    1998 WL 132791 (S.D.N.Y. 1998 (Keenan, D.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hart v. Dart Group,*
    841 F.Supp. 549 (D. Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hellstrom v. U.S. Dep't of Veteran's Affairs,*
    201 F.3d 94 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,21

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,*
    936 F.2d 759 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Levine v. Columbia Labs., Inc.,*
    2004 WL 1392372 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Manley v. Associates in Obstetrics and Gynecology, P.A.,*
    2001 WL 946489 (Del. Super. Ct. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.,*
    297 A.2d 28 (Del. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reeder v. Sanford School, Inc.,*
    397 A.2d 139 (Del.Super. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rhodes v. Silkwood Equity, LLC,*
    2007 WL 2058736 (Del.Ch. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Serdaroglu v. Serdaroglu,*
    209 A.D.2d 600, 621 N.Y.S.2d 806 (2d Dept. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Torrico v. International Business Machines Corp.,*
    213 F.Supp.2d 390 (S.D.N.Y., 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,22,23

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES AND OTHER AUTHORITIES

Fed.R.Civ.P.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
OLD POINT INTERNATIONAL CORPORATION,

                 *Plaintiff,*

         -- against --

BRUCE HILL and CHARLES HALE,

               *Defendants.*
-----------------------------------------------------------------X

Index No: 07-CV-08178 (GEL)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Plaintiff Old Point International Corporation ("Old Point" or "Plaintiff") submits this Memorandum of Law in opposition to Defendant Bruce Hill and Defendant Charles Hale's (collectively "Defendants") motion to dismiss the Complaint.

In essence, Defendants seek to dismiss the Complaint based upon identical Stock Purchase Agreements (collectively "SPAs") that they each entered into with Old Point. According to Defendants, the SPAs preclude Old Point's claim that it is the beneficial owner of SightLine System Corporation ("SSC"), because the SPAs provide for the transfer of all of SSC's shares to Defendants without any limitation. Since the SPAs each contain an integration clause, Defendants further argue, the Court is barred from looking behind the SPAs to ascertain the true nature of the parties' relationship. As discussed below, the motion should be denied. In the alternative, Plaintiff should be granted leave to amend the Complaint.

## STATEMENT OF THE FACTS

With respect to the allegations of the Complaint, dated September 19, 2007, we respectfully refer the Court to the Complaint itself (Exhibit A to the Declaration of Judd Burstein, Esq., dated

October 10, 2007 ["Burstein Declaration"]).  All other facts relevant to a determination of this motion are set forth in the accompanying Burstein Declaration, the Declaration of Avi Vigder, dated October 10, 2007 ("Vigder Declaration"), the Declaration of Shlomo Meichor, dated October 10, 2007 ("Meichor Declaration"), the Declaration of Danny Golan, dated October 10, 2007 ("Golan Declaration"), the Declaration of Gilad Gat, dated October 9, 2007 ("Gat Declaration"), and the Declaration of Holly F. Berger, dated October 10, 2007 ("Berger Declaration"), and the exhibits annexed thereto.  Those facts will be referred to and discussed throughout this Memorandum of Law.

## **ARGUMENT**

### **POINT I**[1]

**THE SPAS DO NOT BAR THIS ACTION, BECAUSE DEFENDANTS HAVE FAILED TO ALLEGE, MUCH LESS SUBMIT PROOF, THAT THEY EVER TENDERED THE CONSIDERATION REQUIRED BY THOSE AGREEMENTS**

Defendants' entire motion proceeds upon the mistaken assumption that the SPAs govern Old Point's transfer of SSC stock to Defendants.  The problem with this argument is that the SPAs do not purport to actually transfer SSC's stock.  Rather than reciting that Old Point was transferring the SSC stock to Defendants upon execution of the SPAs, the SPAs merely obligated Old Point to transfer the SSC stock in accordance with the terms of each SPA only **if** the Defendant signatory fulfilled the condition precedent of delivering a promissory note for $10,000[2]:

---

[1]    Given space limitations, we do not include a discussion of the well known standards governing a Rule 12(b)(6) motion.  Those standards are set out in *American Financial Int'l Group-Asia, L.L.C. v. Bennett*, Case No. 05 Civ. 8988, 2007 WL 1732427, at *2 (S.D.N.Y. June 14, 2007) (Lynch, D.J.).

[2]    The form of the note annexed to each SPA required payment on or before June 30, 2004.

> Buyer **shall** purchase, and Seller **shall** sell ... five (5) shares of common stock ... of SightLine Systems Corporation ... **in return for the consideration set forth below**.
>
> **Buyer shall deliver, at the closing of the transactions contemplated hereby, a note payable to the order of Seller, in the principal amount of $10,000, and otherwise in the form attached hereto as Exhibit A**.

(Exhibits A and B to the Declaration of Susan L. Saltzstein at 1) (Emphasis supplied).

Hence, by their own terms, the SPAs would have become effective only if Old Point's obligation to convey the shares ("shall") to Defendants had been triggered by their each having met the condition precedent of delivering the $10,000 promissory notes to Old Point "at the time of closing." In the absence of having tendered the notes, Defendants may not find any solace in the SPAs. Put simply, proof of the failure to meet a condition precedent "does not constitute an oral contradiction or modification of the written instrument, 'rather it goes to the very existence of the contract and tends to show that no valid and effective contract ever existed.'" *Engle v. Oney*, Case No. 1249, 1989 WL 44045, at *2 (Del. Chan. Ct. April 25, 1989); *accord Manley v. Associates in Obstetrics and Gynecology, P.A.*, Case. No. 00C-049-JOH, 2001 WL 946489, at *5 (Del. Super. Ct. July 27, 2001).

Shareholder rights vest only where "there was an agreement to transfer the shares, **the agreed upon consideration was paid** and any conditions precedent to the issuance of the shares have been satisfied." *Serdaroglu v. Serdaroglu*, 209 A.D.2d 600, 602-03, 621 N.Y.S.2d 806, 808 (2d Dep't 1994)[3] (Emphasis supplied); *see Broadwall America, Inc. v. Bram Will-El LLC*, 32 A.D.3d 748, 752, 821 N.Y.S.2d 190, 193-94 (1st Dep't 2006) ("Plaintiff herein, having failed to tender the requisite payment within the options period never fulfilled the condition precedent to defendants' performance

---

[3]    We agree that the laws of contract in Delaware and New York are identical in all respects that are relevant to this motion.

3

under the contract and derived no rights thereunder that might be enforced by the courts."); *GMAC Mortgage Corp. of Pa. v. Weisman*, Case No. 95 Civ. 9869, 1998 WL 132791, at *9 (S.D.N.Y. March 23, 1998) (Keenan, D.J.) ("First American cannot be held liable on a title insurance policy issued to GMAC for which GMAC never paid any premiums. The payment of the premium was a condition precedent to liability here."); *see also DeMarie v. Neff*, Case No. 2077-S, 2005 WL 89403, at *4 (Del. Chan. Ct. Jan. 12, 2005) ("Substantial failure to live up to the material terms of a valid contract nullifies that contract. [A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party.") (Quotation omitted).

In the light of the language of the SPAs and the governing case law, there is a remarkable and determinative omission in Defendants' motion: a sworn allegation that the notes were tendered to Old Point and that Defendants each satisfied their respective notes by paying the $10,000 due thereunder.[4]

This omission is not a mere oversight, as counsel for Plaintiff has made constant inquiry of counsel for Defendants with respect to this issue. Hence, on October 1, 2007, just hours after the parties appeared before the Court, counsel for Plaintiff sent an e-mail to counsel for Defendants stating, in relevant part:

> In the hope of avoiding unnecessary arguments and surprise, could you let me know (a) whether you have any evidence that the $10,000 Notes were ever executed and delivered to Old Point, and (b) whether the Notes were paid on or before 6/30/2004. My client's records do not reflect receipt of the Notes or payment, but I don't want to make any such argument if you [have] credible evidence to the contrary.

(Exhibit B to Burstein Declaration).

---

[4]    It is, indeed, rather remarkable that the SPAs were submitted by counsel without declarations from Defendants even identifying them as the actual contracts they executed with Old Point.

4

Thereafter, counsel for Plaintiff raised this issue two more times in e-mails to counsel for Defendants. (Exhibits C and D to Burstein Declaration). Finally, on October 4, 2007 (the day before Defendants' filed their motion), counsel for Defendants responded by stating: "My clients tell me that those notes were indeed paid off and that your clients ought to have records of the payments." (Exhibit E to Burstein Declaration). This response is itself telling because it does not answer the question of whether the notes were ever delivered and, moreover, suggests that Defendants have no proof that they actually paid the notes. Why else would Defendants' counsel respond by stating only that **Plaintiff** should have proof of payment?

In any event, the important point here is that, notwithstanding Plaintiff's counsel's highlighting of the issue, Defendants have filed a motion seeking to rely upon agreements as to which they have failed to offer any proof of their performance of conditions precedent to the enforceability of those agreements. In the absence of such proof, their motion must be denied.

Moreover, even if Defendants were suddenly to offer some evidence that they delivered and/or paid the notes, dismissal of the Complaint would still be unwarranted because such proof would, at most, create a factual dispute over these issues. As set forth in the accompanying Berger Declaration, Gat Declaration, and Golan Declaration, an exhaustive search of Old Point's books and records revealed no evidence that the notes had been delivered and/or paid.

5

## POINT II

### BECAUSE PLAINTIFF'S RELIANCE UPON THE SPAS IS IN THE NATURE OF AN AFFIRMATIVE DEFENSE, DEFENDANTS MAY NOT SECURE DISMISSAL OF THE COMPLAINT AT THE PLEADING STAGE

Defendants' reliance upon the SPAs as a basis for dismissal also fails, because those

agreements are not explicitly referred to in the Complaint. As made clear by Judge Kaplan in *Levine*

*v. Columbia Labs., Inc.*, Case No. 03 Civ. 8943, 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004),

this fact renders Defendants' reliance upon the SPAs a mere affirmative defense, and requires the

merits of that defense to be addressed only on a summary judgment motion:

> The fundamental difficulty here is that the release is not referred to in the complaint.
> Columbia is seeking to invoke the release, an affirmative defense, in a motion to
> dismiss. While an affirmative defense properly may be raised by a motion to dismiss,
> that is so only where the defense appears on the face of the pleading and the
> documents incorporated therein. That is not the case here. Although the complaint
> contains a passing reference to the Separation and Consulting Agreement, it would
> be inappropriate to regard it as incorporating that document by reference
>
> .... [T]he appropriate course is to deny the motion to dismiss, saving to defendant the
> ability to raise the release as a defense on a motion for summary judgment or at trial.

*See Donahue v. Uno Restaurants, LLC*, Case No. 3:06-CV-53, 2006 WL 1373094, at *1 (N.D.N.Y.

May 16, 2006) (McAvoy, S.J.) ("Further, there is no basis upon which the Court may take judicial

notice of any release. Accordingly, the documents submitted by Defendants in support of their

motion to dismiss may not be considered by the Court on a Rule 12 motion. The validity of any

contract may properly be determined upon a motion for summary judgment or at trial.").

Here, the circumstances are even more compelling than in *Levine*, because the Complaint

does not even make passing reference to the SPAs. Rather, it recites only that the parties agreed that

6

Defendants would maintain record ownership of SSC (Complaint at ¶¶ 12-14), but does not allege that the SPAs were the vehicle for accomplishing that goal.

Defendants rely upon *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991), and *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991), for the proposition that "a court may consider documents that were not attached to or referenced in the complaint where there is 'undisputed notice to plaintiffs of their content.'" (Defendants' MOL at p. 4, fn. 1). However, Defendants overlook the material distinction between the facts presented here and those in *Cortec Indus., Inc.* and *I. Meyer Pincus*: in both of those cases, there was no dispute between the parties as to the validity and enforceability of the agreements relied upon by the defendants. Indeed, those agreements were central to the plaintiffs' claims in those cases. Here, by way of contrast, there is such a dispute. As such, the Court should deny Defendants' motion to dismiss. *See Donahue*, 2006 WL 1373094, at *1.

**POINT III**

**EVEN IF THE SPAS HAD COME INTO EFFECT, THEIR INTEGRATION CLAUSES DO NOT BAR THIS ACTION IN LIGHT OF PLAINTIFF'S CLAIM THAT IT WAS FRAUDULENTLY INDUCED INTO EXECUTING THE SPAS**

Even if we assume, *arguendo,* that the notes were delivered and paid, and that the SPAs represent the only agreement of the parties as of May 2003, that conclusion provides no comfort for Defendants, because Plaintiff alleges that the SPAs are the product of fraudulent inducement on the part of Defendants.

As noted, Defendants' reliance upon the SPAs and their integration clauses is really an affirmative defense as to which Defendants would bear the burden of proof at a trial. Hence, the

issue on this motion is whether Plaintiff may interpose a fraud in the inducement defense to Defendants' contract-based affirmative defense.[5]  The law sides with Plaintiff.

As detailed in the accompanying Meichor Declaration and Vigder Declaration, Old Point executed the SPAs as a result of a fraud perpetrated by Defendants.  Mr. Meichor's Declaration states, in relevant part:

> I worked with Messrs. Hill and Hale on banking and financial matters relating to Old Point's purchase of the assets of Fortel, Inc. ("Fortel").  I also worked with them in connection with at least one other investment that they managed for Old Point.
>
> In the period immediately following Old Point's acquisition of the Fortel assets, the parties proceeded as they did with another investment – Summit Technology – secured and then managed by Defendants. That is, the investment was managed by DivestCap as sub-advisor to Enright Holding Corp.'s United States sub-advisor.
>
> However, shortly thereafter, Defendants proposed to Mr. Vigder and me a different structure which they contended would be more tax effective and entirely legal. In essence, as detailed in the accompanying Declaration of Avi Vigder:
>
> a.    Two companies would be created: (i) Glenridge Commercial, Inc. ("GCI"), a BVI corporation beneficially owned by Old Point, and (ii) SightLine Systems Corporation ("SSC"), a Delaware Subchapter S corporation wholly owned by Defendants;

---

[5]    The nature of Defendants' motion permits Plaintiff to allege facts that are not set forth in the Complaint because "'as long as they are consistent with the allegations of the complaint, a party may assert additional facts in his or her response to a motion to dismiss,' especially where, as here, those factual allegations are directly responsive to a defense first raised in the motion itself." *Torrico v. International Business Machines Corp.*, 213 F.Supp.2d 390, 400, n.4 (S.D.N.Y. 2002) (Lynch, D.J.) (Citation omitted).  Although *Torrico* involved a *pro se* plaintiff, that fact does not undermine the Court's rationale. *See also Rothman v. Gregor*, 220 F.3d 81, 87-89 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include … documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit….") (Citations omitted).

b.    GCI, as Old Point's investment vehicle, would continue to own all of the Fortel assets;

c.    GCI would sell its products and intellectual property to SSC as the exclusive North American distributor of the Fortel products; and

d.    Defendants would manage the sale of GCI's products throughout the rest of the world, with the income from those sales going directly to GCI.

In response, Mr. Vigder and I deferred to Defendants as our fiduciaries with respect to the best way to structure the investment. Indeed, rather than use Old Point's lawyers at Bryan Cave, Defendants separately retained the law firm of Gray Cary (now DLA Piper) to advise on tax issues.

Consistent with the parties' past custom of dealing on the basis of oral agreements, the structure suggested by Defendants, and to which Mr. Vigder and I had agreed, was never memorialized in signed contract. Indeed, there was no need to do so because, regardless of the formal structure of the investment, the parties operated as though GCI and SSC were one entity merely managed by Defendants.

Moreover, during the period from June of 2003 through June of 2004 (and indeed thereafter), I engaged in numerous telephone conversations with both Mr. Hill and Mr. Hale in which they explicitly acknowledged (or necessarily implied) that (i) their record ownership of SSC was part of the tax structure blessed by their lawyers, but not reflective of the parties' underlying agreement, (ii) Old Point was the beneficial owner of SSC, and/or (iii) they were merely managers of the investment for Old Point. In other words, the parties agreed that, notwithstanding the corporate form, GCI and SSC were to be treated as one overall enterprise ("Sightline Enterprise"), beneficially owned by Old Point and managed by Defendants.

Put simply, we never bothered to document the Sightline Enterprise structure because we all knew that it did not represent the actual working agreement of the parties. Indeed, if this were not so, it is inconceivable that Mr. Hill and Mr. Hale would not have insisted upon executing a written agreement because, if the SPAs are read literally, they were receiving unrestricted ownership of a major portion of Old Point's $300,000 Fortel investment for just $20,000.

In the Spring of 2004, we entered into discussions with BSL, a Japanese company, to purchase the Sightline Enterprise for a price in excess of $40 million ... I had a telephone conversation with Mr. Hill on April 28, 2004, regarding this proposed transaction. During this telephone call Mr. Hill told me that he needed to secure SPAs signed by Old Point **only** because BSL would want to see them in

9

connection with investigating the Sightline Enterprise's tax structure and also because there might be an audit some day. He again explicitly acknowledged that the SPAs did not reflect the true agreement of the parties, but merely created a paper record justifying the tax structure.

Mistakenly believing in Mr. Hill's honesty (he had not yet been indicted for fraud) and in light of our course of conduct to date, I relied upon his representation about the limited need for the SPAs. As a result, after consultation with Mr. Vigder, I directed Kenneth Henderson to sign the SPAs on behalf of Old Point ... In retrospect, I now understand that Mr. Hill defrauded me into directing Mr. Henderson to execute the SPAs so that he could later claim that he and Mr. Hale were the true owners of SSC and were not limited to their agreed-upon 19.5% share of the proceeds of a sale of the entire Sightline Enterprise.

In this regard, it is important to note that ... in April 2004, I asked for signed copies of the promissory notes referred to in the SPAs so that I could have in file a full set of documents. Plainly, if the SPAs really reflected the parties' true agreement, it makes no sense that Mr. Vigder and I would have failed to secure the promised consideration for the transfer of the shares before I authorized Mr. Henderson to sign the SPAs.

Notwithstanding my April of 2004 request of Mr. Henderson that he sign the SPAs ... as of June 23, 2004, the SPAs remained unsigned ... [I]t was only after this June 23, 2004 e-mail that, pursuant to my direction after consultation with Mr. Vigder, Mr. Henderson signed the SPAs on behalf of Old Point, and the SPAs were transmitted to Defendants.

Yet, even at this point, just 9 days before they were due, the notes had not been delivered by Defendants ... Again, if the SPAs really reflected the parties' true agreement, it makes no sense that Mr. Vigder and I would have failed to secure the consideration promised for the transfer of the shares before the SPAs were transmitted to Defendants.

Had Mr. Vigder and/or I known that Mr. Hill and Mr. Hale were intending to rely upon the SPAs to deny that they were only managers of the Sightline Enterprise and also claim that they were entitled to more than 19.5% of the proceeds of a Sightline Enterprise sale, Mr. Vigder and I would never have authorized Mr. Henderson to execute the SPAs....

(Meichor Declaration at ¶ ¶ 16-22)[6].

---

[6]    Because Mr. Meichor's Declaration specifically states the date of his conversation

(continued...)

These sound allegations of fraudulent inducement and breach of fiduciary duty obviate the force of the SPAs' integration clauses and preclude dismissal of the Complaint because, **"Integration clauses do not, as a matter of law, bar claims of fraud and the presumption afforded by such clauses can also be rebutted upon a showing of bad faith**." *Rhodes v. Silkroad Equity, LLC*, Case No. 2133-VCN, 2007 WL 2058736, at *7 (Del. Chan. Ct. July 11, 2007) (Emphasis supplied).

It is also important here to focus upon the fact that the SPAs' integration clauses, by their terms, only bar inquiry into prior agreements and understanding, and do not preclude a claim based upon fraudulent misrepresentations:

> This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof....

(Exhibits A and B to Saltzstein Declaration at ¶ 5(e)).

To the contrary, Paragraph 5(b) of the SPAs actually accords Plaintiff the right to make a claim of fraud in the inducement: "No waiver by either Party of any ... misrepresentation ... hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent ... misrepresentation...." (*Id.*, at ¶ 3). Plainly, then, by speaking about the possibility of waiving a prior misrepresentation (which did not happen here), the parties actually agreed that one of them could bring a claim for fraudulent inducement.

As explained by the Court in *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058-59 (De. Chan. Ct. 2006):

---

[6](...continued)
with Mr. Hill, the details of the false representation and the person who made the representation, it surely meets the requirements of Fed. R. Civ. P. 9(b).

> [T]his court consistently has respected the law's traditional abhorrence of fraud in implementing this reasoning. Because of that policy concern, **we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements. Instead, we have held ... that murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.** The integration clause must contain "language that ... can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract...." If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.

(Emphasis supplied) (Citation omitted). Here, of course, we have far more than a "murky integration clause"; there is in fact a contractual provision that permits claims of fraud in the inducement.

Moreover, the Complaint unquestionably alleges that Defendants were Old Point's fiduciaries as of 2002 (*i.e.*, before Old Point's acquisition of the assets of Fortel, Inc. ["Fortel"]). *See Davis v. CCF Capital Corp.*, 277 A.D.2d 342, 343, 717 N.Y.S.2d 207, 209 (2d Dep't 2000) (Relationship between financial advisor and client is a fiduciary one).[7] As explained by the Court in *D.L.K. v. T.M.K.*, Case No. CN03-06800, 2004 WL 3245797, at *2 (Del. Fam. Ct. Nov. 18, 2004):

> [I]f parties stand in a confidential or fiduciary relationship, there is an equitable presumption against the validity of a transaction by which the superior party obtains a possible benefit at the expense of the inferior one, and the superior party must affirmatively show his compliance with all equitable prerequisites. As such, [the fiduciary] bears the burden of proving his compliance with all equitable requisites and the agreement's fairness.

Plainly, Defendants cannot meet this burden of proof simply by pointing to the SPAs' integration clauses – especially because (i) in contrast to so many other agreements, the SPAs do not specifically recite that Defendants are not fiduciaries, and (ii) as noted above, the Complaint

---

[7]    Although Delaware law applies to the SPAs themselves, New York law plainly governs whether there was in fact a fiduciary relationship between the parties because the Complaint alleges that the fiduciary relationship was created in New York. (Complaint at ¶¶ 7-9).

adequately alleges that Defendants entered into a fiduciary relationship with Plaintiff **before** the Fortel assets were even purchased.

### POINT IV

**THE SPAS ARE IN ANY EVENT IRRELEVANT BECAUSE OF THE PARTIES' CONDUCT SUBSEQUENT TO THE EFFECTIVE DATE OF THE SPAS**

If one assumes, *arguendo,* that the SPAs are otherwise enforceable and further that they bar evidence of any agreement prior to or contemporaneous with their effective date of May 2003, those integration clauses would nonetheless be rendered irrelevant by the parties' subsequent conduct. As we demonstrate below, that conduct unquestionably served to modify the parties' agreement.[8]

In making this argument, we recognize that Paragraph 5(a) the SPAs provides that "[s]ubject to applicable law, this Agreement may be modified or amended only by execution of an instrument in writing on behalf of Buyer and Seller." However, under the "applicable law" – Delaware law – governing the SPAs, "it is settled ... that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." *Continental Ins. Co. v. Rutledge & Co., Inc.,* 750 A.2d 1219, 1229 (Del. Chan. Ct. 2000).

Thus, in *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972), the Supreme Court of Delaware held:

> [a] written agreement between contracting parties, **despite its terms, is not necessarily only to be amended by formal written agreement**. We agree with Stanchifield that a written agreement does not necessarily govern all conduct between

---

[8]    We wish to make clear that this POINT should in no way be read as a concession that the SPAs are enforceable or that their integration clauses bar inquiry into the parties' agreement as of the alleged effective date of the SPAs. Rather, for the purposes of this POINT, we merely assume, *arguendo,* that the integration clauses would otherwise bar Plaintiff from contending that it is the beneficial owner of SSC.

13

contracting parties until it is renounced in so many words. **The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit. They may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement**. We think the existence of Paragraphs 16 in the plaintiffs' appointments does not prohibit the modification of making of a new agreement by conduct of the parties, despite a prohibition of Paragraphs 18 against any change except by written bilateral agreement.

*Id.* (Emphasis supplied).

Accordingly, notwithstanding the SPAs' provision prohibiting oral modifications, Plaintiff is entitled to seek to provide evidence of a new or amended contract of "such specificity 'as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.'" *Hart v. Dart Group*, 841 F.Supp. 549, 568 (D. Del. 1993) (*quoting Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. Super. Ct. 1979)). As set forth directly below, Plaintiff can offer such evidence even now, at the pleading stage. At a minimum, though, this evidence is sufficiently compelling so as to entitle Plaintiff to discovery before the Court considers the merits of Defendants' dismissal claim. *See Hellstrom v. U.S. Dept of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.").

Put simply, there is an overwhelming amount of proof that – even assuming (erroneously) that the SPAs represent the full agreement of the parties as of their effective date – the SPAs were subsequently modified by the parties' statements and conduct.

**The Nature of the Parties' Overall Relationship**

At the recent hearing on Plaintiff's motion for a preliminary injunction, the Court expressed concern about Plaintiff's failure to explain who the parties are. Accordingly, and because that

14

relationship is relevant to explaining the parties' course of conduct, Avi Vigder's Declaration provides that explanation:

> Old Point is a BVI company that is owned by a Trust of which certain members of the Steinmetz family are beneficiaries. Among other businesses and investments, the Steinmetz family owns one of the world's largest diamond businesses. *See* http://www.steinmetz-group.com/.

> Many of the Trust investment vehicles, one of which is Old Point, are managed by Enright Holding Corp. ("Enright"), a BVI company. I am the President and CEO of Enright, and Shlomo Meichor is its secretary and director.

> Enright manages Trust investments throughout the world and, in this process, makes use of a number of sub-advisors with local or industry expertise. The sub-advisors are either fully owned subsidiaries of Enright, or companies which have an exclusive relationship with Enright pursuant to which they manage Trust investments. These sub-advisors assist in identifying investment opportunities, and then in managing, monitoring, reporting and disposing of such investments on behalf of Enright.

> The investments in the United States are managed by Sage Capital Growth, Inc. ("Sage Capital"), a New York Corporation run by, among others, Eldad Gal and Danny Golan. Sage Capital makes and manages investments directly, and also indirectly, via its own sub-advisors. At an earlier point in time, the United States investments were managed through a predecessor company, Cavallo Capital ("Cavallo").

> Within this structure, I am the key decision maker with respect to Enright's investment advice to the Trust. Enright is generally compensated for supervising all of these investments through (i) an equity participation in its sub-advisors, (ii) an equity participation in investments made by those sub-advisors, or (iii) the payment of fees back to Enright.

(Vigder Declaration at ¶¶ 3-7).

15

**The SightLine Investment**

On April 23, 2003, pursuant to 11 U.S.C. § 363, Old Point acquired the Fortel assets for $300,000.[9] The terms of the parties' initial arrangement concerning the investment is detailed in the Complaint at Paragraphs 11-14.

**The Parties' Course of Conduct After the Effective Date of the SPAs**

According to the explicit terms of the SPAs, they reflect the parties' sole agreement as of an unspecified day in May of 2003. Hence, even if (i) the SPAs are deemed effective notwithstanding the failure to deliver or pay the notes, and (ii) the integration clauses therein are deemed to preclude proof of any other agreements entered into prior to or in May of 2003, the parties' conduct **after** May of 2003 shows that they operated under an entirely different, or completely modified, agreement:

On June 2, 2003, Mr. Hill wrote to Mr. Meichor, who was supervising finances for Divestiture Capital Growth ("DivestCap") (Vigder Declaration at ¶ 21), asking about the creation of a United Kingdom bank account for SSC, which Mr. Hill describes as follows: "This is the latest deal **we** did – this is the one where **we** may want to receive payment outside the US from **our** foreign distributors." (Exhibit A to Meichor Declaration).[10]  Hence, as of the beginning of June 2003 (*i.e.*, after the operative date of the SPAs), the parties were treating the purchase of the Fortel assets as "our" investment, and discussing how "we" can receive income from foreign distributors outside of the United States. Yet, if, as Defendants contend, the parties' only agreement is reflected by the SPAs, there would have been no reason for Mr. Hill to be asking Mr. Meichor, who has no formal

---

[9]      We have been awaiting a copy of the Bankruptcy Court Order permitting the sale, and will supply it to the Court if there is a factual dispute over this issue.

[10]     It should be noted that all of Mr. Hill's and Mr. Hale's e-mails are at a "divestcap.com" e-mail address.

relationship with Messrs. Hill and Hale, to set up a bank account for a company in which Old Point had no ownership interest. Nor would there have been any reason why Mr. Hill would have been discussing how to handle income from "our foreign distributors" in light of the fact that the Distributorship Agreement between GCI and SSC (Exhibit C to Vigder Declaration) limits SSC's territory just to North America.

On June 4, 2003, Mr. Hale sent an e-mail to Mr. Hill, with a copy to Mr. Golan (Exhibit B to Golan Declaration) which states that "we" can use a general Old Point account until "we (i) get and account of our own **for Oldpoint** or (ii) do the tax structure reorg...." (Emphasis supplied). Hence, it is clear that even after the operative date of the SPAs, Defendants were still trying to work out the manner in which the Fortel assets would be structured – not for themselves, but "for Oldpoint."

On June 5, 2003, Defendant Hale sent an e-mail to Mr. Golan, stating:

Danny,

I will do my best to hold off all payments until we find a better alternative. We might have one soon: I finally have 2 decent banks in contention for opening an account in the UK for the Oldpoint BVI

In the meantime, 2 important things:

1.    **Please see the attached as Gray Cary's proposed first steps to make the US sub a distributor for OIC, which we believe to be the tax optimal approach.** Note that:

(a)    this structure matches the one Raz had suggested **(US Sub becomes separate distributor for the BVI)**

(b)    since DivestCap (BGH & CCH) will actually own the US distributor, **we'll need to do an agreement with Cavallo that has an adjustment provision to ensure that the total economic split is 20% - 80% DivestCap - Cavallo**

17

    2.    **not reflected in this proposal, we believe it could be important to have a separate BVI buy the assets from Oldpoint for accounting simplicity, for exit simplicity, and for maximal protection of Oldpoint.**

    **I'd like your blessing on #1**, and your thoughts on #2. Thanks much.

(Exhibit A to Golan Declaration) (Emphasis supplied).

This communication overwhelmingly supports Plaintiff's allegations in this action in that (i) it makes clear that Defendants conceived of and recommended the structure of the Sightline Enterprise, and (ii) it is completely inconsistent with the two companies being separate, independent companies.

On June 11, 2003, Mr. Hale sent an e-mail to Messrs. Meichor and Golan (Exhibit B to Meichor Declaration), stating:

> I have been foolish with my whole approach to a UK bank account. As you know, I have been trying to set one up under Oldpoint or our new BV for all of our international revenue. Last night, however, I realized that, with our new structure, I actually can't set up such an account because it would surely foul the separation of the entities. Ugh.

There is only one explanation for this e-mail if, as Defendants allege, the SPAs were in effect as of May 2003: as of June 11, 2003, the parties had agreed upon a **new**, post May 2003, structure for "our international revenue." In other words, at least as of June 2003, the parties were treating the exploitation of the Fortel assets as one joint enterprise.

On June 26, 2003, Mr. Hale sent an e-mail to Mr. Meichor (Exhibit C to Meichor Declaration) discussing a GCI distributorship agreement for GCI's Australian distributor which Mr. Hale had signed. Obviously, by this time, Mr. Hale was not simply managing the affairs of his and

Mr. Hill's wholly owned company, SSC. To the contrary, the parties' relationship included Mr. Hale acting as a fiduciary who signed contracts on behalf of GCI without advance approval from anyone.

On October 28, 2003, Mr. Hill sent an e-mail to Mr. Golan (Exhibit C to Golan Declaration) discussing whether SSC should be a Subchapter S Corporation because of the tax implications for a future sale of the company. If the parties were still operating under the terms of the SPAs, why would Mr. Hill have been consulting with Mr. Golan on the issue of whether he and Mr. Hill should make a Subchapter S election? Even if, as the Court suggested at oral argument on the preliminary injunction motion, GCI exerted a significant degree of control over SSC as its source of product, GCI or Old Point would still have had no interest in the tax structure of SSC unless SSC were part of a broader single enterprise that also included GCI.

On March 18, 2004, Mr. Hale sent an e-mail to Mr. Vigder (Exhibit A to Vigder Declaration) which demonstrates that as of that date, **almost a year after the supposed operative date of the SPAs**, the parties' agreement with respect to Sightline – a "carry" of 19.5% – was exactly as alleged in the Complaint:

a.   Avi gets 35% of the Management Co [DivestCap] carried interest....
b.   Carried interest is increased ... to 25%....
d.   CCH [Hale] and BGH [Hill] effective portion is 65% of 25% for subsequent returns....
e.   **Sightline has another 5% carried interest increase to 30%....**

(Emphasis supplied). In other words: on the SightLine investment, Defendants were to receive 65% of a 30% carry. **Defendants would receive 65% of 30%, which equals 19.5%.**

On February 17, 2006, after the SPAs were finally executed, Mr. Hale sent an e-mail to Mr. Vigder (Exhibit D to Vigder Declaration) entitled "Reconciliation Question." In this e-mail, Mr. Hale estimated that the combined net profit of GCI and SSC for 2005 would be $4,000,000, with

19

$1.95 million of that figure accounted for by GCI's net profits for the year. Hence, according to this e-mail, Mr. Hale was estimating SSC's 2005 net profit at $2.05 million. If in fact the parties were still operating under the terms of the SPAs, all of this net profit would have belonged to SSC, because (i) the SPAs do not grant Old Point any continuing interest in SSC's income, and (ii) SSC's Distributorship Agreement with GCI (Exhibit C to Vigder Declaration) granted SSC the right to **purchase** GCI's products at a 40% discount. Hence, any net profit figure for SSC would have come after deducting the costs of purchasing the product from GCI.

Yet, Mr. Hale's e-mail reflects that the parties were now operating under an entirely different agreement which treated GCI and SSC as a joint enterprise. Thus, the e-mail states that SSC will be forwarding $1.3 million of its $2.05 million in net profits to GCI. This transfer only makes sense if the parties' agreement was as Plaintiff alleges: that GCI was to receive 80.5% of the combined net profit of GCI and SSC. This is so because Mr. Hale's calculation results in a total amount of $3.25 million to be paid to GCI, or **81.2% of the combined net profit**.[11]

On February 20, 2006, Mr. Hale sent an e-mail to Mr. Vigder (Exhibit E to Vigder Declaration) which provides further unequivocal proof that the parties had agreed that the SPAs did not govern their relationship. In this e-mail, Mr. Hale states: "I was also glad to hear that our collective 30% SSC carry won't be cut down if Sage leads in engineering an unusually high sale price." This e-mail confirms that the terms set forth in Mr. Hale's March 18, 2004 e-mail to Mr.

---

[11]    The February 2006 e-mail's calculations are consistent with a December 30, 2004 e-mail sent by Mr. Hale to Mr. Meichor (Exhibit E to Meichor Declaration) explaining that, after certain wires from SSC to GCI, GCI will have received $3.39 million out of $4 million in combined net profits for the year. Mr. Hale goes on to explain that this amount, which actually represents 83.5% of the total, "is over the 80% but we owe Avi some money."

Vigder (Exhibit A to Vigder Declaration) were still operative in 2006: Defendants were to receive 65% of their "collective" 30% carry (*i.e.*, 19.5% to Defendants) with respect to the sale of SSC.

Finally, DivestCap's own website confirms the nature of its ownership of SSC. First, it acknowledges DivestCap's relationship as a sub-advisor to Sage Capital:

> DivestCap is the private equity arm of Sage Capital Growth, a diversified global investment fund. Over the past decade, Sage and related funds have invested in over 300 transactions with an aggregate value in excess of US $8.0 billion spanning, among other areas, real estate, venture capital, public equities, and convertible debt. As a testament to Sage's relationship orientation, approximately one-third of the transactions to date have consisted of multiple investments in the same companies. DivestCap and Sage have offices in cities including New York, Boston, Washington DC, San Francisco, Paris, and Herzilia (Israel).

(See Exhibit B to Vigder Declaration).

Second, the website lists SSC as a DivestCap investment. This is an explicit concession that the SPAs' alleged transfer of the SSC stock to Defendants did not reflect the parties' agreement after May of 2003, because the website in essence claims that DivestCap owns SSC pursuant to its role as an "arm" of Sage Capital. Moreover, since the DivestCap website also discusses a proposed 2006 transaction for Tadpole Technology plc., this description of SSC's ownership unquestionably post-dates May of 2003, or even the execution of the SPAs in 2004.

In sum, this documentary proof, taken together with the accompanying Declarations, overwhelmingly demonstrates that, regardless of the terms of the SPAs, the parties operated pursuant to a different agreement following the effective date of the SPAs. At a minimum, of course, Plaintiff has demonstrated a significant factual dispute that cannot be resolved on a motion to dismiss prior to discovery. *See Hellstrom.*

## POINT V

## AT A MINIMUM, PLAINTIFF SHOULD BE PERMITTED TO FILE AN AMENDED COMPLAINT

As discussed, *supra*, at fn. 5, Plaintiff believes that it has the right to submit evidence in response to Defendants' motion, because the motion is really the assertion of an affirmative defense based upon extrinsic documents. *See Torrico*, 213 F.Supp.2d at 400, n.4.

However, even if the Court were to conclude that it is not permitted to consider that evidence because Defendants have moved pursuant to Rule 12(b)(6), the remedy here would not be dismissal. Rather, the Court should permit Plaintiff to file an amended complaint alleging the facts offered on this motion and seeking the following relief:

a.   A judicial declaration that the SPAs are unenforceable, because (i) Defendants never delivered or paid the promissory notes, and (ii) Plaintiff was fraudulently induced into executing the SPAs;

b.   A judicial declaration that even if the SPAs are enforceable agreements, they were modified and superseded after May of 2003 through the parties' conduct;

c.   A judicial declaration that even if the SPAs are enforceable agreements, the parties had a separate agreement pursuant to which (i) Defendants, through SSC, would manage Old Point's investment in GCI, (ii) Defendants would operate GCI and SSC as though it were a single enterprise, (iii) Defendants would divide the yearly combined net profits of GCI and SSC, with 80.5% paid to GCI and 19.5% paid to Defendants, (iv) Defendants would sell GCI and SSC as a single venture and divide

22

the combined sale proceeds, with 80.5% paid to GCI and 19.5% paid to Defendants, and (v) Old Point had the sole and unfettered discretion to sell both GCI and SSC;

d.      A judicial declaration that, by reason of the agreement detailed directly above, Defendants are Plaintiff's fiduciaries, and are obligated not to interfere, and indeed assist with, any sale or prospective sale of GCI and SSC that Old Point deems appropriate;

e.      A judicial declaration that Defendants have breached their contractual and fiduciary obligations to Plaintiff;

f.      Forfeiture of Defendants' right to compensation from a sale of GCI and SSC; and

g.      An accounting.

When viewed in conjunction with the legal arguments urged in this Memorandum of Law, the facts set forth in Plaintiff's answer to Defendants' motion provide more than adequate support for each of these claims, and given the liberal amendment policy reflected by Fed. R. Civ. P. 15, amendment of the Complaint, if necessary, should be permitted. As this Court stated in *Torrico*, "it would not be proper to grant IBM's motion, even if those allegations could not properly be considered, without first giving the plaintiff an opportunity to amend his complaint to include them...." Accordingly, the Court grants Torrico leave to amend his complaint under Fed. R. Civ. P. 15(a) to incorporate the allegations and documents asserted in opposition to IBM's motion to dismiss." *Torrico v. International Business Machines Corp.*, 213 F.Supp.2d at 390 (Citations omitted); *See Oliver Schools v. Foley*, 930 F.2d 248, 252-253 (2d Cir. 1991):

> To the extent that the court felt it would be unfair to require the defendants to respond to a complaint that did not more precisely state the basis for the claims against them in their personal capacities, the court should at least have granted Oliver

23

leave to amend the complaint to provide greater specificity. Rule 15(a) of the Federal Rules of Civil Procedure provides that the court should grant leave to amend "freely ... when justice so requires," and the principle that permission to amend to state a claim should be freely granted, *see Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), is likewise applicable to dismissals for failure to plead an adequate basis for federal jurisdiction, *see* 3 *Moore's Federal Practice* ¶ 15.10, at 15-104 (2d ed.1990) ("[i]n dismissing a complaint for ... failure to show jurisdiction, the court should heed the admonition of Rule 15 and allow amendment 'freely' if it appears at all possible that the plaintiff can correct the defect"). Thus, in vacating a dismissal with prejudice for, inter alia, failure to state a claim and lack of subject matter jurisdiction, we have noted that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.' ... Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990) (quoting 2A *Moore's Federal Practice* ¶ 12.14, at 12-99 (2d ed.1989)). Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the Complaint should be denied.

In the alternative, Plaintiff should be permitted to file an amended complaint.

Dated: New York, New York
      October 10, 2007

                                      Respectfully Submitted,

                                      JUDD BURSTEIN, P.C.

                                      By_____
                                        Judd Burstein (JB-9585)
                                        1790 Broadway, Suite 1501
                                        New York, New York 10019
                                        (212) 974-2400

25