UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
OLD POINT INTERNATIONAL CORPORATION,

                    *Plaintiff,*

    -- against --

BRUCE HILL and CHARLES HALE,

                  *Defendants.*
-----------------------------------------------------------------X

Index No.: 07-CV-08178 (GEL)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

    Plaintiff Old Point International Corporation, by its attorneys, Judd Burstein, P.C., complaining of the Defendants, alleges as follows:

## JURISDICTION AND VENUE

    1.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, as well as 28 U.S.C. §§ 1332 and 2201.

    2.     Venue lies in this District pursuant to (a) 28 U.S.C. § 1391(a)(2) in that the parties' fiduciary relationship – the key issue in this case – was created as a result of, and during the course of, substantial meetings in New York County, (b) 28 U.S.C. § 1391(a)(3), and (c) 18 U.S.C. § 1965.

## THE PARTIES

    3.     Plaintiff Old Point International Corporation ("Old Point" or "Plaintiff") is a corporation organized under the laws of the British Virgin Islands, with a principal place of business and its registered office in the British Virgin Islands ("BVI").

    4.     Defendant Bruce Hill ("Hill") is a citizen of the State of Massachusetts. Subsequent to Plaintiff making the investments at issue in this case, Hill was convicted of perjury in the United States District Court for the District of Massachusetts.

5.    Defendant Charles Hale is a citizen of the State of New York.  (Hill and Hale are collectively referred to herein as "Defendants").

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

A.    **OLD POINT'S BUSINESS STRUCTURE**

6.    Old Point is a BVI company that is owned by a trust.

7.    At all relevant times hereto, many of the trust's investment vehicles, one of which is Old Point, are managed by Enright Holding Corp. ("Enright"), a BVI company.

8.    In this process, Enright makes use of a number of sub-advisors with local or industry expertise. These sub-advisors assist in identifying investment opportunities, and then in managing, monitoring, reporting and disposing of such investments on behalf of Enright.

9.    At all relevant times, the trust's investments in the United States were managed by Cavallo Capital ("Cavallo") initially and then Sage Capital Growth, Inc. ("Sage Capital"), a New York corporation which is operated by, among others, Eldad Gal and Danny Golan.  Sage Capital makes and manages investments directly, and also indirectly, via its own sub-advisors.

10.    Within this structure, Enright is compensated in a number of ways, some of which are detailed below.

B.    **THE STRUCTURE OF DEFENDANTS' RELATIONSHIP WITH PLAINTIFF**

11.    In or about December of 2001, Defendants approached Old Point through Cavallo in an effort to secure an arrangement pursuant to which Defendants would seek out investment opportunities for Old Point and then, if Old Point availed itself of an opportunity, manage Old Point's investment.  Defendants then made a December 2001 presentation to Cavallo, as Old Point's representative, at Cavallo's Madison Avenue offices in New York County.  Over the next

2

two months, there were additional presentations, conversations, and negotiations between Defendants and Old Point's representatives.

12.    In or about February of 2002, Old Point and Defendants reached an oral agreement pursuant to which, as proposed by Defendants, Defendants would recommend investment opportunities for Old Point and then manage those investments which Old Point made as a result of Defendants' recommendations.

13.    Initially, the parties' arrangement was put into effect through the creation of DivestCap as a sub-advisor to Cavallo (and, later, to Sage Capital). The parties agreed orally that (i) Enright, through Avi Vigder, as Cavallo's representative, would own 35% of DivestCap, (ii) Defendants would jointly own 65% of DivestCap, and (iii) DivestCap would receive compensation on all companies it managed equal to 20% of the net profits of Old Point in such investments subject to certain performance benchmarks. Thus, Defendants' 65% ownership interest in DivestCap gave them a net compensation of 13% (65% of 20%) of Old Point's profits on all DivestCap deals.

14.    The existence and terms of this oral agreement with Defendants are confirmed by significant documentary proof:

15.    On March 18, 2004, Mr. Hale sent Avi Vigder an international or interstate e-mail, which stated in relevant part:

a.    Avi [Enright] gets 35% of the Management Co [DivestCap] carried interest....

b.    Carried interest is increased to 25%....

c.    CCH [Hale] and BGH [Hill] effective portion is 65% of 25% for subsequent returns....

16.    Hence, as of March 2004, Mr. Hale confirmed the original deal discussed above by agreeing that (i) Enright owned 35% of DivestCap, (ii) Defendants owned the other 65% of the company, and (iii) the compensation was increased from the original 20% to 25%.

17.    In addition, DivestCap's own website confirmed that it is not an independent company, but rather is a sub-advisor to Sage Capital:

> **DivestCap is the private equity arm of Sage Capital Growth, a diversified global investment fund**. Over the past decade, Sage and related funds have invested in over 300 transactions with an aggregate value in excess of US $8.0 billion spanning, among other areas, real estate, venture capital, public equities, and convertible debt. As a testament to Sage's relationship orientation, approximately one-third of the transactions to date have consisted of multiple investments in the same companies. DivestCap and Sage have offices in cities including New York, Boston, Washington DC, San Francisco, Paris, and Herzilia (Israel).

18.    Thus, Defendants, as principals of DivestCap, were indirect investment advisors to Old Point, and, as such, were plainly Old Point's fiduciaries. Indeed, in April of 2002, prior to the transaction that rests at the heart of this, Defendants, through DivestCap, had completed a transaction and then managed another investment – Summit Design, Inc. – for Old Point. As reflected on the DivestCap website, this company was sold in 2006. Significantly, the proceeds from that sale were divided according to the formula discussed above.

## C.    THE TRANSACTION AT ISSUE IN THIS CASE; THE FRAUD BEGINS

19.    In 2003, Defendants identified an investment opportunity for Old Point: a Bankruptcy Court purchase, pursuant to 11 U.S.C. § 363, of the assets of a company, Fortel, Inc. ("Fortel"). Fortel designed and sold software systems throughout the world.    Old Point contributed 100% of the $400,000 cash investment, with no financial contribution from

4

Defendants. The ultimate goal of this transaction was to build the business of exploiting the Fortel assets to the point that the business could be sold for a huge profit.

20. Given that Fortel sold its products both domestically and internationally, Defendants informed Old Point that, after consulting with their tax counsel, there was a much more tax-effective and entirely legal structure (recommended by Defendants' counsel) by which Defendants could manage Old Point's investment in the Fortel assets:

a. Two companies would be created: (i) Glenridge Commercial, Inc. ("GCI"), a BVI corporation beneficially owned by Old Point, and (ii) SightLine Systems Corporation ("SSC"), a Delaware corporation to be originally owned by Old Point and then transferred to Defendants, who would then make a Subchapter S Election;

b. GCI, as Old Point's investment vehicle, would continue to own all of the Fortel assets;

c. GCI would sell its products and intellectual property to SSC as the exclusive North American distributor of the Fortel products; and

d. Defendants would manage the sale of GCI's products throughout the rest of the world, with the income from those sales going directly to GCI.

21. Consistent with the nature of Old Point's relationship with Defendants, Old Point deferred to them as fiduciaries with respect to the best way to structure the investment, which included the execution of a Development Agreement and a Distribution Agreement between GCI and SSC. Indeed, rather than use Old Point's lawyers at Bryan Cave, Defendants separately retained the law firm of Gray Cary (now DLA Piper) to advise on tax issues.

22.    Hence, as Old Point understood and Defendants represented they understood, the parties agreed (and explicitly confirmed in numerous telephone conversations between Defendants and Old Point representatives) that, as between Old Point and Defendants, the creation of the two companies – one of them nominally owned by Defendants – did not change the parties' underlying agreement that Old Point was the 100% beneficial owner of the Fortel assets, and that Defendants were only managers who would be compensated as such.

23.    On information and belief, the sources of which are the events set forth below in Paragraphs 32 *et seq.*, Defendants, as part of a scheme to defraud Plaintiff, deceived Plaintiff into agreeing to this business structure – including directing GCI's execution of the Distribution Agreement and the Development Agreement – by falsely representing that this formal structure did not change the true nature the parties' relationship, including the fact that Defendants owed a fiduciary duty to Plaintiff as the manager of its investment in the Fortel assets.  The goal of this scheme was to permit Defendants to block any future sale of the Fortel Assets unless they received a much larger share of the proceeds from such a sale upon the false claim that SSC was an independent company of which they were the true owners.

24.    Consistent with the parties' custom of dealing on the basis of oral agreements, the structure suggested by Defendants was never memorialized in a signed contract.  Indeed, as Old Point understood the situation, there was no need to do so because, regardless of the formal structure of the investment, the parties operated as though GCI and SSC were one entity ("Sightline Enterprise") merely managed by Defendants.  The fact that Defendants misled Plaintiff into believing that the true nature of the parties relationship and agreement was as described directly above is demonstrated by overwhelming documentary evidence:

6

25.     On June 2, 2003, Mr. Hill sent an international e-mail to Shlomo Meichor, one of Enright's Directors, asking about the creation of a United Kingdom bank account for SSC, which Mr. Hill described as follows: "This is the latest deal **we** did – this is the one where **we** may want to receive payment outside the US from **our** foreign distributors." (Emphasis supplied).   Hence, as of the beginning of June 2003, the parties were treating the purchase of the Fortel assets as "our" investment, and were discussing how "we" can receive income from foreign distributors outside of the United States. Yet, if Old Point was not being misled into believing that it was the beneficial owner of SSC (or if Plaintiff merely misunderstood it was the beneficial owner), there would have been no reason for Mr. Hill to be asking Mr. Meichor, who had no formal relationship with Messrs. Hill and Hale, to set up a bank account for a company in which Old Point supposedly had no ownership interest.  Nor would there have been any reason why Mr. Hill would have been discussing how to handle income from "our foreign distributors" in light of the fact that the Distributorship Agreement between GCI and SSC limits SSC's territory just to North America.

26.     On June 5, 2003, Mr. Hale sent an international e-mail to Danny Golan of Sage Global (then associated with Cavallo) stating:

> I will do my best to hold off all payments until we find a better alternative.  We might have one soon: I finally have 2 decent banks in contention for opening an account in the UK for the Oldpoint BVI
>
> In the meantime, 2 important things:
>
> 1.     **Please see the attached as Gray Cary's proposed first steps to make the US sub a distributor for OIC, which we believe to be the tax optimal approach.**
>
> Note that:

7

(a)    this structure matches the one Raz had suggested
**(US Sub becomes separate distributor for the BVI)**

(b)    since DivestCap (BGH & CCH) will actually own the US distributor, **we'll need to do an agreement with Cavallo that has an adjustment provision to ensure that the total economic split is 20% - 80% DivestCap - Cavallo**

2.    **not reflected in this proposal, we believe it could be important to have a separate BVI buy the assets from Oldpoint for accounting simplicity, for exit simplicity, and for maximal protection of Oldpoint.**

**I'd like your blessing on #1**, and your thoughts on #2.  Thanks much.

(Emphasis supplied).

27.    This communication overwhelmingly supports Plaintiff's allegations in this action in that (a) it makes clear that Defendants conceived of and recommended the structure of the Sightline Enterprise based upon advice from Gray Cary, the attorneys they retained, and (b) it is completely consistent with the fact that Defendants were leading Plaintiff to believe that they agreed that the two companies were parts of the single enterprise.

28.    On June 4, 2003, Mr. Hale sent an interstate e-mail to Mr. Hill, with a copy to Mr. Golan which stated that "we" can use a general Old Point account until "we (i) get an account of our own **for Oldpoint** or (ii) do the tax structure reorg...." (Emphasis supplied).  Hence, it is clear that Defendants were misleading Plaintiff into believing that they were seeking to work out the manner in which the Fortel assets would be structured "for Oldpoint."

29.    On June 26, 2003, Mr. Hale sent an international e-mail to Mr. Meichor discussing a GCI distributorship agreement for GCI's Australian distributor which Mr. Hale had signed.  This e-mail confirms and is consistent with Mr. Hale's fraudulent effort to lead Old Point into believing that he was acting as its fiduciary.  Otherwise, there would have been no

8

basis upon which he would have been signing contracts on behalf of GCI without advance approval from anyone associated with GCI.

30.    On October 28, 2003, Mr. Hill sent an interstate e-mail to Mr. Golan, again discussing whether SSC should become a Subchapter S corporation because of the tax implications for a future sale of the company. This is yet another demonstration of Defendants' effort to defraud Plaintiff, as Mr. Hill's consulting with Mr. Golan on the issue of whether he and Mr. Hale should make a Subchapter S election was consistent with the two companies constituting one enterprise.

31.    On March 18, 2004, Mr. Hale sent Mr. Vigder an international e-mail which, in addition to detailing the overall relationship with Defendants (*i.e.*, that DivestCap was owned 35% by Enright and 65% by Defendants, and that it would receive a 25% carry on deals going forward), also states: "**Sightline has another 5% carried interest increase to 30%....**" (Emphasis supplied). The math further demonstrates Defendants' effort to defraud Old Point with respect to the Sightline Enterprise, because Mr. Hale was representing that he understood that he and Mr. Hill were entitled only to a "carry of 19.5%." In other words, as described by Mr. Hale, Defendants were to receive 65% of a 30% carry on the Sightline Enterprise investment. Assuming a $100 sale, then, Defendants would receive 65% of $30, which equals $19.50.

### D.    THE NEXT PHASE OF DEFENDANTS' FRAUD

32.    Commencing in 2006, Defendants began to execute the second phase of their scheme to defraud, in which they sought to claim a much larger share of the proceeds of a sale of the Sightline Enterprise by falsely claiming that SSC was an independent company wholly owned by Defendants.

9

**(1)    The Threat to Interfere With a Sale of the Sightline Enterprise**

33.    In or around 2006, Defendants and Old Point agreed that the Sightline Enterprise should be sold.

34.    In or around June 2007, a software company expressed interest in making such a purchase.

35.    As of July 2007, the prospective purchaser made a preliminary offer of $42 million to purchase the Sightline Enterprise.

36.    In the event of a $42 million sale of the Sightline Enterprise, Defendants would have been entitled to a payment of approximately $8,000,000.

37.    It was at this point that Defendants moved in to the next phase of their scheme to defraud.

38.    In a July 21, 2007 international e-mail from Mr. Hill to Mr. Gal, Mr. Hill falsely denied that Defendants were Old Point's fiduciary.

39.    On August 1, 2007, Mr. Hill spoke with Mr. Gal on an international telephone call, and informed him that Defendants would use their nominal ownership of Sightline – granted to them on the basis of their recommendation that such ownership was the most tax-effective way to manage the Sightline Enterprise – to seek to prevent a sale of the Sightline Enterprise unless Defendants were paid $20,000,000.  In other words, Defendants were insisting upon almost 50% of the proposed sale price.

40.    On August 1, 2007, Mr. Gal sent an international e-mail to Mr. Hill confirming their conversation and asking him the basis for Defendants' $20 million demand in light of the fact that they were entitled to only 19.5% of any sales proceeds.

10

41.    On August 2, 2007, Mr. Hill sent an international e-mail to Mr. Gal in which he disputed the fact that Defendants were entitled to only 19.5% of any sales price, and confirmed that Defendants were seeking $20 million as a condition of agreeing to any sale of the Sightline Enterprise.

42.    This action was then commenced.

**(2)    Defendants' Fraudulent Response to the Original Complaint**

43.    In response to the original Complaint in this action, which detailed the relationship and agreement between the parties as represented to Old Point by Defendants, Defendants continued the execution of their fraudulent scheme by falsely claiming, in a letter to the United States District Court for the Southern District Court dated September 28. 2007, that SSC was an independent company that they owned by virtue of separate Share Purchase Agreements ("SPAs") executed by each of the Defendants with Old Point.  Defendants falsely contended that the SPAs demonstrated that Old Point had transferred its ownership of SSC to Defendants. Defendants then repeated these allegations to the Court in a motion to dismiss the original Complaint that was submitted to the Court on October 5, 2007.  On information and belief, between September 20, 2007 (the date the original Complaint was served upon Mr. Hale) and October 5, 2007, there were numerous telephone calls and e-mails between Mr. Hill in Boston and Mr. Hale in New York in which they discussed how best to further their fraudulent scheme by making false representations to the Court and their own counsel about SSC's supposed status as an independent company and the nature of the parties' relationship and agreement.

11

44.    The true history of what occurred with respect to the SPAs demonstrates that Plaintiff was fraudulently induced into executing those agreements, which are in any event void due to a failure of consideration.

45.    In the Spring of 2004, Old Point and Defendants entered into discussions with BSL, a Japanese company, to purchase the Sightline Enterprise for a price in excess of $40 million.  On April 28, 2004, Mr. Mechior and Mr. Hill spoke on an international telephone call regarding this proposed transaction.  During this telephone call Mr. Hill falsely told Mr. Mechior that he and Mr. Hale needed to secure the SPAs **solely** because BSL would want to see them in connection with investigating the Sightline Enterprise's tax structure, and also because there might be an audit some day.  Mr. Hill explicitly acknowledged that the SPAs did not reflect the true agreement of the parties, but merely created a paper record justifying the tax structure.  In fact, as demonstrated by subsequent events, Mr. Hill's request for executed SPAs was part of a plan to defraud Plaintiff.

46.    Thereafter, in an international e-mail dated April 28, 2004, Mr. Hill asked for signed copies of the SPAs, falsely stating that they were needed because "this will be one of the things that BSL will ask about in terms of our tax structure."

47.    That same day, April 28, 2004, Mr. Hill sent an international e-mail to Mr. Mechior requesting executed copies of the SPAs.

48.    Mistakenly believing in Mr. Hill's honesty (he had not yet been indicted for fraud) and in light of the parties' course of conduct as of that date, Mr. Mechior reasonably relied upon Mr. Hill's intentionally false representation about the limited need for the SPAs.  As a

result, after consultation with Mr. Vigder, Mr. Mechior sent an April 30, 2004 international e-mail to Kenneth Henderson, an attorney for Old Point, to sign the SPAs on behalf of Old Point.

49.    In retrospect, it is now clear that Mr. Hill, on behalf of himself and Mr. Hale, lied to Mr. Mechior about the reason why executed SPAs were needed so that they could later falsely claim that Mr. Hill and Mr. Hale were the true owners of SSC, and were not limited to their agreed-upon 19.5% share of the proceeds of a sale of the entire Sightline Enterprise.

50.    Significantly, the SPAs do not purport to actually transfer SSC's stock to Defendants. Rather than reciting that Old Point was transferring the SSC stock to Defendants upon execution of the SPAs, the SPAs merely obligated Old Point to transfer the SSC stock in accordance with the terms of each SPA only **if** the Defendant signatory fulfilled the condition precedent of delivering a promissory note for $10,000, payable on or before June 30, 2004:

> Buyer **shall** purchase, and Seller **shall** sell ... five (5) shares of common stock ... of SightLine Systems Corporation ... **in return for the consideration set forth below**.
>
> **Buyer shall deliver, at the closing of the transactions contemplated hereby, a note payable to the order of Seller, in the principal amount of $10,000, and otherwise in the form attached hereto as Exhibit A.**

(Emphasis supplied).

51.    At no time did Defendants ever deliver the promissory notes required as a condition precedent to Old Point's obligation to sell its SSC shares to Defendants. Nor did Defendants ever pay the debt evidenced by the (undelivered) notes.

52.    Mr. Henderson did not execute the SPAs in April of 2004.

53.    On June 23, 2004, Mr. Hale sent an e-mail to Mr. Mechior, stating that he needed executed copies of the SPAs because they were "critical to the audit!"

13

54.    Yet, even at this point, approximately a week before they were due, the notes had not been delivered by Defendants. Again, if the SPAs really reflected the parties' true agreement, it makes no sense that Old Point would have failed to secure the consideration promised for the transfer of the shares before the SPAs were transmitted to Defendants.

55.    Had Old Point known that Mr. Hill and Mr. Hale were intending to rely upon the SPAs to deny that they were only managers of the Sightline Enterprise and also claim that they were entitled to more than 19.5% of the proceeds of a Sightline Enterprise sale, Old Point would never have authorized Mr. Henderson to execute the SPAs for at least the following reasons:

a.    Given (i) that the parties had been operating to date pursuant to the agreement that Defendants would receive 65% of DivestCap's 30% carry on the Sightline Enterprise (*i.e.*, 19.5% to them), and (ii) that there was a possible $40 plus million dollar sale of the Sightline Enterprise on the table, no sane person would actually have transferred 100% of SSC for a mere $20,000; and

b.    The $20,000 alleged sale price for the SSC stock also makes no sense even when considered in the context of Old Point's original $400,000 purchase of the Fortel assets. Old Point would never have authorized the transfer of ownership of a company with the exclusive North American distribution rights to SightLine products in the United States, for just 6.6% of the total amount of money it had invested in the Fortel assets.

14

56.     The parties' conduct following execution of the SPAs further confirms that, based upon Defendants' false representations, Old Point had been misled into believing that Defendants agreed that, as is actually the case, Old Point was the beneficial owner of the entire Sightline Enterprise.

57.     On December 30, 2004, Mr. Hale sent an international e-mail to Mr. Meichor explaining that, after certain wires from SSC to GCI, GCI was to receive $3.39 million out of $4 million in combined net profits for 2004. Mr. Hale went on to explain that this amount, which actually represents 84.75% of the total, "is over the 80% but we owe Avi some money." On information and belief, the sources of which include the claims that Defendants made after commencement of this action, this e-mail was sent to fraudulently lull Plaintiff into believing that the parties were in agreement that Old Point was the beneficial owner of the entire Sightline Enterprise.

58.     The fraud is even more clearly demonstrated by an international e-mail, entitled "Reconciliation Question", that Mr. Hale sent to Mr. Vigder on February 17, 2006. In this e-mail, Mr. Hale estimated that the combined net profit of GCI and SSC for 2005 would be $4,000,000, with $1.95 million of that figure accounted for by GCI's net profits for the year. Hence, according to this e-mail, Mr. Hale was estimating SSC's 2005 net profit at $2.05 million. If in fact the parties had been operating under the terms of the SPAs, all of this net profit would have belonged to SSC because (i) the SPAs do not grant Old Point any continuing interest in SSC's income, and (ii) SSC's Distributorship Agreement with GCI granted SSC the right to **purchase** GCI's products at a 40% discount. Hence, any net profit figure for SSC would have come after deducting the costs of purchasing the product from GCI.

15

59.    Yet, Mr. Hale's February 17 e-mail reflects that Defendants were continuing to seek to fraudulently lull Plaintiff into believing that the parties were in agreement that Old Point was the beneficial owner of the entire Sightline Enterprise. Thus, the e-mail stated that SSC would be forwarding $1.3 million of its $2.05 million in net profits to GCI. This transfer only makes sense if the parties' agreement were as Plaintiff alleges: that GCI was to receive 80.5% of the combined net profit of GCI and SSC. Significantly, Mr. Hale's calculation results in a total amount of $3.25 million to be paid to GCI, or 81.2% of the combined net profit.

60.    Finally, on February 20, 2006, Mr. Hale sent an e-mail to Mr. Vigder which further sought to fraudulently lull Plaintiff into believing that the parties had agreed that the SPAs did not govern their relationship. In this e-mail, Mr. Hale stated: "I was also glad to hear that our collective 30% SSC carry won't be cut down if Sage leads in engineering an unusually high sale price." Thus, this e-mail was intended to mislead Plaintiff into believing that Defendants were operating pursuant to the terms set forth in Mr. Hale's March 18, 2004 e-mail to Mr. Vigder: Defendants were to receive 65% of their "collective" 30% compensation (*i.e.*, 19.5% of the total net proceeds to Defendants) with respect a sale of SSC.

## FIRST CLAIM FOR RELIEF

61.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

62.    SSC is an enterprise as that term is defined by 18 U.S.C. § 1961(4). The affairs of SSC affect interstate and foreign commerce.

63.    From 2003 through the date of the filing of this First Amended Complaint, Defendants have knowingly and intentionally participated in the scheme to defraud Plaintiff that

is alleged above in Paragraphs 19 through 60. In furtherance of that scheme, Defendants caused the following wire communications to be made in violation of 18 U.S.C. § 1343:

  a. Numerous international and interstate telephone calls from 2003 through September 19, 2007, between Defendants, Mr. Vigder, Mr. Gal, Mr. Golan, and Mr. Mechior in the United Kingdom, Israel and other foreign countries, including the telephone calls detailed above; and

  b. The international and interstate e-mails detailed above, as well as those annexed to this Amended Complaint and incorporated by reference as Exhibit A.

64. Each of these communications served to further the scheme to defraud set forth above, although the content of any particular communication may not have been fraudulent. Each such wire transmission was a separate violation of 18 U.S.C. § 1343 by Defendants.

65. As a result thereof, Defendants have engaged in a pattern of racketeering as that term is defined by 18 U.S.C. § 1961(5), and acquired and maintained an interest in SSC through that pattern of racketeering activity.

66. By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

## SECOND CLAIM FOR RELIEF

67. Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

68. Defendants thereby participated in the operation and management of SSC through the pattern of racketeering activity alleged above.

69.    By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

### THIRD CLAIM FOR RELIEF

70.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

71.    SSC and GCI are an association-in-fact enterprise ("Sightline Enterprise") as that term is defined by 18 U.S.C. § 1961(4).   The affairs of SSC affect interstate and foreign commerce.

72.    Defendants have acquired and maintained an interest in the Sightline Enterprise through the pattern of racketeering activity alleged above.

73.    By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

### FOURTH CLAIM FOR RELIEF

74.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

75.    Defendants have participated in the operation and management of the Sightline Enterprise through the pattern of racketeering activity alleged above.

76.    By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

### FIFTH CLAIM FOR RELIEF

77.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

78.    DivestCap is an enterprise as that term is defined by 18 U.S.C. § 1961(4).  The affairs of DivestCap affect interstate and foreign commerce.

79.    Defendants have acquired and maintained an interest in DivestCap through the pattern of racketeering activity alleged above.

80.    By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

<strong><u>SIXTH CLAIM FOR RELIEF</u></strong>

81.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

82.    Defendants have participated in the operation and management of DivestCap through the pattern of racketeering activity alleged above.

83.    By reason thereof, Plaintiff has been injured in its property and business and is entitled to recover three times its actual damages plus attorneys' fees.

<strong><u>SEVENTH CLAIM FOR RELIEF</u></strong>

84.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this paragraph.

85.    Plaintiff contends that, notwithstanding Defendants' nominal ownership of Sightline, the entire Sightline Enterprise is beneficially owned by Plaintiff, and that Defendants are fiduciaries retained to manage Plaintiff's investment.

86.    Defendants contend that they are the true owners of Sightline, as opposed to mere managers of Plaintiff's investment, and therefore do not owe any fiduciary duty to Plaintiff.

87.    A justiciable controversy has therefore arisen with respect to whether (a) Plaintiff is the beneficial owner of the entire Sightline Enterprise, and (b) Defendants owe a fiduciary duty to Plaintiff.

88.    Plaintiff has no adequate remedy at law.

89.    The equities favor Plaintiff.

90.    Pursuant to 28 U.S.C. § 2201, Plaintiff is therefore entitled to a judicial declaration that (a) it is the beneficial owner of the Sightline Enterprise, and (b) Defendants owe a fiduciary duty to Plaintiff.

**EIGHTH CLAIM FOR RELIEF**

91.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

92.    Plaintiff contends that it never transferred ownership of SSC to Defendants because its obligation to transfer its shares in SSC to Defendants was contingent upon Defendants executing the promissory notes required by the SPAs and then satisfying those notes on or before June 30, 2004. In that Defendants never met those obligations, Plaintiff remains the true owner of SSC.

93.    On information and belief, Defendants contend that they are the true owners of SSC because they either (a) executed the promissory notes and satisfied them on or before June 30, 2004, or (b) satisfied the notes in timely fashion even if they did not execute the promissory notes.

94.     A justiciable controversy has therefore arisen with respect to whether Plaintiff are is true owner of SSC because Defendants failed to execute or satisfy the promissory notes required by the SPAs.

95.     Plaintiff has no adequate remedy at law.

96.     The equities favor Plaintiff.

97.     Pursuant to 28 U.S.C. § 2201, Plaintiff is therefore entitled to a judicial declaration that Plaintiff is the true owner of SSC because Defendants failed to execute or satisfy the promissory notes required by the SPAs.

## NINTH CLAIM FOR RELIEF

98.     Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

99.     Plaintiff contends that even if the SPAs are valid, the parties' subsequent conduct modified their agreement such that the parties' relationship became the fiduciary relationship described above.

100.    Defendants contend that the SPAs were not modified by the parties' subsequent conduct.

101.    A justiciable controversy has therefore arisen with respect to whether the SPAs were modified by the parties' subsequent conduct.

102.    Plaintiff has no adequate remedy at law.

103.    The equities favor Plaintiff.

104.    Pursuant to 28 U.S.C. § 2201, Plaintiff is therefore entitled to a judicial declaration that if the SPAs were otherwise binding, they were modified by the parties' subsequent conduct.

## TENTH CLAIM FOR RELIEF

105.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

106.    As described above, Defendants falsely represented to Plaintiff that the SPAs needed to be executed by Plaintiff solely in connection with the potential BSL purchase and a potential audit.

107.    This representation was knowingly false when made because the true purpose of Defendants' request for the executed SPAs was to permit Defendants later to argue that they were the true owners of SSC.

108.    Defendants' false statements were made for the purpose of inducing Plaintiff into executing the SPAs.

109.    Plaintiff rightfully relied upon Defendants' false representations believing them to be true.

110.    Plaintiff has been injured thereby.

111.    Therefore, if the SPAs are otherwise enforceable, Plaintiff is entitled to rescission of those agreements.

112.    In addition, Plaintiff is also entitled to rescission because Defendants failed to pay the consideration set forth in the SPAs.

## ELEVENTH CLAIM FOR RELIEF

113.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

114.    Even if one were to assume (erroneously) that GCI and SSC were originally true, separate arms' length companies, the parties' course of conduct nonetheless created a fiduciary obligation owed to Plaintiff by Defendants with respect to the Sightline Enterprise. This is so because, since the acquisition of the Fortel assets, Defendants have been the managers of Plaintiff's investment. In light of this relationship, as well as by reason of the relationship between DivestCap and Old Point, Plaintiff's relationship with Defendants was one founded upon trust and confidence reposed by Plaintiff in the integrity and fidelity of Defendants.

115.    Defendants breached the fiduciary duties they owed to Old Point regardless of whether GCI and SSC were separate companies, in at least the following ways:

116.    **First**, in seeking more than 19.5% of any sale of the Sightline Enterprise, Defendants were seeking monies from Plaintiff to which they were not entitled.

117.    **Second,** by engaging in their fraud with respect to the SPAs, as well as by their effort to rely upon the SPAs in answering the original Complaint, Defendants breached the fiduciary duties they owed to Plaintiff.

118.    **Third**, on information and belief, at some time in 2007, Defendants secretly purchased a company (the identity of which is unknown to Plaintiff) or the intellectual property of a company. This conduct constituted the theft of a corporate opportunity that belonged to Plaintiff.

119.    **Fourth,** in September 2007, Defendants directed SSC to send GCI four years' worth of invoices representing almost $7.5 million allegedly due to SSC from GCI pursuant to a Development Agreement between the two companies. In directing SSC to send these invoices to GCI, Defendants breached their fiduciary duty to Plaintiff because, as Defendants well knew, the financial terms of the Development Agreement did not reflect the parties' actual agreement and in directing SSC to claim that GCI owed SSC millions of dollars pursuant to the Development Agreement, Defendants breached their fiduciary duty to Plaintiff by advancing a position they knew would be precluded by the Development Agreement if it were binding: that GCI could be held responsible for invoices that SSC waited four years to send GCI, even though the Development Agreement required them to be sent every 90 days.

120.    **Fifth**, in November of 2007, Defendants also violated their fiduciary duty to Plaintiff by directing SSC to commence suit against GCI in the New York Supreme Court falsely claiming that (a) GCI owed SSC almost $7.5 million under the Development Agreement; (b) SSC had a perfected lien on GCI's intellectual property; and (c) GCI has been unjustly enriched at the expense of SSC.

121.    **Sixth**, Defendants have cause SSC to withhold monies rightfully due to GCI.

122.    **Seventh**, Defendants have failed to account to Plaintiff as requested.

123.    By reason of these breaches of fiduciary duty, Plaintiff is entitled to recover its actual damages as determined at trial, including all compensation earned after April of 2004, by Defendants as a result of their relationship with Plaintiff.

24

124.   In addition, because Defendants' conduct was wanton, willful and malicious, Plaintiff should be awarded punitive damages as determined at trial.

## TWELFTH CLAIM FOR RELIEF

125.   Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

126.   By reason thereof, Defendants have defrauded Plaintiff.

127.   Plaintiff is entitled to recover its actual damages as determined at trial.

128.   In addition, because Defendants' conduct was wanton, willful and malicious, Plaintiff should be awarded punitive damages as determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

129.   Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

130.   By reason thereof, Defendants have breached their oral agreement with Plaintiff with respect to the management of the Sightline Enterprise.

131.   Plaintiff is entitled to recover its actual damages as determined at trial.

## FOURTEENTH CLAIM FOR RELIEF

132.   Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

133.   If Defendants are permitted to maintain their ownership of Sightline, they will be unjustly enriched.

134.    A constructive trust on all of the shares of Sightline and all benefits derived by Defendants therefrom, including any assets acquired, directly or indirectly, with SSC's funds or as a result of the theft of a corporate opportunity belonging to Plaintiff, should therefore be imposed for the benefit of Plaintiff.

## FIFTEENTH CLAIM FOR RELIEF

135.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

136.    Plaintiff is entitled to an accounting of the Sightline Enterprise.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    On Plaintiff's First through Sixth Claims for Relief, three times Plaintiff's actual damages, plus tits legal fees and expenses;

B.    On Plaintiff's Seventh Claim for Relief, a judicial declaration that (a) Plaintiff is the beneficial owner of the Sightline Enterprise, and (b) Defendants owe a fiduciary duty to Plaintiff;

C.    On Plaintiff's Eighth Claim for Relief, a judicial declaration that Plaintiff is the true owner of SSC because Defendants failed to execute or satisfy the promissory notes required by the SPAs;

D.    On Plaintiff's Ninth Claim for Relief, a judicial declaration that if the SPAs were otherwise binding, they were modified by the parties' subsequent conduct;

E.    On Plaintiff's Tenth Claim for Relief, rescission of the SPAs;

26

F.     On Plaintiff's Eleventh and Twelfth Claims for Relief, Plaintiff's actual damages as proven at trial, as well as an award of punitive damages;

G.     On Plaintiff's Thirteenth Claim for Relief, Plaintiff's actual damages as proven at trial;

H.     On Plaintiff's Fourteenth Claim for Relief, a constructive trust on the shares of SSC and all benefits derived by Defendants therefrom, including any assets acquired, directly or indirectly, with SSC's funds;

I.     On Plaintiff's Fifteenth Claim for Relief, an accounting of the Sightline Enterprise; and

J.     An Order and Judgment granting such other and further relief as is deemed just and appropriate by the Court.

Dated: New York, New York
       May 28, 2008

JUDD BURSTEIN, P.C.

By_____
Judd Burstein (JB-9585)
1790 Broadway, Suite 1501
New York, New York 10019
T: (212) 974-2400
F: (212) 974-2944
jburstein@burlaw.com