# EXHIBIT A

## divestcap

| | |
|---|---|
| From: | charles@divestcap.com |
| Sent: | Thursday, April 25, 2002 10:35 AM |
| To: | Avi Vigder; Shlomo Melchor; Raz Steinmetz |
| Attachments: | DivestCap Summit Immediate Next Steps 25 Apr 2002.doc |

Avi, Raz, & Shlomo,

DivestCap immediate next steps re. Summit Design attached.

Good luck closing Ampal.

Charlie

Charles C. Hale
Divestiture Growth Capital
Office (212) 289-3809
Universal (617) 818-2222
charles@divestcap.com

1

# DIVESTITURE GROWTH CAPITAL

[DivestCap partial list pending delivery of full list from management team]

1. **Q2 Plan Resolution**
   a. Delivery of final pipelines (sales force, executive team) to DivestCap
   b. Delivery of final plan (sales force, executive team) to DivestCap

2. **Organization Creation**
   a. Offer letters
      i. Sales force offer letters
      ii. Issuance of full contracts supporting DivestCap's summary binding contracts
   b. With board, creation of governance rules
      i. Board committees
      ii. Grants of authority system (signatories, etc.)
      iii. Bylaws
   c. Benefits package creation for US employees
   d. Portland facilities setup and hiring the (i) admin and (ii) maintenance renewal person
   e. System set up
      i. Order entry (NexLM)
      ii. Payroll
      iii. Financial
   f. Bank account set up, tax ID (with DivestCap)
      i. Registrations in all states

3. **Business Operations**
   a. Customer communications rollout

4. **Additional Fundraise**
   a. With DivestCap, build go to market approach for additional venture investor

CONFIDENTIAL

# DIVESTITURE GROWTH CAPITAL

CBGH-GGE Next Steps Re Summit Design Inc.

1. Finish remaining diligence
   a. Call TransEDA to validate asset sale potential and to help determine at how much money it is worthwhile for us to sell the various product lines
   b. Technical and market diligence call with Verisity – with assistance of Shlomo
   c. Call with CoWare to fine tune view of (i) exit potential, and (ii) competitive environment and positioning.

*Note: We have already had calls with Cadence, Synopsys, and Mentor, as well as over 15 customers, but we feel we should take the opportunity to do as much diligence as possible. At this point, we anticipate fully recommending investing the initial $1 million and positioning to fund the additional $1 - $2 million as our robot and launch continue.*

2. Gain rock solid commitment on revenue plan and pipeline
   a. Valuation issues:
      i. Management signed up to a plan of $8mm revenue and a low cash point (in October) of $1.03mm (assuming a $3mm raise). Bruce and I need to nail down 100% commitment to this plan, which we suspect is $1mm too aggressive on revenue and $400,000 too aggressive on cash flow.
      ii. To the extent the plan needs to come down, Bruce and I plan to negotiate down the management equity, especially since management attempted throughout the end of the transaction to base its equity stake on a $3mm pre-money valuation with a $3 million raise.
   b. As part of nailing down the plan, we'll settle on a more granular cash needs forecast

3. Settle financing-related issues
   a. Forward financials to Shlomo
   b. If our decision remains going with the growth plan – and we anticipate that it will be – based on the final outcome of steps #1 and #2, we'll want to (i) begin drawing down on I fund our $1mm, and (ii) proceed with raising the additional venture funds
   c. We'll also want to start bank financing discussions, although you should be aware that, because we have fewer receivables in this structure, a receivables line will not provide very much short-term cash.

4. Resolve outstanding comp plan issues
   a. Decide whether to give in on the issue of Israeli employees wanting stock instead of options. Also decide on whether to stay with our requirement that the employees vest based on EBITDA
   b. Sign / resolve Larry & Al's comp plan term sheets

5. Determine Cavallo-level corporate structure and setup
   a. Determine tax optimal structure / transference of ownership
      i. Bruce and I need to sell our shares in Summit to the tax optimal entity, thereby both transferring ownership to Cavallo or Enright and achieving a tax optimal structure.

6. Finalize terms of DivestCap / Cavallo relationship
   a. Finalize affiliating with Cavallo
   b. Finalize economic terms for this investment. Given the fact that we fronted our own expenses on this transaction, and valuation we achieved, we believe that a 20% carry is reasonable, although we understand this may depend on the source of the funds.

---

                                              CONFIDENTIAL

## divestcap

| | |
|---|---|
| From: | charles@divestcap.com |
| Sent: | Wednesday, November 13, 2002 1:19 PM |
| To: | Shlomo Meichor; Avi Vigder |
| Subject: | RE: Summit- cap table |
| Attachments: | Adjusted Prefd Model  Cap Tables 11 Nov_annotated.xls |

Annotated cap table and share / option breakout attached.

Thanks.

Charlie

Charles C. Hale
Divestture Growth Capital
660 Madison Avenue, Floor 18
New York, NY 10021
Universal: 617 818 2272
NY Office: 212 651 9013
Toll Free: 866 966 6400
charles@divestcap.com

**Visit DivestCap at:**
www.divestcap.com
-----Original Message-----
**From:** Shlomo Meichor [mailto:shlomo@gaiainv.com]
**Sent:** Wednesday, November 13, 2002 7:59 AM
**To:** charles@divestcap.com; Vigder, Avi
**Subject:** Summit

Hi,
For the approved enterprise status of Summit  and other issues in our tax planing please provide  the cap
table and the equity contribution of all the holders of Summit U.S.
thanks , Shlomo

·1

divestcap

| | |
|---|---|
| From: | Vigder, Avi [Avi@cavallocapital.com] |
| Sent: | Friday, June 28, 2002 4:10 PM |
| To: | Raz Steinmetz |
| Cc: | Shlomo Meichor |
| Subject: | FW: Update on Summit and Other Matters |
| Attachments: | Divestcap I LP Agreement.DOC; DivestCap Management Agreement.DOC |

-----Original Message-----
From: Bruce Hill [mailto:bruce@divestcap.com]
Sent: Thursday, June 27, 2002 2:47 PM
To: Vigder, Avi
Cc: charles@divestcap.com
Subject: Update on Summit and Other Matters

Avi - we have a number of topics to cover, so I have segmented them under different headings:

Larry and Al

Larry and Al sent Charlie releases with two changes:

(i) inserting a settlement amount of $90,000 payable in addition to the $25,000 already paid

(ii) making the release reciprocal, so that we release them from claims arising out of our relationship together.

Do the amounts look OK to you? The change related to reciprocity looks acceptable to Charlie and me.

Regarding payment timeframe, Larry and Al want to be paid in advance of the round since we have pushed back the round. I think it's fair to pay them since we will do so eventually. What do you think?

Sigma

Sigma is proceeding with Summit. The partner leading the investment for Sigma is the senior person at the firm. He has asked for more work to bring the financials to GAAP, and we are doing that. He will also be doing more diligence on the new product direction, although he has characterized that work as confirmatory. If new product sales come in close to plan, we should be in good shape with them. As a catalyst and to protect ourselves, we're working on bringing in other candidates.

Summit should beat plan ($1,388mm), with maintenance bookings well above the $650k forecast (a great sign for the health of the business and customer base). Currently, we have about $1.2mm booked. We won't know our actual new product sales number until the last day or two of the quarter. You should know that we have focused the business almost exclusively on bookings and cash flow, rather than GAAP revenue. This makes a large difference now, because we are booking maintenance orders and collecting the cash within 30 - 50 days mostly, but the revenue will be recognized ratably over the next 12 months.

Exit Strategies

Based on where we are currently, I think we should check in with Verisity sometime after the end of the quarter to let them know where we stand. We know that revenue will be at plan, and we had a great reception at DAC, which I'm sure that they saw. They are currently running at $11.5m a quarter in total revenue, of which about $4m is maintenance. Operating cash flow is very strong, about $2.5 million per quarter. Therefore, we could increase their overall business at our current run rate about 10 - 12%. I

1

## divestcap

| | |
|---|---|
| From: | Vigder, Avi [Avi@cavallocapital.com] |
| Sent: | Friday, June 28, 2002 4:10 PM |
| To: | Raz Steinmetz |
| Cc: | Shlomo Melchor |
| Subject: | FW: Update on Summit and Other Matters |
| Attachments: | Divestcap I LP Agreement.DOC; DivestCap Management Agreement.DOC |

-----Original Message-----
From: Bruce Hill [mailto:bruce@divestcap.com]
Sent: Thursday, June 27, 2002 2:47 PM
To: Vigder, Avi
Cc: charles@divestcap.com
Subject: Update on Summit and Other Matters

Avi - we have a number of topics to cover, so I have segmented them under different headings:

Larry and Al

Larry and Al sent Charlie releases with two changes:

(i) inserting a settlement amount of $90,000 payable in addition to the $25,000 already paid

(ii) making the release reciprocal, so that we release them from claims arising out of our relationship together.

Do the amounts look OK to you? The change related to reciprocity looks acceptable to Charlie and me.

Regarding payment timeframe, Larry and Al want to be paid in advance of the round since we have pushed back the round. I think it's fair to pay them since we will do so eventually. What do you think?

Sigma

Sigma is proceeding with Summit. The partner leading the investment for Sigma is the senior person at the firm. He has asked for more work to bring the financials to GAAP, and we are doing that. He will also be doing more diligence on the new product direction, although he has characterized that work as confirmatory. If new product sales come in close to plan, we should be in good shape with them. As a catalyst and to protect ourselves, we're working on bringing in other candidates.

Summit should beat plan ($1.366mm), with maintenance bookings well above the $650k forecast (a great sign for the health of the business and customer base). Currently, we have about $1.2mm booked. We won't know our actual new product sales number until the last day or two of the quarter. You should know that we have focused the business almost exclusively on bookings and cash flow, rather than GAAP revenue. This makes a large difference now, because we are booking maintenance orders and collecting the cash within 30 - 60 days mostly, but the revenue will be recognized ratably over the next 12 months.

Exit Strategies

Based on where we are currently, I think we should check in with Verisity sometime after the end of the quarter to let them know where we stand. We know that revenue will be at plan, and we had a great reception at DAC, which I'm sure that they saw. They are currently running at $11.5m a quarter in total revenue, of which about $4m is maintenance. Operating cash flow is very strong, about $2.5 million per quarter. Therefore, we could increase their overall business at our current run rate about 10 - 12%. I

1

think they will want to see us on a stronger profitability footing than we will be at the end of Q2. However, if we want to get something done with them toward the end of the year, we need to be in front of them now. The good news is that with our maintenance running well ahead of plan, we should be more attractive to them from a profitability perspective, since maintenance dollars are much higher margin.

Similarly, we should continue the discussions that Charlie began with Co-ware at DAC. Although they are a private company they could provide an acceptable fallback plan in a private for private stock merger if we feel we need to exit.

We are also staying engaged with TransEDA. They are unclear about their own strategic direction, but I believe they do have a real interest in the company. They are scared we will sell or OEM significant technology to one of the larger players, so they will probably only act defensively.

I believe Guy has established contact with people at Cadence who might very well be interested in acquiring Summit, but probably not for another 12 – 18 months.

<u>Legal Structure</u>

We are in process on three different things:

1. Employee agreements and stock issuance – we are pretty close to getting all this resolved
2. DivestCap/Cavallo investment docs for Summit – these have been prepared and we have attached them. We didn't show them to you before because we realized the structure might be different if Sigma and/or Genesis came in. These docs assume a "plain vanilla" US structure that other US VCs would probably want to see.
3. Finalizing the transfers of assets to the overseas entities – I think we have the documents all set, we just need to know if we are going to use an overseas structure or not.

I think we could get this all done in a week once we know what is going to happen with Sigma.

<u>DivestCap/Cavallo Long-term Agreement</u>

We would like to create real investment documents, create and fund the DivestCap entity in the next two weeks. We have a number of opportunities in our pipeline right now, and we need to resolve our situation before we can deal effectively with them. We can discuss this in greater detail when you have time.

<<Divestcap I LP Agreement.DOC>> <<DivestCap Management Agreement.DOC>>

Bruce G. Hill

Divestiture Growth Capital

(617) 489-8162

(617) 413-5531 (mobile)

bruce@divestcap.com

[Draft 6/3/02]

MANAGEMENT AGREEMENT, dated as of June [ ], 2002, by and
between DIVESTITURE GROWTH CAPITAL I, L.P., a limited partnership formed
under the laws of the State of Delaware (the "Partnership"), and DIVESTITURE
MANAGEMENT CORPORATION, a Delaware corporation (the "Manager").

       1.     The Partnership hereby employs the Manager, and the Manager
agrees to act, as the Partnership's investment advisor in, and manager of, the investment
and reinvestment of the Partnership's assets. The Manager agrees (a) to render
investment research services, advice and supervision to the Partnership, and (b) to furnish
all administrative services, including office space and administrative, bookkeeping and
clerical personnel and services as may be necessary for the affairs of the Partnership. The
Manager shall devote such time to the Partnership as shall be necessary in its reasonable
judgment to conduct and manage the Partnership's affairs in an efficient manner.

       2.     The Manager shall receive as compensation for its services
hereunder a management fee (the "Management Fee") equal on an annual basis to the
product obtained by multiplying (x) 0.02 by (y) the average cost basis of the investments
of the Partnership in the securities of Summit Design Technologies, Inc., or any successor
thereof (the "Company"), as of any date of determination. The first payment of the
Management Fee shall be due on the date hereof and thereafter shall be payable (and
determined) annually in advance on each anniversary of the date hereof. Upon the date
this Agreement is terminated, the Manager shall reimburse the Partnership for the
allocable portion of the Management Fee for the period between such date of such
termination and the end of the annual period for which the Management Fee had
previously been paid.

       3.     The Manager agrees to pay the compensation of all its employees
who render services to the Partnership, and the Partnership shall have no liability for such
compensation. The Manager and the Partnership each agree to pay the respective
expenses of the Partnership to be paid by such party as provided at the time in the
Agreement of Limited Partnership with respect to the Partnership, dated as of June [ ],
2002 among Divestcap LLC, a Delaware limited liability company, as General Partner,
and the Limited Partners referred to therein.

       4.     This Agreement shall be effective as of the date hereof and shall
terminate upon the dissolution, liquidation and winding up of the Partnership, or, if
earlier, as of the date that the Manager ceases to act as the liquidator of the Partnership.

       5.     The Manager shall not be subject to liability for any act or
omission to act in the course of, or connected with, performance of services under this
Agreement, provided that it acted in good faith, without gross negligence, willful
misfeasance or reckless disregard of its duties hereunder, and in what it reasonably
believed to be in the best interests of the Partnership.

{N0551?8.DOC}

6.    This Agreement shall be governed by the laws of the State of New York.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed in its name or by its authorized officer, all as of this day and year first above written.

DIVESTITURE GROWTH CAPITAL I, L.P.

By:   Divestcap LLC
      General Partner

By _____

DIVESTITURE MANAGEMENT CORPORATION

By _____

[Draft of 5/30/02]

# AGREEMENT OF LIMITED PARTNERSHIP

of

Divestiture Growth Capital I, L.P.

(a Delaware Limited Partnership)

Dated as of June [   ], 2002

{0269772.DOC  Ver.2}

## TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS................................................................................ 2

     Section 1.1      Definitions ..................................................................... 2

ARTICLE II      GENERAL PROVISIONS ............................................................ 4

     Section 2.1      Partnership Name.......................................................... 4

     Section 2.2      Office; Registered Agent ............................................ 4

     Section 2.3      Purposes of the Partnership........................................ 4

     Section 2.4      Liability of the Partners Generally.......................... 4

     Section 2.5      Fiscal Year ..................................................................... 5

     Section 2.6      Additional Partners ...................................................... 5

     Section 2.7      Employees...................................................................... 5

ARTICLE III      MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP ........... 5

     Section 3.1      Management Generally................................................. 5

     Section 3.2      Authority of the General Partner ............................ 5

     Section 3.3      Management Compensation and Expenses................ 6

     Section 3.4      Advances by the Partners............................................ 7

     Section 3.5      Other Activities............................................................. 7

     Section 3.6      Books and Records; Accounting Method ................ 7

     Section 3.7      Partnership Tax Returns............................................... 8

     Section 3.8      Reliance by Third Parties............................................ 8

ARTICLE IV      CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; DISTRIBUTIONS AND ALLOCATIONS ................................................. 8

     Section 4.1      Capital Contributions................................................... 8

     Section 4.2      Capital Accounts........................................................... 9

     Section 4.3      Distributions................................................................... 9

     Section 4.4      Allocations .................................................................... 12

     Section 4.5      Temporary Investment of Funds................................ 12

ARTICLE V      REPORTS TO LIMITED PARTNERS ........................................ 13

     Section 5.1      Reports ........................................................................... 13

ARTICLE VI      EXCULPATION AND INDEMNIFICATION .......................... 14

     Section 6.1      Exculpation and Indemnification.............................. 14

{00557778.DOC  Ver:2}

-i-

TABLE OF CONTENTS
(continued)

Page

ARTICLE VII     DURATION AND DISSOLUTION OF THE PARTNERSHIP................ 15

    Section 7.1          Duration ............................................................................................ 15

    Section 7.2          Dissolution ...................................................................................... 15

    Section 7.3          Liquidation of Partnership Interests................................................. 16

    Section 7.4          Distribution upon Dissolution of the Partnership ............................ 16

    Section 7.5          Withdrawal, Death or Incompetency of a Partner .......................... 16

ARTICLE VIII    TRANSFERABILITY OF A PARTNER'S INTEREST ...................... 17

    Section 8.1          Transferability of a Partner's Interest............................................. 17

ARTICLE IX      MISCELLANEOUS............................................................................ 17

    Section 9.1          Amendments to the Agreement ....................................................... 17

    Section 9.2          Representations................................................................................ 17

    Section 9.3          Successors; Counterparts.................................................................. 18

    Section 9.4          Governing Law; Severability.......................................................... 18

    Section 9.5          Section 9.5  Filings ......................................................................... 18

    Section 9.6          Power of Attorney........................................................................... 19

    Section 9.7          Notices .......................................................................................... 19

    Section 9.8          Withholding of Taxes ..................................................................... 19

PAGE

Schedule I     Names and Addresses of Limited Partners and Statement of Each
               Partner's Initial Capital Contribution and Partnership Percentage

Schedule II    Description of the Acquisition Investment

{00557278.00C  Ver.2}

AGREEMENT OF LIMITED PARTNERSHIP of Divestiture Growth Capital I, L.P., dated as of June [    ], 2002, among DivestCap LLC, a Delaware limited liability company, as General Partner, the initial limited partner named on the foot hereof (the "Initial Limited Partner") and the Persons listed on Schedule I hereto, as Limited Partners.

The General Partner and the Initial Limited Partner have heretofore associated themselves and agreed to become partners and have formed a limited partnership under the Delaware Act (as hereinafter defined), pursuant to the filing for record of a certificate of limited partnership on June [    ], 2002 and a certificate of amendment on June [    ], 2002 with respect thereto (such certificate of limited partnership, as amended, the "Certificate of Limited Partnership") in the Office of the Secretary of State of the State of Delaware.

In connection with the formation of the Partnership (as hereinafter defined), the General Partner and the Initial Limited Partner entered into a limited partnership agreement, dated as of June [    ], 2002, which the parties wish (i) to amend to permit the withdrawal of the Initial Limited Partner and the admission of the Limited Partners designated herein and (ii) to amend and restate in its entirety as set forth below; and

In furtherance thereof, the parties do hereby confirm their agreement that (i) the Initial Limited Partner, effective upon the execution and delivery of this Agreement by the other parties hereto, shall withdraw from the Partnership and cease to be a limited partner of the Partnership and shall thereafter have no interest in the Partnership whatsoever and (ii) the Partners do hereby associate themselves and agree to become partners of the Partnership and do hereby confirm their agreement as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  The following terms, as used herein, have the following meanings:

"Affiliate" of any Person means any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Agreement of Limited Partnership, as amended from time to time.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"Capital Account" has the meaning set forth in Section 4.2.

"Capital Contribution" means, with respect to any Partner, a contribution of cash made by such Partner to the Partnership pursuant to Section 4.1.

{00537776.DOC  Ver 2}

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means Summit Design Technologies, Inc., a [Delaware] corporation.

"Delaware Act" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101 et seq., as amended from time to time.

"General Partner" means, at any time, DivestCap LLC, a Delaware limited liability company, majority owned by Charles Hale and Bruce Hill, or any other Person who at such time serves as the general partner of the Partnership.

"Incapacity", with respect to any individual, means the death or bankruptcy of such individual, or the physical or mental disability of such individual (or the occurrence of such other event) such that the individual has been incapable of fulfilling his duties under this Agreement for a period of 180 days or more out of any 365-day period.

"Indemnitee" has the meaning set forth in Section 6.1(a).

"Limited Partners" means the persons listed as Limited Partners on Schedule 1 hereto.

"Management Agreement" has the meaning set forth in Section 3.3(a).

"Management Fee" has the meaning set forth in Section 3.3(a).

"Manager" has the meaning set forth in Section 3.3(a).

"Net Profit" and "Net Loss" mean, with respect to any fiscal year or other period, the net income or net loss of the Partnership determined in accordance with accounting methods and principles used by the Partnership for federal income tax purposes; provided, that Net Profit and Net Loss shall include, without limitation, the unrealized gain (or loss) with respect to any security or other asset of the Partnership that is distributed in kind by the Partnership (whether in connection with the liquidation of the Partnership or otherwise) during such fiscal year or other period, such unrealized gain (or loss) to be measured by the difference between the fair market value of such security or other asset (determined in accordance with Section 4.5(c)) and its adjusted tax basis in the hands of the Partnership as of the date distributed.

"Partners" means the General Partner and the Limited Partners.

"Partnership" means Divestiture Growth Capital I, L.P., as this partnership may from time to time be constituted.

"Partnership Expenses" has the meaning set forth in Section 3.3(a).

"Partnership Percentage" means, as to any Partner at any date of determination, the percentage obtained by dividing the aggregate amount of such Partner's Capital Contributions actually made on or prior to such date by the aggregate amount of the Capital Contributions of

all Partners actually made on or prior to such date. The initial Partnership Percentage of each of the Partners is set forth on Schedule I hereto.

"Person" means any individual, partnership, association, corporation, trust or other entity.

## ARTICLE II

### GENERAL PROVISIONS

Section 2.1    Partnership Name.  The name of the Partnership is Divestiture Growth Capital I, L.P.

Section 2.2    Office; Registered Agent.

(a)    The Partnership shall maintain a registered office in Delaware at, and the name and address of the Partnership's registered agent in Delaware is, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

(b)    The address of the General Partner shall be [660 Madison Avenue, New York, NY 10021], or such other place as the General Partner shall determine.

Section 2.3    Purposes of the Partnership.  The principal purposes of the Partnership are (i) to acquire, hold and dispose of investments, whether direct or indirect, in the Company, (ii) to engage in any lawful business activities in which limited partnerships formed under the Delaware Act may engage or participate relating to, arising from, or in connection with, the matters referred to in clause (i) of this Section 2.3, and (iii) to do everything necessary or desirable for the accomplishment of the above purposes or the furtherance of any of the powers herein set forth and to do every other act and thing incident thereto or connected therewith.

Section 2.4    Liability of the Partners Generally.

(a)    The General Partner shall have unlimited liability for the repayment and discharge of all recourse debts and obligations of the Partnership.

(b)    Except as otherwise provided in this Agreement or in the Delaware Act, the Limited Partners shall not be obligated to make any contribution of capital to the Partnership or have any liability for the debts and obligations of the Partnership.

Section 2.5    Fiscal Year.  The fiscal year of the Partnership for financial statement and federal income tax purposes shall be the calendar year, unless otherwise required under the Code.

Section 2.6    Additional Partners.  Except as provided in Section 8.1, no Person may be admitted as a Partner without the prior written approval of (i) the General Partner and (ii) a majority in interest of the Limited Partners (based on Partnership Percentages).

{00557773.DOC  Ver: 2}

3

Section 2.7    Employees. The Partnership shall have no employees, and except as otherwise provided in Sections 3.1(b) and 3.3, Partners shall not be entitled to any compensation for services rendered to the Partnership (except as agreed to in writing by all Partners).

## ARTICLE III

## MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP

(a)    Management Generally.    The management and control of the Partnership shall be vested exclusively in the General Partner. Except as provided in the Delaware Act, the Limited Partners shall have no part in the management or control of the Partnership and shall have no authority or right to act on behalf of the Partnership in connection with any matter.

Section 3.2    Authority of the General Partner. The General Partner shall have the power on behalf and in the name of the Partnership to carry out any and all of the purposes of the Partnership and to perform all acts which are necessary or desirable in connection therewith, including the power to:

(a)    acquire, hold and dispose of investments in the Company;

(b)    open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(c)    enter into, and take any action under, any contract, agreement or other instrument as the General Partner shall determine to be necessary or desirable to further the purposes of the Partnership;

(d)    bring and defend actions and proceedings at law or equity and before any governmental, administrative or other regulatory agency, body or commission;

(e)    employ and dismiss from employment any and all attorneys, accountants (subject to Section 5.1(a)), consultants, appraisers or custodians of the assets of the Partnership and managing, disbursement or other agents on such terms and for such compensation as the General Partner may determine;

(f)    subject to Section 3.4, borrow money to pay Partnership Expenses, which borrowing shall be on such reasonable terms as the General Partner shall determine;

(g)    incur Partnership Expenses in accordance with this Agreement, and, to the extent that funds of the Partnership are available for such purpose, pay all such Partnership Expenses;

(h)    purchase liability insurance from third parties; and

(i)    act for and on behalf of the Partnership in all matters incidental to the foregoing.

Section 3.3    Management Compensation and Expenses.

(a)     The Partnership shall enter into an agreement in the form of Exhibit A attached hereto (the "Management Agreement") with Divestiture Management Corporation, a Delaware corporation, as Manager (the "Manager"), pursuant to which the Manager shall render services to the Partnership and shall receive, as compensation for such services, an annual fee (the "Management Fee"), payable annually in advance, calculated as provided therein.

(b)     The Management Agreement shall provide that the Manager shall pay the compensation of all its employees who render service to the Partnership and the Partnership shall have no liability for such compensation. All expenses of, or relating to, the Partnership, including without limitation, expenses relating to developing, investigating and monitoring the investments of the Partnership, expenses of operation and administration of the Partnership and travel, food and lodging expenses incurred by the Manager, shall be paid by the Manager, except for the following which shall be paid by the Partnership: (i) up to $[          ] to be paid to, or as directed by, the Manager, in reimbursement of actual costs and expenses (including the reasonable fees and expenses of counsel and all out-of-pocket travel expenses of the General Partner, the Manager and the Manager's officers, directors, shareholders, employees and affiliates of the organization of the Partnership, (ii) out-of-pocket fees, costs and expenses directly related to the purchase or sale of securities of the Company by the Partnership, (iii) any Federal, state, local or other taxes of the Partnership, (iv) reasonable fees and expenses of independent public accountants and counsel for the Partnership and fees and expenses of consultants and other professionals rendering special services to the Partnership (exclusive of services of the type provided by the employees of the Manager), (v) reasonable interest expense of the Partnership, (vi) reasonable costs of insurance of the Partnership (but excluding costs of insurance relating solely to the operations and personnel of the Manager), (vii) reasonable costs and expenses of meetings of the Limited Partners, (viii) fees, costs and expenses associated with litigation involving the Partnership, and (ix) extraordinary expenses (such items referred to in clauses (i) through (ix), together with the Management Fee are referred to herein as the "Partnership Expenses"). Organization expenses of the Partnership in excess of the $[          ] amount referred to in clause (i) above, if any, shall be discharged by the General Partner, or on its behalf by one of its affiliates, including the Manager, but excluding the Partnership.

(c)     The Management Agreement may be amended or terminated by the General Partner on behalf of the Partnership only with the approval of Limited Partners having in the aggregate not less than 50% in interest of all Limited Partners (based on Partnership Percentages). In the event that the Management Agreement should terminate prior to the dissolution of the Partnership, the General Partner shall arrange for the services supplied thereunder to be supplied by the General Partner or some other person or persons as shall be acceptable to 50% in interest of the Limited Partners (based on Partnership Percentages) at a cost to the Partnership not exceeding the cost to the Partnership under the Management Agreement.

(d)     The Partnership shall be responsible for and shall pay all Partnership Expenses. All Partnership Expenses shall be paid out of funds of the Partnership determined by the General Partner to be available for such purpose.

Section 3.4     Advances by the Partners. The General Partner or any Limited Partner may, but shall not be obligated to, advance its own funds to the Partnership in connection with the payment of Partnership Expenses. The General Partner or such Limited Partner, as the case

may be, will be repaid, with interest payable at a fluctuating rate per annum equal to the prime lending rate of interest publicly announced from time to time throughout the period such advance is outstanding by The Chase Manhattan Bank, as promptly as practicable out of funds of the Partnership determined by the General Partner to be available for such purpose.

Section 3.5   Other Activities.  The General Partner, any of its affiliates and any officer or employee of any such Person will devote such time to the affairs of the Partnership as the General Partner reasonably determines is necessary to manage and operate the Partnership. Neither this Agreement, nor any principle of law or equity, shall preclude or limit in any respect the right of any Partner or any affiliate thereof to engage in or derive profit or compensation from any activities or investments not relating to, arising from, or in connection with, an investment, whether direct or indirect, in the Company, or shall give any Limited Partner any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

Section 3.6   Books and Records; Accounting Method.

(a)   The General Partner shall keep or cause to be kept at the address of the General Partner (or at such other place as the General Partner shall advise the Limited Partners in writing) full and accurate books and records of the Partnership.  Such books and records shall be available for inspection and copying at reasonable times during business hours by any of the Limited Partners or their duly authorized agents or representatives.

(b)   The Partnership's books of account shall be kept on the same basis followed by the Partnership for federal income tax purposes.

Section 3.7   Partnership Tax Returns.

(a)   The General Partner shall cause the accountants of the Partnership to prepare and timely file all tax returns required to be filed for the Partnership.

(b)   The General Partner is hereby designated as the Partnership's "Tax Matters Partner" under Section 6231(a)(7) of the Code.  The General Partner is specifically directed and authorized to take whatever steps the General Partner, in its discretion, deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under Treasury regulations.  Any Limited Partner shall have the right to participate in any administrative proceedings relating to the determination of Partnership items at the Partnership level at its own cost and expense.

(c)   The General Partner shall have full power and authority to execute and file on behalf of the Partnership any applicable elections under federal, state, local and foreign tax laws that the General Partner, in its sole discretion, deems necessary or advisable, including without limitation, the execution and filing of any election or other statement confirming the status of the Partnership as a partnership, and not as an association taxable as a corporation, for federal income tax purposes.

{00657772.DOC  Ver.2}

6

Section 3.8    Reliance by Third Parties. Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

### ARTICLE IV

#### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Capital Contributions. Each Partner has made an initial Capital Contribution to the Partnership in the amount reflected on Schedule I hereto. The aggregate amount of the initial Capital Contributions of all Partners shall be used to purchase the securities of the Company set forth on Schedule II hereto and to pay related transaction fees and expenses. Each Partner shall make additional Capital Contributions to the Partnership to pay Partnership Expenses; provided that any such additional Capital Contributions used to pay Partnership Expenses shall be subject to the following limitations. The obligation of each Partner to make additional Capital Contributions to pay Partnership Expenses shall not exceed such Partner's Partnership Percentage of $[_____] per annum, which annual amount shall cumulate over the life of the Partnership. All additional Capital Contributions shall be payable within eight (8) Business Days after call by the General Partner.

Section 4.2    Capital Accounts. There shall be established for each Partner, on the books and records of the Partnership, an account of partnership capital (a "Capital Account"). The Capital Account shall be maintained in accordance with the principles of applicable Treasury regulations under Section 704 of the Code.

Section 4.3    Distributions.

(a)    Order of Priority of Distributions. All distributions in respect of, or attributable to, the investment in securities of the Company, shall be made, without duplication, as follows:

(i)    first, to the Partners (in proportion to their respective Partnership Percentages) until the Partners shall have received (and, in the case of distributions in connection with dividends received by the Partnership with respect to securities of the Company, together with any other amounts previously distributed with respect to any other prior dividends with respect to such securities) an amount equal to the original cost basis of the securities of the Company which such distribution is in respect of or attributable to, plus any Management Fees ("Original Capital";

(ii)    second, 90% to all Partners (in proportion to their respective Partnership Percentages), and 10% to the General Partner as a carried interest; and

(iii)    third, after all Partners shall have received from distributions pursuant to Section 4.3(a)(ii) above an amount equal to a fifteen percent (15%) per annum rate of return on the Original Capital, 80% to all Partners and 20% to the General Partner as a carried interest.

{00657778.DOC Ver.2}

(b)     Distributions of Cash. Any cash received by the Partnership, net of Partnership Expenses and a reasonable reserve for any actual or contingent liabilities of the Partnership, shall be distributed to the Partners as soon as practicable after such receipt.

(c)     Distributions in Kind. Any securities or other property constituting all or any portion of the Partnership assets may be distributed in kind in such amounts as the General Partner shall determine, and any such distribution shall be made to the Partners in accordance with this Article IV. For purposes of this Agreement, the amount of any distribution of property shall be equal to the fair market value of such property as determined at the time of such distribution in accordance with the provisions of this Section 4.3(c).

Except as otherwise provided in this paragraph, all valuations and/or determinations of fair market value required or permitted by this Agreement shall be made by the General Partner in a written report to the Limited Partners, and shall be conclusive and binding upon the parties hereto for all purposes of this Agreement. In determining the fair market value of any assets, the following principles shall apply: (i) securities that are transferable without restriction under the securities laws, and the principal market for which is either the New York Stock Exchange or the American Stock Exchange, shall be valued at their last reported sale price on such exchange on the last trading day on or prior to the date of determination, or, if no reported sales occurred on such day, at the mean between the closing "bid" and "asked" prices on such day; (ii) securities that are transferable without restriction under the securities laws, and the principal market for which is some other national securities exchange or the over-the-counter market, shall be valued at their last reported sale price on the last trading day on or prior to the date of determination, or, if no reported sales occurred on such day, at the mean between the closing "bid" and "asked" prices on such day, or, if the principal market for such securities is in the over-the-counter market, at their last sale price, if available, or, if not available, their closing "bid" price on such day, each as published by the National Association of Securities Dealers Automated Quotation System, or, if neither such price is so published, at the mean between their closing "bid" and "asked" prices on such day, if available, which prices may be obtained from any reputable broker or dealer; (iii) securities distributed in kind shall be valued at the average of the valuations established in accordance with clauses (i) and (ii) above, as applicable, over the ten trading days immediately preceding the date of distribution of such securities; and (iv) all other assets (including securities the fair market value of which is not determinable pursuant to the foregoing provisions of this sentence) shall be valued at their fair market value. Fair market value of securities for purposes of clause (iv) of the immediately preceding sentence shall initially be equal to the cost of such securities, with subsequent adjustments to fair market value to reflect meaningful third party transactions with respect to the same or similar securities in the private marketplace.

(d)     Reinvestment of Proceeds. Proceeds from the sale or other disposition of an investment in the Company shall not be reinvested by the Partnership except to the extent that such proceeds represent an investment repayable to, or redeemable by, the Partnership within one year from the date of initial investment.

Section 4.4     Allocations. (a) For purposes of computing Partners' Capital Accounts and for United States federal income tax purposes, allocations of items of income, gain, loss,

{00357778.DOC Ver.2}

8

deduction, expense and credit for each fiscal year of the Partnership shall be in accordance with each Partner's economic interest in the respective item as provided in this Agreement.

Accordingly, Net Profit or Net Loss for each fiscal year or other period shall be allocated among the Partners (and credited or debited to their Capital Accounts) in such manner that were the Partnership to liquidate completely at the end of such fiscal year or other period and (i) in connection with such liquidation sell all of its assets at their then adjusted tax basis (i.e., without any Net Profit or Net Loss resulting therefrom) and settle all of its liabilities, and (ii) distribute its remaining cash to the Partners in accordance with their respective positive Capital Account balances (after crediting or debiting Capital Accounts for Net Profit or Net Loss for such fiscal year or other period), the resulting distribution would correspond as closely as possible to the distributions that would result if the liquidating distributions had instead been made in accordance with the provisions of Section 4.3; provided that in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss, deduction and credit with respect to any property other than cash contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and the property's fair market value (determined in accordance with Section 4.3(c)) on the date of its contribution to the Partnership.

(b)    Notwithstanding anything else contained in this Section 4.4, if any Partner has a deficit balance in its Capital Account for any fiscal year as a result of any adjustment of the type described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (6), then items of Partnership income and gain will be specially allocated to such Partner in an amount and manner sufficient to eliminate such deficit as quickly as possible. Any special allocation of items of income and gain pursuant to this Section 4.4(b) shall be taken into account in computing subsequent allocations pursuant to this Section 4.4 so that the cumulative net amount of all items allocated to each Partner shall, to the extent possible, be equal to the amount that would have been allocated to such Partner if there had never been any allocation pursuant to this Section 4.4(b).

Section 4.5    Temporary Investment of Funds. Unless otherwise agreed by the Partners in writing, the General Partner shall invest all cash held by the Partnership, including all amounts being held by the Partnership for payment of Partnership Expenses or distribution to the Partners (above a reasonable amount needed to maintain a checking account), in short-term money market or other comparable investments in high-quality investment-grade securities.

## ARTICLE V

## REPORTS TO LIMITED PARTNERS

Section 5.1    Reports.

(a)    The books of account and records of the Partnership shall be audited as of the end of each fiscal year by the Partnership's independent public accountants.

{00557718.DOC Ver: 2}

9

The Partnership's independent public accountants shall be a nationally recognized independent certified public accounting firm selected by the General Partner.

(b)    Not later than 60 days after the end of each of the first three fiscal quarters, the General Partner shall deliver to each of the Limited Partners a report setting forth as of the end of such fiscal quarter:

(i)    a balance sheet of the Partnership,

(ii)   an income and expense statement of the Partnership for such fiscal quarter, and

(iii)  a list of the Partnership assets at the end of such fiscal quarter and a list of the Partnership assets acquired or disposed of by the Partnership during such fiscal quarter and the consideration paid or received for such assets.

(c)    Not later than 120 days after the end of each fiscal year, the General Partner shall cause the independent public accountants to prepare, and shall mail to each Partner, an audited report setting forth as of the end of such fiscal year:

(i)    a balance sheet of the Partnership,

(ii)   an income statement of the Partnership for such fiscal year,

(iii)  a statement of the Partnership's capital for such year, and

(iv)   footnotes disclosing the assets of the Partnership at the end of such fiscal year and the assets of the Partnership acquired or disposed of during such fiscal year and the consideration paid or received for such assets.

(d)    After the end of each fiscal year, the General Partner shall transmit to each Partner, as promptly as practicable and in any event within 120 days after the close of the fiscal year, a federal income tax Form K-1 for such Partner, a copy of the Partnership's return filed for federal income tax purposes and a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable each Partner to prepare its federal income tax return, if any.

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.1    Exculpation and Indemnification.

(a)    Neither the General Partner or the Manager, nor any director, officer, employee, agent, member or affiliate of the General Partner or the Manager (individually, an "Indemnitee"), shall be liable to the Partnership or any Limited Partner (or any director, officer, employee, agent or affiliate thereof) for any losses, claims, damages, liabilities or expenses (collectively, "Damages") arising out of or relating to any act or omission performed or omitted by such

{00553778.DOC  Ver.2}

The Partnership's independent public accountants shall be a nationally recognized independent certified public accounting firm selected by the General Partner.

(b)    Not later than 60 days after the end of each of the first three fiscal quarters, the General Partner shall deliver to each of the Limited Partners a report setting forth as of the end of such fiscal quarter:

     (i)    a balance sheet of the Partnership,

     (ii)    an income and expense statement of the Partnership for such fiscal quarter, and

     (iii)    a list of the Partnership assets at the end of such fiscal quarter and a list of the Partnership assets acquired or disposed of by the Partnership during such fiscal quarter and the consideration paid or received for such assets.

(c)    Not later than 120 days after the end of each fiscal year, the General Partner shall cause the independent public accountants to prepare, and shall mail to each Partner, an audited report setting forth as of the end of such fiscal year:

     (i)    a balance sheet of the Partnership,

     (ii)    an income statement of the Partnership for such fiscal year,

     (iii)    a statement of the Partnership's capital for such year, and

     (iv)    footnotes disclosing the assets of the Partnership at the end of such fiscal year and the assets of the Partnership acquired or disposed of during such fiscal year and the consideration paid or received for such assets.

(d)    After the end of each fiscal year, the General Partner shall transmit to each Partner, as promptly as practicable and in any event within 120 days after the close of the fiscal year, a federal income tax Form K-1 for such Partner, a copy of the Partnership's return filed for federal income tax purposes and a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable each Partner to prepare its federal income tax return, if any.

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.1    Exculpation and Indemnification.

(a)    Neither the General Partner or the Manager, nor any director, officer, employee, agent, member or affiliate of the General Partner or the Manager (individually, an "Indemnitee"), shall be liable to the Partnership or any Limited Partner (or any director, officer, employee, agent or affiliate thereof) for any losses, claims, damages, liabilities or expenses (collectively, "Damages") arising out of or relating to any act or omission performed or omitted by such

{0565778.DOC Ver.2}

10