Indemnitee in connection with this Agreement, except for Damages attributable to the gross negligence, willful misconduct or bad faith of such Indemnitee. Each Indemnitee may consult with counsel, accountants and other professional advisors in respect of the affairs of the Partnership and shall be fully protected and justified in acting, or failing to act, if such action or failure to act is in good faith and in accordance with the written advice or opinion of such counsel, accountants or other professional advisors. Neither (i) the failure of an Indemnitee to consult with any such advisors nor (ii) the failure of an Indemnitee to act or refrain from acting in accordance with the advice of any such advisor shall constitute, per se, gross negligence, willful misconduct or bad faith.

(b)    The Partnership shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Indemnitee from and against any and all Damages arising out of or relating to any action taken or omitted by such Indemnitee in connection with this Agreement, or to which any such Indemnitee may become subject by reason of representing the Partnership on the Board of Directors of any portfolio company, except any such Damages that are attributable to the gross negligence, willful misconduct or bad faith of such Indemnitee. If an Indemnitee becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with the Partnership's business or affairs, the Partnership will periodically reimburse such Indemnitee for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith; provided that such Indemnitee shall have entered into an undertaking with the Partnership to promptly repay to the Partnership the amount of any such reimbursed expenses paid to it if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified by the Partnership in connection with such action, proceeding or investigation as provided in the exception contained in the immediately preceding sentence.

The termination of any proceeding by settlement shall not, of itself, create a presumption that an Indemnitee acted in bad faith or a manner which constituted gross negligence or willful misconduct. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall extend to his heirs, successors, assigns and legal representatives.

In addition, to the extent that insurance from third parties has been obtained and is available in respect of any Damages incurred by an Indemnitee, the General Partner will use its best efforts to have such Damages paid out of such insurance rather than having the Partnership make any payments pursuant to the indemnification obligation contained herein; provided that if such proceeds are not readily available, the General Partner may in its sole discretion cause the Partnership to pay such Damages, in which event the Partnership will be entitled to reimbursement therefor out of the proceeds of insurance when and if obtained. The General Partner may (but shall not be obligated to) cause the Partnership to obtain, at the expense of the Partnership, insurance against any Damages, regardless of whether the Partnership would, pursuant to this Section 6.1(b), be required to indemnify an Indemnitee in respect of such Damages.

ARTICLE VII

{02557778.DOC Ver. 2}

11

DURATION AND DISSOLUTION
OF THE PARTNERSHIP

Section 7.1    Duration.  The Partnership shall continue in existence until [ _____ ], unless sooner dissolved pursuant to Section 7.2; provided that the General Partner may, with the consent of a majority in interest of the Limited Partners (based on Partnership Percentages), extend the term of the Partnership for up to three successive one-year terms following the expiration of such initial term to the extent necessary to permit an orderly termination of the Partnership and the liquidation of Partnership assets.

Section 7.2    Dissolution.  Subject to the Delaware Act, the Partnership shall be dissolved and its affairs shall be wound up upon the earliest of:

(a)    the expiration of the term of the Partnership provided in Section 7.1 as it may be extended;

(b)    written consent of the General Partner and at least 75% in interest of the Partners (based on Partnership Percentages);

(c)    delivery of a notice by a majority in interest of the Limited Partners (based on Partnership Percentages) to the General Partner in the event of the death or incapacity of both Charles Hale and Bruce Hill;

(d)    delivery of a notice by a majority in interest of the Limited Partners (based on Partnership Percentages) to the General Partner in the event that a majority of the limited liability company interests of the General Partner ceases to be owned by Charles Hale and Bruce Hill or their respective affiliates and legal or testamentary heirs; and

(e)    notice of an event of withdrawal of the General Partner (within the meaning of the Delaware Act) unless (i) at the time there is at least one general partner of the Partnership and such general partner shall continue the business of the Partnership or (ii) if within 90 days after the event of withdrawal, the Limited Partners agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of the event of withdrawal, of a new General Partner.

Section 7.3    Liquidation of Partnership Interests.  Upon dissolution, the Partnership's business and assets shall be liquidated in an orderly manner.  The General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement, except that in case of dissolutions pursuant to paragraphs (c), (d) and (e) of Section 7.2, a majority in interest of the Limited Partners (based on Partnership Percentages) may by written notice to the General Partner designate the liquidator.  In performing its duties, the liquidator is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Partnership in any reasonable manner that the liquidator shall determine to be in the best interest of the Partners.  Subject to the Delaware Act, the liquidator shall dispose of or distribute all Partnership assets to the Partners within one year of dissolution, except that such one-year period may be extended with the approval of a majority in interest of the Partners (based on Partnership Percentages).

Section 7.4    Distribution upon Dissolution of the Partnership.  Subject to the Delaware Act, after all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be distributed to the Partners in accordance with Section 4.3.

Section 7.5    Withdrawal, Death or Incompetency of a Partner.  Except as otherwise provided in Article VIII, a Partner may not withdraw from the Partnership prior to its termination.  Except as expressly provided in this Agreement, no event affecting a Partner (including bankruptcy or insolvency) shall affect its obligations under this Agreement or affect the Partnership; provided that the provisions of this Section 7.5 shall not prevent an event that would otherwise result in a dissolution of the Partnership under Section 7.2 from having such effect.

## ARTICLE VIII

## TRANSFERABILITY OF
## A PARTNER'S INTEREST

Section 8.1    Transferability of a Partner's Interest.  (a)  Except as otherwise provided herein, a Partner may not, directly or indirectly, sell, exchange, transfer, assign, pledge, hypothecate or otherwise dispose of all or any portion of its interest in the Partnership to any Person without the prior written approval of the General Partner and a majority in interest of the Limited Partners (based on Partnership Percentages), which may be granted or withheld in each Partner's sole discretion; provided that the interest of any Partner in the Partnership may be transferred to a testamentary or legal heir of such Partner, without the prior approval of any Partner, but no such transferee shall become a substituted Limited Partner without the prior written consent of the General Partner (which consent may be granted or withheld in its sole discretion) and without such transferee having executed this Agreement and becoming bound by the terms hereof applicable to a Limited Partner to the extent of the interest transferred.

(b)     Charles Hale and Bruce Hill shall retain control over the General Partner and, collectively, taken together with their respective affiliates and legal or testamentary heirs, shall own at least a majority of the limited liability company interests issued by the General Partner.

(c)     The foregoing notwithstanding, no transfer of any interest in the Partnership shall be made (and no proposed transfer shall be deemed effective for any purpose or vest any rights in the proposed transferee) if such transfer: (i) would violate the then applicable federal or state securities laws or rules and regulations of the Securities and Exchange Commission, state securities commissions or any other governmental authorities with jurisdiction over such transfer; (ii) would result in the Partnership being treated as an association taxable as a corporation or as a publicly traded partnership or would result in a termination of the Partnership, for federal income tax purposes; or (iii) would affect the Partnership's existence or qualification as a limited partnership under any applicable state law.

(d)     The General Partner may not withdraw from the Partnership prior to its dissolution.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Amendments to the Agreement.  This Agreement may be amended or compliance with any provision waived only with the written approval of the General Partner and a majority in interest of the Limited Partners (based on Partnership Percentages); provided that without the consent of all adversely affected Partners, the rights, powers or privileges of any Limited Partner may not be adversely modified in any manner.

Section 9.2    Representations.

(a)    Each Partner, by executing this Agreement, represents and warrants that its interest in the Partnership has been acquired for its own account, in each case for investment and not with a view to resale or distribution thereof and that it is fully aware that in agreeing to admit it as a Partner, the other Partners and the Partnership are relying upon the truth and accuracy of this representation and warranty.

(b)    Each Limited Partner, by executing this Agreement, represents and warrants that it is the beneficial owner of its interest in the Partnership and that it is either (i) not a partnership, grantor trust or S corporation for United States Federal income tax purposes (a "flow-through entity") or (ii) is a flow-through entity and (x) substantially all of its value is attributable to property other than its interest in the Partnership or (y) it was not formed, availed of or reorganized for the principal purpose (or as one of its principal purposes) to permit the Partnership to satisfy the 100 partner limitation of United States Treasury Regulation Section 1.7704-1(h)(ii).

(c)    If any Limited Partner is a "special purpose entity" (which, for this purpose, shall mean any entity (i) that was formed for the purpose of investing in the Partnership or (ii) whose principal asset will be its interest in the Partnership), such Partner (x) shall so advise the General Partner in writing, and (y) shall provide the General Partner with such information (including such representations and warranties) relating to such entity and its ultimate beneficial owners as may be reasonably requested in order to assure compliance with all legal and regulatory requirements (including those under the Code, the Securities Act of 1933, the Investment Company Act of 1940 and the Investment Advisers Act of 1940). In addition, restrictions (substantially similar to the restrictions contained in Section 8.1 hereof on the transfer of limited partnership interests) shall be imposed on the ability of the ultimate beneficial owners of such "special purpose entity" to transfer directly or indirectly their interests in such entity.

Section 9.3    Successors; Counterparts. This Agreement (i) shall be binding upon, and inure to the benefit of, the legal successors and permitted assigns of the Partners and (ii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 9.4    Governing Law; Severability. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the

{00557778.DOC Ver.2}

14

Delaware Act. If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Agreement shall be invalid or unenforceable under said Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

Section 9.5    Section 9.5 Filings. The General Partner shall promptly prepare, following the execution and delivery of this Agreement, any documents required to be filed and recorded, or, in the General Partner's view, appropriate for filing and recording, under the Delaware Act, and the General Partner shall promptly cause each such document to be filed and recorded in accordance with said Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each state in which the Partnership may hereafter establish a place of business. The General Partner shall also promptly cause to be filed, recorded and published such statements of fictitious business name and other notices, certificates, statements or other instruments required by any provision of any applicable law of the United States or any State or other jurisdiction which governs the conduct of its business from time to time.

Section 9.6    Power of Attorney. The Limited Partners do hereby constitute and appoint the General Partner as their true and lawful representative and attorney-in-fact, in their name, place and stead to make, execute, sign and file a Certificate of Limited Partnership of the Partnership, any amendment thereof required because of an amendment to this Agreement or in order to effectuate any amendments to this Agreement approved in accordance with Section 9.1 and all such other instruments, documents and certificates that may from time to time be required by the laws of the United States of America, the State of Delaware or any other State, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership or to dissolve the Partnership.

Such representatives and attorneys-in-fact shall not have any right, power or authority to amend or modify this Agreement when acting in such capacities.

Section 9.7    Notices. All notices, capital calls, requests and other communications to any party hereunder shall be in writing (including facsimile, telecopier or similar writing) and shall be given to such party at its address or facsimile number set forth on Schedule I hereto or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other Partners. Each such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified pursuant to this Section 9.7 and the appropriate confirmation is received on a Business Day, (ii) if given by mail, 72 hours after such communication is deposited in the mails with first class, certified or registered postage prepaid, addressed as aforesaid or (iii) if given by any other means, when delivered at the address specified pursuant to this Section 9.7 on a Business Day.

Section 9.8    Withholding of Taxes.

(a)     The General Partner is authorized to take any action that it determines to be necessary or appropriate to cause the Partnership to comply with applicable United States federal, state, local or foreign withholding tax requirements. Any amount withheld with respect to a Limited Partner shall be deducted from the amount that would otherwise have been distributed to such Limited Partner, but shall be treated as though it had been distributed to such Limited Partner for all purposes under this Agreement.

(b)     Each Limited Partner covenants for itself and its successors, assigns, heirs and personal representatives that such Limited Partner will, at any time prior to or after dissolution of the Partnership, on demand, whether before or after such Limited Partner's withdrawal from the Partnership, pay to the Partnership or the General Partner, any amounts which the Partnership or the General Partner, as the case may be, pays or is required to pay in respect of taxes (including withholding taxes, and any interest and penalties imposed with respect to such taxes) imposed upon income of or distributions to such Limited Partner to the extent not previously deducted from amounts otherwise distributable to such Limited Partner pursuant to Section 9.8(a).

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day and year first above written.

[_____],
as General Partner

_____
By:
Title:

[     [_____], ]
as Limited Partner

_____

(a)     The General Partner is authorized to take any action that it determines to be necessary or appropriate to cause the Partnership to comply with applicable United States federal, state, local or foreign withholding tax requirements. Any amount withheld with respect to a Limited Partner shall be deducted from the amount that would otherwise have been distributed to such Limited Partner, but shall be treated as though it had been distributed to such Limited Partner for all purposes under this Agreement.

(b)     Each Limited Partner covenants for itself and its successors, assigns, heirs and personal representatives that such Limited Partner will, at any time prior to or after dissolution of the Partnership, on demand, whether before or after such Limited Partner's withdrawal from the Partnership, pay to the Partnership or the General Partner, any amounts which the Partnership or the General Partner, as the case may be, pays or is required to pay in respect of taxes (including withholding taxes, and any interest and penalties imposed with respect to such taxes) imposed upon income of or distributions to such Limited Partner to the extent not previously deducted from amounts otherwise distributable to such Limited Partner pursuant to Section 9.8(a).


IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the day and year first above written.

[_____],
as General Partner


By:
Title:

[     [          ],          ]
as Limited Partner

## SCHEDULE I

| Partner and Address | Aggregate Initial Capital Contribution | Initial Partnership Percentage |
|---|---|---|
| **General Partner** | | |
| [          ] <br> [          ] <br> [          ] <br> [          ] <br> Tel: [      ] <br> Fax: [      ] | [$      ] | 1.0% |
| | [$      ] | 1.0% |
| **Limited Partners** | | |
| _____ <br> _____ <br> _____ | [$      ] | [____%] |
| _____ <br> _____ <br> _____ | [$      ] | [____%] |
| | [$      ] | 99.0% |
| | [$      ] | 100.0% |

## SCHEDULE II

Description of the Acquisition Investment

divestcap

| | |
|---|---|
| From: | Charles@divestcap.com |
| Sent: | Monday, October 13, 2003 11:43 AM |
| To: | 'Shlomo Melchor' |
| Cc: | pcbogonis@hotmail.com; Golan, Daniel; 'Bruce Hill' |
| Subject: | FW: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc |

Shlomo – one thing to add to your list:

Summit is an approved enterprise but we get no grants and no tax benefits since we're not operating at a profit in Israel (cost center). So, why is Summit an approved enterprise? Is it just because the team wants to tie up the IP to guarantee job security?

Summit needs a Shlomo proctology exam to make sure SD Israel is in line. When do you think we can make that happen?

Charlie

Charles C. Hale
DivestCap Management Corp
Divestiture Growth Capital LLC
660 Madison Avenue, Floor 21
New York, NY 10021
Mobile: 617 818 2222
NY Office: 212 651 9023
eFax: 702 977 3355
charles@divestcap.com

**Visit DivestCap at:**
**www.divestcap.com**

*Growing Technology Divestitures with Knowledge & Capital*

-----Original Message-----
From: charles@divestcap.com [mailto:charles@divestcap.com]
Sent: Monday, October 13, 2003 9:33 AM
To: 'Shlomo Melchor'
Subject: RE: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc

Okay – thanks for the response. I'm checking with our US VP of Finance to see if he believes there is some kind of more material expense. I should have an update in a few hours. I still think it would be helpful for you to visit to see what's going on, whether the car leases are appropriate, et cetera. I may be paranoid, but the team's behavior leads me to suspect they're hiding something. This something probably isn't material but I still don't like the feeling.

Charlie

Charles C. Hale
DivestCap Management Corp
Divestiture Growth Capital LLC
660 Madison Avenue, Floor 21
New York, NY 10021
Mobile: 617 818 2222
NY Office: 212 651 9023
eFax: 702 977 3355
charles@divestcap.com

Visit DivestCap at:
www.divestcap.com

1

*Growing Technology Divestitures with Knowledge & Capital*

-----Original Message-----
From: Shlomo Meichor [mailto:shlomo@galakiv.com]
Sent: Monday, October 13, 2003 5:02 AM
To: charles@divestcap.com
Subject: RE: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc

Yes it helps.
There are some expenses that are not deductible for tax.Not only that these are not deductible you need to pay
tax at the rate of 45%(this tax is an advance on the account of the company corporate tax and can be used at any
time as long as you need to pay taxes which I believe is not the case here). These expenses includes mainly Car
expenses travel abroad (first class tickets,hotel expenses above certain amount food costs restaurants etc.by the
way mobile phones are NOT part of it this is anther issue). I can tell you that these expenses are common to  all
the companies operating in Israel so you should not be that worried about it  although procedures must be in
place  with respect to travel expenses and company cars.
Yes, you can avoid some of it by paying it from the anther entity provided that this entity is not subject to Israel
law nor it is an Israeli residence.


-----Original Message-----
From: charles@divestcap.com [mailto:charles@divestcap.com]
Sent: Sunday, October 12, 2003 11:42 PM
To: Shlomo Meichor
Cc: bruce@divestcap.com
Subject: RE: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc

Shlomo -- I don't know the exact name of the tax but here's how it works:

Apparently, especially if one is an approved enterprise, one gets taxed at 100% of the cost of certain
expenses that the government deems excessive.   Danny said even Gala had this issue with mobile
phones.

We have 2 concerns: one is that this tax should be avoidable by Summit's putting expenses through the
US instead of Israel; the second concern is that we're actually spending too much in Israel on
unnecessary luxuries, and getting taxed inordinately because of that.

Does this help?  If not, I'll ask the US controller to give us a clearer description.  Please let me know.
Thank you.

Charlie

Charles C. Hale
DivestCap Management Corp
Divestiture Growth Capital LLC
660 Madison Avenue, Floor 2E
New York, NY 10021
Mobile: 617 818 2222
NY Office: 212 651 9023
eFax: 702 977 3355
charles@divestcap.com

**Visit DivestCap at:**
**www.divestcap.com**

*Growing Technology Divestitures with Knowledge & Capital*

2

-----Original Message-----
From: Shlomo Melchor [mailto:shlomo@galainv.com]
Sent: Sunday, October 12, 2003 3:41 AM
To: charles@divestcap.com
Subject: RE: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc

Hi Charlie,
I have no problem getting into this issue but please clarify the term "Luxury Tax" we have no
luxury tax in Israel. ...
Shlomo

     -----Original Message-----
     From: charles@divestcap.com [mailto:charles@divestcap.com]
     Sent: Friday, October 10, 2003 8:05 PM
     To: daniel@cavallocapital.com; Shlomo Melchor
     Cc: Bruce Hill'
     Subject: F&A MEMO 8 OCT 03 - Governance Rules - For Paul.doc

     Bruce and I suspect Summit is trying to build walls between the Israeli Finance & Admin
     and the company's US VP of Finance (who is our appointment). We don't know why but
     we don't like it. Our hypothesis is that Guy is trying to hide a few embarrassing /
     inexcusable issues. These could include (i) renewing long-term leases without telling us
     (a violation of our governance rules), and (ii) incurring a hefty luxury tax.

     Bruce and I submitted the attached rules to Guy with a warning about termination for
     cause if he violates board directives. Guy accepted those rules and, under our
     orders, sent them to the US finance staff.

     Shlomo - we would like you to visit the company to inquire about the leases and luxury
     tax. Would you be game for an investigation?

     Note: the company is doing well. It delivered a good Q3 (strong new license growth), and
     is back up to close to $1mm in cash. It is precisely because of the success, however,
     that we want to really clamp down on these issues and make sure that the company isn't
     wasting money in Israel, so we don't waste that cash.

     Charlie

3



| | Price | Shares | % |
|---|---|---|---|
| Guy (Preferred B) | $0.050 | 1,999,999 | 10.60% |
| 3 Lieutenants (Preferred B) | $0.050 | 1,500,000 | 7.50% |
| DivestCap (Common) | NA | 1,291,668 | 6.19% |
| Israel | $0.220 | 1,280,000 | 6.40% |
| Sales VPs | $0.220 | 660,000 | 2.75% |
| Current Sales | $0.220 | 425,000 | 2.13% |
| Allocated Offer | $0.220 | 30,000 | 0.15% |
| Unallocated | TBD (>=$0.50) | 300,000 | 1.60% |
| 3 Lieutenants | $0.500 | 150,000 | 0.76% |
| DivestCap | | 12,553,333 | 62.67% |

**Ownership Summary**

| | | |
|---|---|---|
| DivestCap | 13,785,001 | 68.8% |
| Management | 5,834,999 | 29.7% |
| Unallocated | 300,000 | 1.5% |

Invested Capital
Convertible Debt $31,200,000
Equity $0

# DIVESTCAP / SAGE DISCUSSION

DivestCap
Divestiture Growth Capital LLC

26-NOV-03

CONFIDENTIAL — NOT FOR REDISTRIBUTION

C O N F I D E N T I A L  –  N O T  F O R  R E D I S T R I B U T I O N

# DIVESTCAP & SAGE MANDATE

- Big picture: DivestCap wants see Sage to expand its business and do more transactions
  - Strong synergy (Proxim, TSYS, USRobotics, CMRC)
  - Shared values and culture

- DivestCap mandate: <u>tech buyouts</u>
  - Sometimes growers (Summit), sometimes not (FORTEL)
  - Always high margin of safety
  - We, along with GTG and PEH, are only players who have proven the ability to do these deals

28-NOV-03

DivestCap

PAGE 2

CONFIDENTIAL -- NOT FOR REDISTRIBUTION

# DIVESTCAP RATIONALE & VEHICLES

- We have a particular focus -- doing tech buyouts that make sense

  - This means buying cheap and avoiding competition whenever possible -- speed and flexibility rather than price = success

- DivestCap Rationale: value tech done any other way doesn't make money

  - 95% of tech divestitures have problems, otherwise they wouldn't be sold

  - In tech, most problems aren't fixable

- Preferred Transactions:

  - Non-core divestitures from public companies -- most of the time, this will be the situation that gets us the situational dynamic we require

DivestCap

C O N F I D E N T I A L  –  N O T  F O R  R E D I S T R I B U T I O N

# HOW DO WE WORK TOGETHER IN THE FUTURE?

- To work optimally, DivestCap needs a vertical domain where we are the focus for Sage's efforts

- Channel conflict hurts all
  - Confusing to deal intermediaries (Broadview)
  - Confusing to extensive DMC proactive sourcing
  - Creates perverse incentive not to share deals
  - Leads to wrong team executing on the right deal
  - Leads to both teams bidding competitively under same umbrella (which we will do with deals like ADP)

- We don't want to educate competitors, internal or external
  - Loosely tied internal competitors of today become the external competitors of tomorrow

- Without clear focus for each group, internal culture becomes closed and competitive rather than open and collaborative

DivestCap

C O N F I D E N T I A L -- N O T   F O R   R E D I S T R I B U T I O N

# HOW TO GROW SAGE'S TECH EFFORTS? - PROPOSAL

- DivestCap leads all tech divestitures
  - Narrowest version of our domain
  - Critical fit with our name, branding, and expertise

- Mechanics:
  - DivestCap has a ROFR over other groups on tech divestitures
    - In reality, if we maintain true to our focus, we will let other groups over-ride
  - We can help new funds that join Sage but we have to work out mechanics
    - Narrow situation and vertical funds make sense: eg distressed debt
    - Other funds have to expect to work under us when it's a tech divestiture and we expect to work under them in their domain, unless agreed otherwise
  - We can cede Telecom deals. We can also cede big market buyouts (over $15-20mm in equity)
    - Although ideally we will reach the stage where we can bring someone on to help with those -- we recognize this is not our focus right now and Sage may want to cover this market

- Longer term: if we're not generating the returns and confidence to justify this narrow focus, something much bigger is wrong

CONFIDENTIAL -- NOT FOR REDISTRIBUTION

# OTHER OPTION: NO VERTICAL DOMAINS & GROUPS COMPETE ON DEALS

Pros:

- More deal flow to Sage since groups with broad mandates will be incented to source more broadly

- Allows more a survival of the fittest

Cons:

- Worse execution -- wrong team executing on the right deal (already discussed) -- leads to worse deals -- sub-optimal price and terms

- DivestCap will compete head on with internal groups for deals in our space, just as we do with Gores and Platinum
  - Air war against them in front of intermediaries and targets
  - Standard bidding tactics to outmaneuver them
  - Mutual refusal to share data, deals, or pipelines (has already happened)

- If Sage is conflicted by supporting another internal group, DivestCap will be forced to outsiders for funding

28-NOV-03

DivestCap

PAGE 6

C O N F I D E N T I A L  –  N O T  F O R  R E D I S T R I B U T I O N

## VARIANT: NO VERTICAL DOMAINS & AI ALLOCATES WHO DOES WHAT

Pros

- Competition diminished by central allocation of deals

Cons

- Someone has to baby sit

- How do you allocate?
  – First to source? Unrealistic, particularly for auctions

- DivestCap will have difficult time living with allocation
  – Few deals have the right dynamic so we absolutely need to go after those that do
  – Dynamic generally can't be discovered until in process
    - All girls like to think of selves as beautiful – growth tech cover both real skill set and necessary to get in process
    - All deals require "work down"

25-NOV-03                    DivestCap                    PAGE 7

## divestcap

| | |
|---|---|
| **From:** | Bruce Hill [bruce@divestcap.com] |
| **Sent:** | Monday, January 26, 2004 2:22 PM |
| **To:** | 'Shlomo Meichor' |
| **Cc:** | Vigder, Avi; Sagi, Mor; Golan, Daniel |
| **Subject:** | Summit Stock Sale |

Shlomo,

As you may know, we are in process to sell approximately 30% of Summit Design to a Japanese purchaser, BSL Corporation. In order to make this happen, we need to take some steps fairly quickly to put ourselves in position to close this transaction as soon as possible -- certainly by February 4, 2004. We will not finalize any of these steps until immediately prior to the closing, but we need to take the preparatory steps now.

I have attached a short PowerPoint presentation which shows these steps in detail, but I have provided a short summary of the necessary actions below.

The key things we need you to do are:

1. Contribute the shares that Raz received in Summit in December 2002 to a Delaware limited partnership. Raz will receive in return a 10% limited partner interest in the LP. If you remember, this was originally done to give Raz a 10% indirect beneficial interest in an Israeli Approved Enterprise. I don't if this still has any value.
2. We need to get someone who is an authorized signer for Enright to sign an agreement to contribute the $308K convertible note from January 2003 to the same LP, in exchange for an 80% LP interest (reduced by whatever % Raz needs to get).
3. The same person needs to sign an limited partnership agreement which provides for the 80% interest.
4. If Raz still needs to have an interest, then he needs to sign the LP agreement too.

I know that I will need to get a draft of the contribution agreement and the LP agreement to you ASAP, which I will do.

Bruce

1

divestcap

| From: | charles@divestcap.com |
|---|---|
| Sent: | Wednesday, April 21, 2004 7:13 PM |
| To: | Vigder, Avi; Golan, Daniel |
| Cc: | 'Bruce Hill' |
| Subject: | RE: Summit Transaction and GP Ownership Distribution to Cavallo |

Danny -- any progress re the final gross & net profit reconciliation?

Avi -- thoughts re the below?

With thanks,
Charlie

-----Original Message-----
From: charles@divestcap.com [mailto:charles@divestcap.com]
Sent: Monday, April 19, 2004 9:34 PM
To: 'Vigder, Avi'; 'Golan, Daniel'
Cc: 'Bruce Hill'
Subject: RE: Summit Transaction and GP Ownership Distribution to Cavallo

Avi,

The team wants to sell all the stock they can at a $14mm valuation. I didn't think Guy would do this. You and Bruce were 100% right.

The attached spreadsheet allows one to model the cost of SDI Holdings LP buying any percent of their stock at any valuation (allowing you to play with the numbers if you like).

Bruce and I propose the following:

1. We let the team exercise its pro rata -- eg 28.99% of their holdings -- at a $14mm valuation. This means they sell us 1,014,646 shares at 70 cents ea., costing us $710,252 cumulatively. We could insist that they share transaction costs if we want, which would reduce the valuation somewhat. Since I don't have from you a calc of Gross versus Net proceeds, I haven't included these calcs.

2. We offer this deal on 1 condition; that failure to meet the Operating Targets of the 2004 Low Case budget trigger termination for cause, at our option, if we terminate. We propose this because it would let us terminate Guy for poor performance without having to pay severance. We'd hate to have this payout, have him miss Q2, and then have to pay him severance. The Operating Targets are Bookings, Revenue, EBITDA, and Cash generation. There is a prohibition against deal acceleration to make plan, but and we would strengthen that to guard against desperate measures to make plan.

Finally, before we consent to this proposal, Bruce and I would each like to know where we come out on the actual net proceeds prior to this transaction. We've been told the gross profits were approx $11.66mm and net profits $11.4mm? Is that correct? At those levels and with this performance condition, we'd feel good about this proposal. Are we giving the team too much or being too harsh?

Charlie

Red = input

**Data**

| | |
|---|---|
| Valuation - Sale to Team | $14,000,000 |
| Pdce Per Share | $9.70 |
| % Team Ownership | 17.500% |

1

| | | | |
|---|---|---|---|
| % SDI Sold In BSL Deal | | | 28.990% |

**Assumptions**

| | | | |
|---|---|---|---|
| % We Let Team Sell (% of their shares) | | | 28.990% |

| Team Member | Total Team Shares | Team Pro Rata Sale (Shares) | Proceeds to Team & Cost to Sage |
|---|---|---|---|
| Guy | 1,999,999 | 579,798 | $405,858 |
| Other | 1,500,000 | 434,848 | $304,394 |
| TOTAL | | | $710,252 |

| | | | |
|---|---|---|---|
| Nominal Sale Price, Inclusive of BSL Gain | | | $9,000,000 |
| Percent of Price | | | 7.9% |
| Estimated Actual Net Proceeds, Inclusive of BSL Gain | | | $11,400,000 |
| Percent of Price | | | 6.2% |

Charles C. Hale
DivestCap Management Corp
660 Madison Avenue, Floor 23
New York, NY 10021
Mobile: 617 818 2222
NY Office: 212 651 9023
charles@divestcap.com

**Visit DivestCap at:**
www.divestcap.com

*Growing Technology Divestitures with Knowledge & Capital*

-----Original Message-----
**From:** Vigder, Avi [mailto:Avi@sagecap.com]
**Sent:** Monday, April 19, 2004 1:55 AM
**To:** charles@divestcap.com; Golan, Daniel
**Cc:** Bruce Hill
**Subject:** RE: Summit Transaction and GP Ownership Distribution to Cavallo

i would like to do the final reconciliation once we have decided how much and what price are we buying stock from the employees. i am in tokyo this week but lets talk and decide what to do with them. i'll call you on monday.

-----Original Message-----
**From:** charles@divestcap.com [mailto:charles@divestcap.com]
**Sent:** Mon 4/19/2004 12:13 AM
**To:** Golan, Daniel
**Cc:** Vigder, Avi; 'Bruce Hill'
**Subject:** RE: Summit Transaction and GP Ownership Distribution to Cavallo

Can I get a commitment to get this reconciliation done early this week?

With thanks,
C

2

-----Original Message-----
From: Golan, Daniel [mailto:Daniel@sagecap.com]
Sent: Friday, April 16, 2004 8:43 AM
To: charles@divestcap.com
Subject: RE: Summit Transaction and GP Ownership Distribution to Cavallo

Got it

---

From: charles@divestcap.com [mailto:charles@divestcap.com]
Sent: Thursday, April 15, 2004 5:50 PM
To: Golan, Daniel
Cc: Vigder, Avi; bruce@divestcap.com
Subject: Summit Transaction and GP Ownership Distribution to Cavallo

Danny,

To finish on the Summit / BSL deal, we need to take care of some housekeeping, and wish to tackle this in the next week so we can actually pay ourselves.

Avi proposed:

    a.  Avi gets 35% of the Management Co carried interest (called LMC l)
    b.  Carried interest is increased 5% in 25% once the IRR exceeds 25% in the investment
    c.  LMC portion is calculated on the total return from the transaction of $11.85 million
    d.  CCH and SGH effective portion is 65% of 25% for subsequent returns (16.25%)
    e.  SightLine has another 5% carried interest increase to 30% once the IRR exceeds 100%.

Fine. To execute on this structure, we believe you need to:

    1.  Wire more money into SDI Holdings LP to make the management company's carried interest align with the above formula.

        a.  Assuming gross profits were $[11.85]mm and net profits $[11.4]mm, the carry calc at the above formula comes to $[2,808,958].
        b.  SDI Holdings LP currently has $1,782,209.87. Therefore, you would need to wire in an additional $1,026,748.13. We made the initial distribution out of SDI Holdings as debt, so this transaction should be no problem
        c.  Our deal expenses were (i) legal if $19,822.98 (for the SPA work and legal / tax for SDI entity formation), and (ii) $4,485 for the 2 day turnaround on the EastPoint design and website. We had given an estimate of $25,000 between these two items, and, as you can see, ended up almost right on that. Assuming you baked our $25K into the gross, you would have to send additional money for this full amount: $24,307.

    2.  SDI Holdings distributes the carried interest of $[2,808,958] in relationship to the 65%-35% split of profits. Therefore, approx. $983,135 gets wired out to Cavallo by us with the following adjustments

        a.  Management company expenses were minimal but would need to be deducted prior to the 65-35% split. We can discuss them item by item and you can approve them if you like. The only major one was a CEO headhunter fee Summit will reimburse the management company for,